IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BOSTON SCIENTIFIC CORPORATION and
BOSTON SCIENTIFIC SCIMED, INC.,

        Plaintiffs,

        v.

JOHNSON & JOHNSON, INC. and
CORDIS CORPORATION,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 07-

**JURY TRIAL DEMANDED**

## COMPLAINT FOR DECLARATORY JUDGMENT
## OF PATENT INVALIDITY AND NONINFRINGEMENT

Plaintiffs Boston Scientific Corporation and Boston Scientific Scimed, Inc. (collectively "BSC"), through their attorneys, bring this complaint against Defendants Johnson & Johnson, Inc. and Cordis Corporation (collectively "J&J") and requests a jury trial on all issues so triable. BSC alleges as follows, upon knowledge with respect to itself and its own acts, and upon information and belief as to the circumstances and facts of others:

### NATURE OF THE ACTION

1.      This is an action for a declaratory judgment that United States Patent No. 7,223,286 entitled "Local Delivery of Rapamycin for Treatment of Proliferative Sequelae Associated With PTCA Procedures, Including Delivery Using a Modified Stent" ("the Wright '286 patent") is invalid and not infringed by BSC. The Wright '286 patent is attached as Exhibit A.

## THE PARTIES

2.      Plaintiff Boston Scientific Corporation is a corporation organized under the laws of the State of Delaware, having its principal place of business at One Boston Scientific Place, Natick, Massachusetts 01760.

3.      Plaintiff Boston Scientific Scimed, Inc. is a corporation organized under the laws of the State of Minnesota, having its principle place of business at One Scimed Place, Maple Grove, MN 55311-1566.

4.      Upon information and belief, Defendant Johnson & Johnson, Inc. is a corporation organized under the laws of the State of New Jersey and has a principal place of business at 1 Johnson and Johnson Plaza, New Brunswick, New Jersey.

5.      Upon information and belief, Defendant Cordis Corporation ("Cordis") is a corporation organized under the laws of the State of Florida and has a principal place of business in Miami Lakes, Florida.  Cordis is a subsidiary of Johnson & Johnson, Inc.

## JURISDICTION AND VENUE

6.      This action arises under the Patent Laws of the United States (35 U.S.C. § 1, *et seq.*).

7.      This Court has jurisdiction over the subject matter of all causes of action herein pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201 and 2202.

8.      On information and belief, J&J has systematic and continuous contacts in this judicial district.

9.      On information and belief, J&J regularly avails itself of the benefits of this judicial district, including the jurisdiction of the courts.

10.    On information and belief, J&J regularly transacts business within this judicial district.

11.    On information and belief, J&J regularly sells products in this judicial district. J&J derives substantial revenues from sales in this district.

12.    This Court has personal jurisdiction, general and specific, over J&J.

13.    Venue in this judicial district is proper pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(b).

## BACKGROUND

14.    BSC is a world renowned leader in the development of intravascular stents used to treat coronary artery disease.

15.    J&J and, in particular, Cordis, directly compete with BSC in the field of intravascular stents used to treat coronary artery disease.

16.    J&J has a well-known history of suing competitors, including BSC, in the field of intravascular stents for patent infringement.  Within the past several years, J&J and/or Cordis have sued BSC in this Court, alleging patent infringement in cases involving intravascular stents used to treat coronary artery disease.  BSC has also brought suits for patent infringement against J&J within this judicial district.

17.    Pursuant to an agreement between BSC and Abbott Laboratories ("Abbott"), BSC is presently selling the PROMUS™ Everolimus-Eluting Coronary Stent System ("PROMUS") in Europe and other countries outside the United States.  The PROMUS stent is a private-labeled XienceV™ Everolimus-Eluting Coronary Stent System ("XIENCE V") which is manufactured for BSC by Abbott in the United States.  The PROMUS stent is an intravascular stent used to

3

treat coronary artery disease.  It advantageously releases a drug designed to diminish reblocking (restenosis) of the patient's blood vessel into which the stent has been inserted.

18.    The PROMUS stent received CE Mark approval in October 2006, which allows BSC to distribute PROMUS in 27 countries of the European Economic Area.  Since that time, BSC has been taking title to the PROMUS stent from Abbott in the United States and then exporting those stents to the European market.  BSC intends to begin selling its PROMUS stent in the United States in 2008.

19.    In 2006, BSC purchased Guidant Corporation ("Guidant").  As part of the agreement governing the Guidant acquisition, Guidant separately sold the rights to its everolimus-eluting stent product to Abbott.  BSC separately entered into an agreement with Abbott that permits BSC to sell (under the designation "PROMUS") the everolimus-eluting stents manufactured by Abbott (which Abbott sells on its own as its "XIENCE V" stent).

20.    Abbott currently manufactures and sells its own everolimus-eluting stent, the XIENCE V stent, which is the same product as BSC's PROMUS stent, and BSC has made a substantial investment in the PROMUS stent.

21.    On May 29, 2007, Cordis Corporation filed a patent infringement suit against Abbott in the United States District Court for the District of New Jersey.  *See* Exhibit B, the Complaint.  Cordis alleges in its May 29 Complaint that Abbott's manufacture and/or use of the XIENCE V stent in the Unites States infringes the Wright '286 patent.  *Id.*, pp. 3-4.  Among other remedies, Cordis seeks a preliminary and permanent injunction prohibiting Abbott from making, using, selling, or offering for sale the XIENCE V stent in the United States.  *Id.*, p. 4.

22.    Cordis' patent infringement suit, as referenced in paragraph 21, has created a present substantial controversy between J&J and BSC concerning the PROMUS stent.  J&J,

4

through Cordis, has asserted rights under the Wright '286 patent against the same product as the PROMUS stent, and the alleged infringement of that patent has created an apprehension that Cordis will sue BSC for alleged infringement of the Wright '286 patent..

## RELATED CASES PENDING IN THE DISTRICT OF DELAWARE

23.     There are now four cases pending in the District of Delaware that are related to the instant case, as set forth in the below paragraphs.

24.     On May 15, 2007, Abbott filed a declaratory judgment action against Cordis in the United States District Court for the District of Delaware relating to U.S. Patent No. 7,217,286 (the "Falotico '286 patent"). *See* Exhibit C, the complaint in Civil Action No. 07-259-SLR. Abbott alleges in its May 15 Complaint that the Falotico '286 patent is invalid and not infringed by Abbott's manufacture and/or use of the XIENCE V stent in the Unites States. *Id.*, p. 17. Abbott's declaratory judgment action against the Falotico '286 patent, which is currently pending in this judicial district, is the first filed action concerning the Falotico '286 patent.

25.     On May 25, 2007, BSC also filed a declaratory judgment action against Cordis in the United States District Court for the District of Delaware relating to the Falotico '286 patent. *See* Exhibit D, the complaint in Civil Action No. 07-333-UNA.  BSC asserts in that May 25 Complaint that the Falotico '286 patent is invalid and not infringed by BSC's above activities regarding the PROMUS stent.  The instant action by BSC against J&J is related to Abbott's May 15 complaint and BSC's May 25 complaint on the Falotico '286 patent, in terms of the relationship between the Falotico '286 patent and the Wright '286 patents at issue (they arose from the same family), the prior art to those patents, and the nature of the products of the declaratory judgment defendants, XIENCE V (Abbott) and PROMUS (BSC).

5

26.    Abbott previously filed, on September 29, 2006, in this Court, a declaratory

judgment action against J&J, alleging that other Cordis-owned patents – U.S. Patent Nos.

6,585,764, 6,776,796, and 6,808,536 – are invalid and not infringed by Abbott's manufacture

and/or use of the XIENCE V stent in the Unites States. *See* Exhibit E, the complaint in Civil

Action No. 06-613-SLR. The instant action is related to Abbott's September 29 action because

the '764 and '536 patents are part of the same patent family as the Wright '286 patent and the

Falotico '286 patent, the prior art to each of those patents is related, and the products at issue in

the September 29 action (Abbott's XIENCE V) and this action (BSC's PROMUS) are related.

Abbott has also recently filed a motion to amend its Complaint in the September 29 action to

include the Falotico '286 patent or, in the alternative, consolidate its September 29 and May

15 actions.

27.    On May 29, 2007, Abbott filed a Motion for Leave to File a Supplemental

Complaint in Civil Action No. 07-259-SLR pending before the United States District Court for

the District of Delaware. *See* Exhibit F, Abbott's Motion for Leave to Supplement. Abbott's

motion requests leave to file a supplemental complaint to add a claim for declaratory judgment

of invalidity and noninfringement of the Wright '286 patent. The instant action by BSC against

J&J is related to Abbott's May 29 motion in terms of the Wright '286 patent at issue, the prior art

to that patent, and the nature of the products of the declaratory judgment defendants, XIENCE V

(Abbott) and PROMUS (BSC).

## COUNT I

### INVALIDITY AND NONINFRINGEMENT OF U.S. PATENT NO. 7,223,286

28.    BSC repeats and realleges each and every allegation contained in paragraphs 1-27

of this Complaint as though fully set forth herein.

6

29.    Each of the claims in the Wright '286 patent is invalid for failure to comply with one or more of the requirements of Title 35, United States Code, including, but not limited to, 35 U.S.C. §§ 102, 103 and 112.

30.    The PROMUS stent does not infringe any valid claim of the Wright '286 patent.

**PRAYER FOR RELIEF**

WHEREFORE, BSC prays that this Court enter judgment as follows, ordering that:

(a)    Each and every claim of U.S. Patent No. 7,223,286 is invalid;

(b)    Plaintiffs are not liable for directly, contributorily or inducing infringement of any claim of U.S. Patent No. 7,223,286;

(c)    Defendants and their officers, agents, employees, representatives, counsel and all persons in active concert or participation with any of them, directly or indirectly, be enjoined from threatening or charging infringement of, or instituting any action for infringement of U.S. Patent No. 7,223,286 against Plaintiffs, its suppliers, customers, distributors or users of its products;

(d)    Defendants pay to Plaintiffs the costs and reasonable attorney's fees incurred by Plaintiffs in this action; and

(e)    Plaintiffs be granted such other and further relief as this Court deems just and proper.

DB02:6016781.1                                                                                    900002.0003

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

YOUNG CONAWAY STARGATT &
   TAYLOR, LLP

*Karen E. Keller*

Josy W. Ingersoll (#1088)
Karen E. Keller (#4489)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
jingersoll@ycst.com
kkeller@ycst.com
(302) 571-6554

*Attorneys for Plaintiffs*
*Boston Scientific Corporation and*
*Boston Scientific Scimed, Inc.*

*Of Counsel:*

Richard L. Delucia
Paul M. Richter
Michael K. Levy
Jerry Canada
KENYON & KENYON LLP
One Broadway
New York, NY 10004
(212) 425-7200

Dated: June 1, 2007

DB02:6016781.1
900002.0003

# EXHIBIT A

US007223286B2

(12) **United States Patent**
Wright et al.

(10) Patent No.: **US 7,223,286 B2**
(45) Date of Patent: **\*May 29, 2007**

(54) **LOCAL DELIVERY OF RAPAMYCIN FOR TREATMENT OF PROLIFERATIVE SEQUELAE ASSOCIATED WITH PTCA PROCEDURES, INCLUDING DELIVERY USING A MODIFIED STENT**

(75) Inventors: **Carol Wright**, Somerset, NJ (US); **Gerard H. Llanos**, Stewartsville, NJ (US); **Ronald Rakos**, Neshanic Station, NJ (US); **Kristin King**, Mahwah, NJ (US); **Robert Falotico**, Bell Mead, NJ (US)

(73) Assignee: **Cordis Corporation**, Miami Lakes, FL (US)

( \* ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 265 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/951,385**

(22) Filed: **Sep. 28, 2004**

(65) **Prior Publication Data**

US 2005/0085902 A1      Apr. 21, 2005

**Related U.S. Application Data**

(63) Continuation of application No. 10/408,328, filed on Apr. 7, 2003, now Pat. No. 6,808,536, which is a continuation of application No. 09/874,117, filed on Jun. 4, 2001, now Pat. No. 6,585,764, which is a continuation of application No. 09/061,568, filed on Apr. 16, 1998, now Pat. No. 6,273,913.

(60) Provisional application No. 60/044,692, filed on Apr. 18, 1997.

(51) **Int. Cl.**
*A61F 2/06*          (2006.01)

(52) **U.S. Cl.** .................................................... **623/1.42**

(58) Field of Classification Search ...... 623/1.42–1.48; 427/2.1–2.31
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 861,659 A | 7/1907 | Johnston | 464/147 |
| 3,051,677 A | 8/1962 | Rexford | 522/156 |
| 3,279,996 A | 10/1966 | Long et al. | 424/424 |
| 3,526,005 A | 9/1970 | Bokros | 623/11.11 |
| 3,599,641 A | 8/1971 | Sheridan | 604/256 |
| 3,657,744 A | 4/1972 | Ersek | 128/898 |

(Continued)

FOREIGN PATENT DOCUMENTS

DE          3205942 A1      9/1983

(Continued)

OTHER PUBLICATIONS

U.S. Appl. No. 07/819,314, filed Jan. 9, 1992, Morris.

(Continued)

*Primary Examiner*—Suzette Gherbi
(74) *Attorney, Agent, or Firm*—Woodcock Washburn LLP

(57) **ABSTRACT**

Methods of preparing intravascular stents with a polymeric coating containing macrocyclic lactone (such as rapamycin or its analogs), stents and stent graphs with such coatings, and methods of treating a coronary artery with such devices. The macrocyclic lactone-based polymeric coating facilitates the performance of such devices in inhibiting restenosis.

**77 Claims, 2 Drawing Sheets**



US 7,223,286 B2

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,744,596 A | 7/1973 | Sander | 188/203 |
| 3,779,805 A | 12/1973 | Alsberg | 427/105 |
| 3,929,992 A | 12/1975 | Sehgal et al. | 424/122 |
| 3,932,627 A | 1/1976 | Margraf | 514/56 |
| 3,948,254 A | 4/1976 | Zaffaroni | 128/833 |
| 3,952,334 A | 4/1976 | Bokros et al. | 623/1.11 |
| 3,968,800 A | 7/1976 | Vilasi | 606/198 |
| 4,069,307 A | 1/1978 | Higuchi et al. | 424/432 |
| 4,076,285 A | 2/1978 | Martinez | 285/332 |
| 4,292,965 A | 10/1981 | Nash et al. | 128/833 |
| 4,299,226 A | 11/1981 | Banka | 604/509 |
| 4,300,244 A | 11/1981 | Bokros | 623/1.13 |
| 4,312,920 A | 1/1982 | Pierce et al. | 428/425.5 |
| 4,321,711 A | 3/1982 | Mano | 623/1.43 |
| 4,323,071 A | 4/1982 | Simpson et al. | 606/194 |
| 4,390,599 A | 6/1983 | Broyles | 428/597 |
| 4,413,359 A | 11/1983 | Akiyama et al. | 623/23.72 |
| 4,423,183 A | 12/1983 | Close | 524/546 |
| 4,441,216 A | 4/1984 | Ionescu et al. | 623/2.19 |
| 4,503,569 A | 3/1985 | Dotter | 623/1.19 |
| 4,512,338 A | 4/1985 | Balko et al. | 606/108 |
| 4,550,447 A | 11/1985 | Seiler, Jr. et al. | 623/1.32 |
| 4,553,545 A | 11/1985 | Maass et al. | 606/198 |
| 4,560,374 A | 12/1985 | Hammerslag | 604/509 |
| 4,562,596 A | 1/1986 | Kornberg | 623/1.32 |
| 4,565,740 A | 1/1986 | Golander et al. | 428/409 |
| 4,580,568 A | 4/1986 | Gianturco | 606/198 |
| 4,613,665 A | 9/1986 | Larm | 536/20 |
| 4,642,111 A | 2/1987 | Sakamoto et al. | 424/492 |
| 4,655,771 A | 4/1987 | Wallsten | 623/1.22 |
| 4,656,083 A | 4/1987 | Hoffman et al. | 442/123 |
| 4,676,241 A | 6/1987 | Webb et al. | 128/207.14 |
| 4,678,466 A | 7/1987 | Rosenwald | 424/427 |
| 4,687,482 A | 8/1987 | Hanson | 623/1.49 |
| 4,689,046 A | 8/1987 | Bokros | 623/2.19 |
| 4,731,054 A | 3/1988 | Billeter et al. | 604/93.01 |
| 4,733,665 A | 3/1988 | Palmaz | 606/108 |
| 4,739,762 A | 4/1988 | Palmaz | 623/1.11 |
| 4,740,207 A | 4/1988 | Kreamer | 623/1.15 |
| 4,749,585 A | 6/1988 | Greco et al. | 428/422 |
| 4,753,652 A | 6/1988 | Langer et al. | 623/1.42 |
| 4,760,849 A | 8/1988 | Kropf | 606/191 |
| 4,768,507 A | 9/1988 | Fischell et al. | 623/1.11 |
| 4,776,337 A | 10/1988 | Palmaz | 623/1.11 |
| 4,786,500 A | 11/1988 | Wong | 424/422 |
| 4,787,899 A | 11/1988 | Lazarus | 623/1.11 |
| 4,800,882 A | 1/1989 | Gianturco | 606/194 |
| 4,810,784 A | 3/1989 | Larm | 536/20 |
| 4,856,516 A | 8/1989 | Hillstead | 606/194 |
| 4,871,357 A | 10/1989 | Hsu et al. | 604/266 |
| 4,872,867 A | 10/1989 | Joh | 604/269 |
| 4,876,109 A | 10/1989 | Mayer et al. | 604/269 |
| 4,886,062 A | 12/1989 | Wiktor | 606/194 |
| 4,907,336 A | 3/1990 | Gianturco | 29/515 |
| 4,916,193 A | 4/1990 | Tang et al. | 525/413 |
| 4,954,126 A | 9/1990 | Wallsten | 600/36 |
| 4,969,458 A | 11/1990 | Wiktor | 623/1.11 |
| 4,990,131 A | 2/1991 | Dardik et al. | 600/36 |
| 4,990,155 A | 2/1991 | Wilkoff | 606/191 |
| 4,994,071 A | 2/1991 | MacGregor | 606/194 |
| 4,994,298 A | 2/1991 | Yasuda | 427/490 |
| 4,998,923 A | 3/1991 | Samson et al. | 606/194 |
| 5,015,253 A | 5/1991 | MacGregor | 623/1.15 |
| 5,019,090 A | 5/1991 | Pinchuk | 623/1.15 |
| 5,019,096 A | 5/1991 | Fox, Jr. et al. | 600/36 |
| 5,029,877 A | 7/1991 | Fedeli | 277/354 |
| 5,034,265 A | 7/1991 | Hoffman et al. | 442/126 |
| 5,035,706 A | 7/1991 | Giantureo et al. | 606/198 |
| 5,041,100 A | 8/1991 | Rowland et al. | 604/265 |
| 5,041,126 A | 8/1991 | Gianturco | 623/1.15 |
| 5,047,020 A | 9/1991 | Hsu | 604/266 |
| 5,049,132 A | 9/1991 | Shaffer et al. | 604/101.02 |
| 5,049,403 A | 9/1991 | Larm et al. | 427/2.1 |
| 5,053,048 A | 10/1991 | Pinchuk | 623/1.43 |
| 5,059,166 A | 10/1991 | Fischell et al. | 600/3 |
| 5,061,275 A | 10/1991 | Wallsten et al. | 623/1.22 |
| 5,061,750 A | 10/1991 | Feijen et al. | 525/54.1 |
| 5,064,435 A | 11/1991 | Porter | 623/23.7 |
| 5,092,877 A | 3/1992 | Pinchuk | 128/898 |
| 5,102,417 A | 4/1992 | Palmaz | 606/195 |
| 5,104,404 A | 4/1992 | Wolff | 623/1.16 |
| 5,116,365 A | 5/1992 | Hillstead | 623/1.15 |
| 5,122,154 A | 6/1992 | Rhodes | 623/1.13 |
| 5,131,908 A | 7/1992 | Dardik et al. | 600/36 |
| 5,133,732 A | 7/1992 | Wiktor | 623/1.22 |
| 5,134,192 A | 7/1992 | Feijen et al. | 525/54.1 |
| 5,135,536 A | 8/1992 | Hillstead | 606/195 |
| 5,163,952 A | 11/1992 | Froix | 623/1.18 |
| 5,163,958 A | 11/1992 | Pinchuk | 623/23.49 |
| 5,171,217 A | 12/1992 | March et al. | 604/507 |
| 5,171,262 A | 12/1992 | MacGregor | 623/1.15 |
| 5,176,660 A | 1/1993 | Truckai | 604/527 |
| 5,176,972 A | 1/1993 | Bloom et al. | 430/14 |
| 5,178,618 A | 1/1993 | Kandarpa | 606/28 |
| 5,180,366 A | 1/1993 | Woods | 604/96.01 |
| 5,182,317 A | 1/1993 | Winters et al. | 523/112 |
| 5,185,408 A | 2/1993 | Tang et al. | 525/415 |
| 5,192,307 A | 3/1993 | Wall | 623/1.2 |
| 5,195,984 A | 3/1993 | Schatz | 623/1.2 |
| 5,213,576 A | 5/1993 | Abiuso et al. | 604/103.01 |
| 5,213,898 A | 5/1993 | Larm et al. | 428/422 |
| 5,217,483 A | 6/1993 | Tower | 623/1.15 |
| 5,222,971 A | 6/1993 | Willard et al. | 606/198 |
| 5,226,913 A | 7/1993 | Pinchuk | 140/71 R |
| 5,234,456 A | 8/1993 | Silvestrini | 623/1.2 |
| 5,246,445 A | 9/1993 | Yachia et al. | 623/1.2 |
| 5,258,020 A | 11/1993 | Froix | 128/898 |
| 5,258,021 A | 11/1993 | Duran | 623/2.3 |
| 5,262,451 A | 11/1993 | Winters et al. | 523/112 |
| 5,266,073 A | 11/1993 | Wall | 623/1.2 |
| 5,272,012 A | 12/1993 | Opolski | 428/423.1 |
| 5,273,665 A | 1/1994 | Palmaz | 606/108 |
| 5,275,622 A | 1/1994 | Lazarus et al. | 623/1.11 |
| 5,282,823 A | 2/1994 | Schwartz et al. | 623/1.22 |
| 5,282,824 A | 2/1994 | Gianturco | 623/1.13 |
| 5,283,257 A | 2/1994 | Gregory et al. | 514/458 |
| 5,288,711 A | 2/1994 | Mitchell et al. | 424/122 |
| 5,290,305 A | 3/1994 | Inoue | 623/1.2 |
| 5,292,331 A | 3/1994 | Boneau | 623/1.16 |
| 5,292,802 A | 3/1994 | Rhee et al. | 525/54.1 |
| 5,304,121 A | 4/1994 | Sahatjian | 604/509 |
| 5,304,200 A | 4/1994 | Spaulding | 623/1.16 |
| 5,306,250 A | 4/1994 | March et al. | 604/104 |
| 5,308,862 A | 5/1994 | Ohlstein | 514/411 |
| 5,308,889 A | 5/1994 | Rhee et al. | 523/113 |
| 5,314,444 A | 5/1994 | Gianturco | 606/195 |
| 5,314,472 A | 5/1994 | Fontaine | 623/1.22 |
| 5,328,471 A | 7/1994 | Slepian | 604/101.03 |
| 5,334,301 A | 8/1994 | Heinke et al. | 204/267 |
| 5,336,518 A | 8/1994 | Narayanan et al. | 427/470 |
| 5,338,770 A | 8/1994 | Winters et al. | 523/112 |
| 5,342,348 A | 8/1994 | Kaplan | 604/891.1 |
| 5,342,387 A | 8/1994 | Summers | 606/198 |
| 5,342,621 A | 8/1994 | Eury | 606/198 |
| 5,354,257 A | 10/1994 | Roubin et al. | 600/7 |
| 5,354,308 A | 10/1994 | Simon et al. | 623/1.15 |
| 5,356,433 A | 10/1994 | Rowland et al. | 424/422 |
| 5,366,504 A | 11/1994 | Andersen et al. | 623/1.5 |
| 5,368,566 A | 11/1994 | Crocker | 604/101.02 |
| 5,370,683 A | 12/1994 | Fontaine | 623/1.22 |
| 5,370,691 A | 12/1994 | Samson | 623/1.2 |
| 5,375,612 A | 12/1994 | Cottenceau et al. | 128/899 |
| 5,376,112 A | 12/1994 | Duran | 623/1.26 |
| 5,378,475 A | 1/1995 | Smith et al. | 424/473 |

US 7,223,286 B2
Page 3

| | | | |
|---|---|---|---|
| 5,380,299 A | 1/1995 | Fearnot et al. | 604/265 |
| 5,382,261 A | 1/1995 | Palmaz | 606/158 |
| 5,383,853 A | 1/1995 | Jung et al. | 604/103.04 |
| 5,383,928 A | 1/1995 | Scott et al. | 623/1.12 |
| 5,387,235 A | 2/1995 | Chuter | 623/1.11 |
| 5,389,106 A | 2/1995 | Tower | 623/1.15 |
| 5,393,772 A | 2/1995 | Yue et al. | 514/410 |
| 5,395,390 A | 3/1995 | Simon et al. | 623/1.18 |
| 5,397,355 A | 3/1995 | Marin et al. | 623/1.2 |
| 5,399,352 A | 3/1995 | Hanson | 424/423 |
| 5,403,341 A | 4/1995 | Solar | 606/198 |
| 5,405,377 A | 4/1995 | Cragg | 623/1.2 |
| 5,409,696 A | 4/1995 | Narayanan et al. | 424/78.17 |
| 5,411,549 A | 5/1995 | Peters | 623/1.15 |
| 5,415,619 A | 5/1995 | Lee et al. | 600/36 |
| 5,417,969 A | 5/1995 | Hsu et al. | 424/78.27 |
| 5,419,760 A | 5/1995 | Narciso, Jr. | 604/8 |
| D359,802 S | 6/1995 | Fontaine | D24/155 |
| 5,421,955 A | 6/1995 | Lau et al. | 216/48 |
| 5,423,885 A | 6/1995 | Williams | 623/1.17 |
| 5,429,618 A | 7/1995 | Keogh | 604/266 |
| 5,429,634 A | 7/1995 | Narciso, Jr. | 604/890.1 |
| 5,439,446 A | 8/1995 | Barry | 604/103.01 |
| 5,441,515 A | 8/1995 | Khosravi et al. | 606/194 |
| 5,441,516 A | 8/1995 | Wang et al. | 606/198 |
| 5,441,947 A | 8/1995 | Dodge et al. | 514/179 |
| 5,443,458 A | 8/1995 | Eury | 604/891.1 |
| 5,443,477 A | 8/1995 | Marin et al. | 606/198 |
| 5,443,496 A | 8/1995 | Schwartz et al. | 623/1.16 |
| 5,443,498 A | 8/1995 | Fontaine | 623/1.17 |
| 5,443,500 A | 8/1995 | Sigwart | 623/1.17 |
| 5,447,724 A | 9/1995 | Helmus et al. | 424/426 |
| 5,449,372 A | 9/1995 | Schmaltz et al. | 606/198 |
| 5,449,373 A | 9/1995 | Pinchasik et al. | 606/198 |
| 5,449,382 A | 9/1995 | Dayton | 623/1.15 |
| 5,464,450 A | 11/1995 | Buscemi et al. | 632/1.2 |
| 5,464,540 A | 11/1995 | Friesen et al. | 210/640 |
| 5,464,650 A | 11/1995 | Berg et al. | 427/2.3 |
| 5,474,563 A | 12/1995 | Myler et al. | 606/108 |
| 5,486,357 A | 1/1996 | Narayanan | 424/78.17 |
| 5,496,365 A | 3/1996 | Sgro | 623/1.2 |
| 5,500,013 A | 3/1996 | Buscemi et al. | 623/1.22 |
| 5,510,077 A | 4/1996 | Dinh et al. | 264/485 |
| 5,512,055 A | 4/1996 | Domb et al. | 604/265 |
| 5,516,781 A | 5/1996 | Morris et al. | 514/291 |
| 5,519,042 A | 5/1996 | Morris et al. | 514/378 |
| 5,523,092 A | 6/1996 | Hanson et al. | 424/423 |
| 5,527,354 A | 6/1996 | Fontaine et al. | 623/1.17 |
| 5,545,208 A | 8/1996 | Wolff et al. | 623/1.22 |
| 5,551,954 A | 9/1996 | Buscemi et al. | 623/1.15 |
| 5,554,182 A | 9/1996 | Dinh et al. | 600/36 |
| 5,554,954 A | 9/1996 | Takahashi | 327/546 |
| 5,556,413 A | 9/1996 | Lam | 623/1.2 |
| 5,562,922 A | 10/1996 | Lambert | 424/486 |
| 5,563,146 A | 10/1996 | Morris | 514/291 |
| 5,569,197 A | 10/1996 | Helmus | 604/102.02 |
| 5,569,295 A | 10/1996 | Lam | 606/198 |
| 5,569,462 A | 10/1996 | Martinson et al. | 424/423 |
| 5,569,463 A | 10/1996 | Helmus et al. | 424/426 |
| 5,571,089 A | 11/1996 | Crocker | |
| 5,571,166 A | 11/1996 | Dinh et al. | 128/898 |
| 5,574,059 A | 11/1996 | Regunathan et al. | 514/397 |
| 5,575,818 A | 11/1996 | Pinchuk | 623/1.15 |
| 5,578,075 A | 11/1996 | Dayton | 623/1.15 |
| 5,580,873 A | 12/1996 | Bianco et al. | 514/263.36 |
| 5,580,874 A | 12/1996 | Bianco et al. | 514/263.36 |
| 5,591,140 A | 1/1997 | Narayanan et al. | 604/269 |
| 5,591,197 A | 1/1997 | Orth et al. | |
| 5,591,224 A | 1/1997 | Schwartz et al. | 623/1.22 |
| 5,591,227 A | 1/1997 | Dinh et al. | 623/1.22 |
| 5,599,352 A | 2/1997 | Dinh et al. | 128/898 |
| 5,603,722 A | 2/1997 | Phan et al. | 623/1.18 |
| 5,604,283 A | 2/1997 | Wada et al. | 524/236 |
| 5,605,696 A | 2/1997 | Eury et al. | 424/423 |
| 5,607,463 A | 3/1997 | Schwartz et al. | 623/1.44 |
| 5,607,475 A | 3/1997 | Cahalan et al. | 424/423 |
| 5,609,629 A | 3/1997 | Fearnot et al. | 623/1.42 |
| 5,616,608 A | 4/1997 | Kinsella et al. | 514/449 |
| 5,620,984 A | 4/1997 | Bianco et al. | 514/263.36 |
| 5,621,102 A | 4/1997 | Bianco et al. | 544/267 |
| 5,622,975 A | 4/1997 | Singh et al. | 514/324 |
| 5,624,411 A | 4/1997 | Tuch | 604/265 |
| 5,628,785 A | 5/1997 | Schwartz et al. | 128/898 |
| 5,629,077 A | 5/1997 | Turnlund et al. | 623/1.15 |
| 5,629,315 A | 5/1997 | Bianco et al. | 514/263.36 |
| 5,632,763 A | 5/1997 | Glastra | 623/1.15 |
| 5,632,771 A | 5/1997 | Boatman et al. | 623/1.15 |
| 5,632,776 A | 5/1997 | Kurumatani et al. | 424/423 |
| 5,632,840 A | 5/1997 | Campbell | 156/196 |
| 5,635,201 A | 6/1997 | Fabo | 424/443 |
| 5,637,113 A | 6/1997 | Tartaglia et al. | 623/1.42 |
| 5,643,312 A | 7/1997 | Fischell et al. | 623/1.15 |
| 5,643,939 A | 7/1997 | Ohlstein | 514/411 |
| 5,646,160 A | 7/1997 | Morris et al. | 514/291 |
| 5,648,357 A | 7/1997 | Bianco et al. | 514/263.36 |
| 5,649,952 A | 7/1997 | Lam | 623/1.15 |
| 5,649,977 A | 7/1997 | Campbell | 623/1.15 |
| 5,651,174 A | 7/1997 | Schwartz et al. | 29/527.2 |
| 5,652,243 A | 7/1997 | Bianco et al. | 514/263.36 |
| 5,653,747 A | 8/1997 | Dereume | 623/1.54 |
| 5,653,992 A | 8/1997 | Bezwada et al. | 424/426 |
| 5,662,609 A | 9/1997 | Slepian | 604/101.03 |
| 5,665,591 A * | 9/1997 | Sonenshein et al. | 435/375 |
| 5,665,728 A | 9/1997 | Morris et al. | 424/122 |
| 5,667,764 A | 9/1997 | Kopia et al. | 424/1.45 |
| 5,669,924 A | 9/1997 | Shaknovich | 623/1.11 |
| 5,670,506 A | 9/1997 | Leigh et al. | 514/141 |
| 5,672,638 A | 9/1997 | Verhoeven et al. | 523/112 |
| 5,674,242 A | 10/1997 | Phan et al. | 606/198 |
| 5,679,400 A | 10/1997 | Tuch | 427/2.14 |
| 5,679,659 A | 10/1997 | Verhoeven et al. | 514/56 |
| 5,684,061 A | 11/1997 | Ohnishi et al. | 523/114 |
| 5,691,311 A | 11/1997 | Maraganore et al. | 514/12 |
| 5,693,085 A | 12/1997 | Buirge et al. | 623/1.13 |
| 5,697,967 A | 12/1997 | Dinh et al. | 128/898 |
| 5,697,971 A | 12/1997 | Fischell et al. | 623/1.15 |
| 5,700,286 A | 12/1997 | Tartaglia et al. | 623/1.15 |
| 5,707,385 A | 1/1998 | Williams | 606/192 |
| 5,709,874 A | 1/1998 | Hanson et al. | 424/423 |
| 5,713,949 A | 2/1998 | Jayaraman | 623/1.12 |
| 5,716,981 A | 2/1998 | Hunter et al. | 514/449 |
| 5,725,549 A | 3/1998 | Lam | 623/1.15 |
| 5,725,567 A | 3/1998 | Wolff et al. | 623/1.42 |
| 5,728,150 A | 3/1998 | McDonald et al. | 623/1.15 |
| 5,728,420 A | 3/1998 | Keogh | 427/2.12 |
| 5,731,326 A | 3/1998 | Hart et al. | 514/323 |
| 5,733,327 A | 3/1998 | Igaki et al. | 623/1.5 |
| 5,733,920 A | 3/1998 | Mansuri et al. | 514/337 |
| 5,733,925 A | 3/1998 | Kunz et al. | 514/449 |
| 5,735,897 A | 4/1998 | Buirge | 623/1.15 |
| 5,739,138 A | 4/1998 | Bianco et al. | 514/263.36 |
| 5,755,734 A | 5/1998 | Richter et al. | 606/194 |
| 5,755,772 A | 5/1998 | Evans et al. | 128/898 |
| 5,759,205 A | 6/1998 | Valentini | 433/173 |
| 5,769,883 A | 6/1998 | Buscemi et al. | 623/1.42 |
| 5,776,184 A | 7/1998 | Tuch | 623/1.11 |
| 5,780,476 A | 7/1998 | Underiner et al. | 514/263.36 |
| 5,782,908 A | 7/1998 | Cahalan et al. | 623/1.13 |
| 5,788,979 A | 8/1998 | Alt et al. | 424/426 |
| 5,792,106 A | 8/1998 | Mische | 604/103.01 |
| 5,792,772 A | 8/1998 | Bianco et al. | 514/263.36 |
| 5,798,372 A | 8/1998 | Davies et al. | 514/356 |
| 5,799,384 A | 9/1998 | Schwartz et al. | 29/458 |
| 5,800,507 A | 9/1998 | Schwartz | 623/1.11 |
| 5,800,508 A | 9/1998 | Goicoechea et al. | 623/1.15 |
| 5,807,861 A | 9/1998 | Klein et al. | 514/263.35 |

US 7,223,286 B2
Page 4

| | | | | |
|---|---|---|---|---|
| 5,811,447 A | 9/1998 | Kunz et al. | 514/411 | |
| 5,820,917 A | 10/1998 | Tuch | 427/2.1 | |
| 5,820,918 A | 10/1998 | Ronan et al. | 427/2.1 | |
| 5,824,048 A | 10/1998 | Tuch | 128/898 | |
| 5,824,049 A | 10/1998 | Ragheb et al. | 623/1.44 | |
| 5,827,587 A | 10/1998 | Fukushi | 428/36.6 | |
| 5,833,651 A | 11/1998 | Donovan et al. | 604/509 | |
| 5,837,008 A | 11/1998 | Berg et al. | 427/2.21 | |
| 5,837,313 A | 11/1998 | Ding et al. | 427/2.21 | |
| 5,843,120 A | 12/1998 | Israel et al. | | |
| 5,843,166 A | 12/1998 | Lentz et al. | | |
| 5,843,172 A | 12/1998 | Yan | 623/1.42 | |
| 5,849,034 A | 12/1998 | Schwartz | 606/36 | |
| 5,851,217 A | 12/1998 | Wolff et al. | 606/191 | |
| 5,851,231 A | 12/1998 | Wolff et al. | 623/1.42 | |
| 5,858,990 A | 1/1999 | Walsh | 514/44 | |
| 5,861,027 A | 1/1999 | Trapp | 623/1.15 | |
| 5,865,814 A | 2/1999 | Tuch | 623/1.15 | |
| 5,871,535 A | 2/1999 | Wolff et al. | 128/898 | |
| 5,873,904 A | 2/1999 | Ragheb et al. | 623/1.13 | |
| 5,876,433 A | 3/1999 | Lunn | 623/1.15 | |
| 5,877,224 A | 3/1999 | Brocchini et al. | 514/772.2 | |
| 5,879,697 A | 3/1999 | Ding et al. | 424/422 | |
| 5,882,335 A | 3/1999 | Leone et al. | 604/103.02 | |
| 5,891,108 A | 4/1999 | Leone et al. | | |
| 5,893,840 A | 4/1999 | Hull et al. | 604/103.02 | |
| 5,897,911 A | 4/1999 | Loeffler | 427/2.25 | |
| 5,900,246 A | 5/1999 | Lambert | 424/429 | |
| 5,902,266 A | 5/1999 | Leone et al. | 604/509 | |
| 5,916,910 A | 6/1999 | Lai | 514/423 | |
| 5,922,393 A | 7/1999 | Jayaraman | 427/2.3 | |
| 5,932,243 A | 8/1999 | Fricker et al. | | |
| 5,932,299 A | 8/1999 | Katoot | 427/508 | |
| 5,932,580 A | 8/1999 | Levitzki et al. | 181/152 | |
| 5,951,586 A | 9/1999 | Berg et al. | 606/198 | |
| 5,957,971 A | 9/1999 | Schwartz | 623/1.15 | |
| 5,968,091 A | 10/1999 | Pinchuk et al. | 623/1.16 | |
| 5,972,027 A | 10/1999 | Johnson | | |
| 5,976,534 A | 11/1999 | Hart et al. | 424/145.1 | |
| 5,977,163 A | 11/1999 | Li et al. | 514/449 | |
| 5,980,553 A | 11/1999 | Gray et al. | 623/1.15 | |
| 5,980,566 A | 11/1999 | Alt et al. | 623/23.7 | |
| 5,980,972 A | 11/1999 | Ding | 427/2.24 | |
| 5,981,568 A | 11/1999 | Kunz et al. | 514/411 | |
| 5,985,307 A | 11/1999 | Hanson et al. | 424/423 | |
| 5,997,468 A | 12/1999 | Wolff et al. | 606/36 | |
| 6,004,346 A | 12/1999 | Wolff et al. | 623/23.71 | |
| 6,015,432 A | 1/2000 | Rakos et al. | 623/1.13 | |
| 6,039,721 A | 3/2000 | Johnson et al. | 604/508 | |
| 6,059,813 A | 5/2000 | Vrba et al. | 606/198 | |
| 6,071,305 A | 6/2000 | Brown et al. | 623/1.43 | |
| 6,074,659 A | 6/2000 | Kunz et al. | 424/423 | |
| 6,080,190 A | 6/2000 | Schwartz | 623/1.22 | |
| 6,096,070 A | 8/2000 | Ragheb et al. | 623/1.39 | |
| 6,120,536 A | 9/2000 | Ding et al. | 623/1.43 | |
| 6,120,847 A | 9/2000 | Yang et al. | | |
| 6,136,798 A | 10/2000 | Cody et al. | 514/141 | |
| 6,140,127 A | 10/2000 | Sprague | 435/395 | |
| 6,146,358 A | 11/2000 | Rowe | 604/103 | |
| 6,153,252 A | 11/2000 | Hossainy et al. | 427/2.3 | |
| 6,159,488 A | 12/2000 | Nagler et al. | 424/423 | |
| 6,171,232 B1 | 1/2001 | Papandreou et al. | 600/36 | |
| 6,171,609 B1 | 1/2001 | Kunz | 424/422 | |
| 6,177,272 B1 | 1/2001 | Nabel et al. | 435/320.1 | |
| 6,179,817 B1 | 1/2001 | Zhong | 604/265 | |
| 6,193,746 B1 | 2/2001 | Strecker | 623/1.13 | |
| 6,214,901 B1 | 4/2001 | Chudzik et al. | 523/113 | |
| 6,225,346 B1 | 5/2001 | Tang et al. | 514/523 | |
| 6,240,616 B1 | 6/2001 | Yan | 29/527.2 | |
| 6,245,537 B1 | 6/2001 | Williams et al. | 435/135 | |
| 6,251,920 B1 | 6/2001 | Grainger et al. | 514/319 | |
| 6,254,632 B1 | 7/2001 | Wu et al. | 623/1.15 | |
| 6,254,634 B1 | 7/2001 | Anderson et al. | 623/1.42 | |

| | | | | |
|---|---|---|---|---|
| 6,258,121 B1 | 7/2001 | Yang et al. | 623/1.46 | |
| 6,268,390 B1 | 7/2001 | Kunz | 514/411 | |
| 6,273,913 B1 | 8/2001 | Wright et al. | 623/1.42 | |
| 6,284,305 B1 | 9/2001 | Ding et al. | 427/2.28 | |
| 6,287,320 B1 | 9/2001 | Slepian | 606/194 | |
| 6,287,628 B1 | 9/2001 | Hossainy et al. | 427/2.3 | |
| 6,299,604 B1 | 10/2001 | Ragheb et al. | 604/265 | |
| 6,306,144 B1 | 10/2001 | Sydney et al. | 606/108 | |
| 6,306,166 B1 | 10/2001 | Barry et al. | 623/1.46 | |
| 6,306,176 B1 | 10/2001 | Whitbourne | 623/23.59 | |
| 6,306,421 B1 | 10/2001 | Kunz et al. | 424/423 | |
| 6,309,380 B1 | 10/2001 | Larson et al. | 604/502 | |
| 6,309,660 B1 | 10/2001 | Hsu et al. | 424/425 | |
| 6,313,264 B1 | 11/2001 | Caggiano et al. | 530/350 | |
| 6,316,018 B1 | 11/2001 | Ding et al. | 424/423 | |
| 6,335,029 B1 | 1/2002 | Kamath et al. | 424/423 | |
| 6,358,556 B1 | 3/2002 | Ding et al. | 427/2.24 | |
| 6,369,039 B1 | 4/2002 | Palasis et al. | 424/93.2 | |
| 6,379,382 B1 | 4/2002 | Yang | 623/1.42 | |
| 6,387,121 B1 | 5/2002 | Alt | 623/1.15 | |
| 6,403,635 B1 | 6/2002 | Kinsella et al. | 514/449 | |
| 6,407,067 B1 | 6/2002 | Schafer | 514/19 | |
| 6,517,858 B1 | 2/2003 | Haberbosch et al. | 424/424 | |
| 6,517,889 B1 | 2/2003 | Jayaraman | 427/2.24 | |
| 6,545,097 B2 | 4/2003 | Pinchuk et al. | 525/240 | |
| 6,585,764 B2 | 7/2003 | Wright et al. | 623/1.42 | |
| 6,620,194 B2 | 9/2003 | Ding et al. | 623/1.43 | |
| 6,746,773 B2 | 6/2004 | Llanos et al. | 428/421 | |
| 6,776,796 B2 | 8/2004 | Llanos et al. | 623/1.46 | |
| 6,808,536 B2 | 10/2004 | Wright et al. | 623/1.42 | |
| 2001/0007083 A1 | 7/2001 | Roorda | 623/1.15 | |
| 2001/0029351 A1 | 10/2001 | Falotico et al. | 604/103.02 | |
| 2001/0029660 A1 | 10/2001 | Johnson | 29/557 | |
| 2001/0032014 A1 | 10/2001 | Yang et al. | 623/1.15 | |
| 2001/0034363 A1 | 10/2001 | Li et al. | 514/449 | |
| 2001/0037145 A1 | 11/2001 | Guruwaiya et al. | 424/423 | |
| 2002/0010418 A1 | 1/2002 | Lary et al. | 604/101.04 | |
| 2002/0032477 A1 | 3/2002 | Helmus et al. | 623/1.2 | |
| 2002/0041899 A1 | 4/2002 | Chudzik et al. | 424/487 | |
| 2002/0061326 A1 | 5/2002 | Li et al. | 424/424 | |
| 2002/0068969 A1 | 6/2002 | Shanley et al. | 623/1.16 | |
| 2002/0071902 A1 | 6/2002 | Ding et al. | 427/2.24 | |
| 2002/0082680 A1 | 6/2002 | Shanley et al. | 623/1.16 | |
| 2002/0082685 A1 | 6/2002 | Sirhan et al. | 623/1.42 | |
| 2002/0091433 A1 | 7/2002 | Ding et al. | 623/1.2 | |
| 2002/0095114 A1 | 7/2002 | Palasis | 604/96.01 | |
| 2002/0099438 A1 | 7/2002 | Furst | 623/1.16 | |
| 2002/0103526 A1 | 8/2002 | Steinke | 623/1.11 | |
| 2002/0119178 A1 | 8/2002 | Levesque et al. | 424/423 | |
| 2002/0123505 A1 | 9/2002 | Molliston et al. | 514/291 | |
| 2002/0127327 A1 | 9/2002 | Schwartz et al. | 427/2.15 | |
| 2002/0133222 A1 | 9/2002 | Das | 623/1.16 | |
| 2002/0133224 A1 | 9/2002 | Bajjar et al. | 623/1.39 | |
| 2002/0165608 A1 | 11/2002 | Llanos | 604/500 | |
| 2002/0193475 A1 | 12/2002 | Hossainy et al. | 524/113 | |
| 2003/0065377 A1 | 4/2003 | Davila et al. | 604/265 | |
| 2003/0216699 A1 | 11/2003 | Falotico | 604/265 | |
| 2004/0049265 A1 | 3/2004 | Ding et al. | 623/1.42 | |
| 2004/0243097 A1 | 12/2004 | Falotico et al. | 604/500 | |
| 2004/0260268 A1 | 12/2004 | Falotico et al. | 604/500 | |
| 2005/0002986 A1 | 1/2005 | Falotico et al. | 424/426 | |
| 2005/0004663 A1 | 1/2005 | Llanos et al. | 623/1.46 | |
| 2005/0033261 A1 | 2/2005 | Falotico et al. | 604/500 | |
| 2005/0106210 A1 | 5/2005 | Ding et al. | 424/423 | |
| 2005/0187611 A1 | 8/2005 | Ding et al. | 623/1.15 | |
| 2005/0208200 A1 | 9/2005 | Ding et al. | 427/2.25 | |
| 2006/0088654 A1 | 4/2006 | Ding et al. | 427/2.21 | |
| 2006/0089705 A1 | 4/2006 | Ding et al. | 623/1.15 | |

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| DE | 19723723 A1 | 12/1998 | |
| EP | 0 145 166 A2 | 6/1985 | |

US 7,223,286 B2

Page 5

| | | |
|---|---|---|
| EP | 0 177 330 A2 | 4/1986 |
| EP | 0 183 372 A1 | 6/1986 |
| EP | 0 221 570 A2 | 5/1987 |
| EP | 0 421 729 A2 | 4/1991 |
| EP | 0 540 290 A2 | 5/1993 |
| EP | 0 568 310 A1 | 11/1993 |
| EP | 0 604 022 A1 | 6/1994 |
| EP | 0 621 015 A1 | 10/1994 |
| EP | 0 623 354 A1 | 11/1994 |
| EP | 0 734 698 A2 | 3/1996 |
| EP | 0 712 615 A1 | 5/1996 |
| EP | 0 716 836 A1 | 6/1996 |
| EP | 0 734 721 A2 | 10/1996 |
| EP | 0 747 069 A2 | 12/1996 |
| EP | 0 761 251 A1 | 3/1997 |
| EP | 0 800 801 A1 | 10/1997 |
| EP | 0 540 290 B1 | 1/1998 |
| EP | 0 830 853 A1 | 3/1998 |
| EP | 0 815 803 A1 | 7/1998 |
| EP | 0 850 651 A2 | 7/1998 |
| EP | 0 938 878 A2 | 9/1999 |
| EP | 0 938 878 A3 | 9/1999 |
| EP | 0 950 386 A2 | 10/1999 |
| EP | 0 968 688 A1 | 1/2000 |
| EP | 0 633 032 B1 | 2/2001 |
| EP | 1 192 957 A2 | 4/2002 |
| EP | 1 588 726 A1 | 10/2005 |
| EP | 1 588 727 A1 | 10/2005 |
| FR | 566 807 A1 | 4/1992 |
| GB | 0 662 307 A2 | 12/1951 |
| GB | 1 205 743 A | 9/1970 |
| GB | 2 135 585 A | 9/1984 |
| SU | 660689 | 5/1979 |
| SU | 1457921 | 2/1989 |
| WO | 89/03232 A1 | 4/1989 |
| WO | 91/12779 A1 | 9/1991 |
| WO | 92/15286 A1 | 9/1992 |
| WO | 94/01056 A1 | 1/1994 |
| WO | 94/21308 A1 | 9/1994 |
| WO | 94/21309 A1 | 9/1994 |
| WO | 94/24961 A1 | 11/1994 |
| WO | 96/00272 A1 | 1/1996 |
| WO | 96/26689 A1 | 9/1996 |
| WO | 96/32907 A1 | 10/1996 |
| WO | 96/34580 A1 | 11/1996 |
| WO | 97/25000 A1 | 7/1997 |
| WO | 97/33534 A1 | 9/1997 |
| WO | 98/08463 A1 | 3/1998 |
| WO | 98/13344 A1 | 4/1998 |
| WO | 98/19628 A1 | 5/1998 |
| WO | 98/23228 A1 | 6/1998 |
| WO | 98/23244 A1 | 6/1998 |
| WO | 98/34669 A1 | 8/1998 |
| WO | 98/36784 A1 | 8/1998 |
| WO | 98/47447 A1 | 10/1998 |
| WO | 98/56312 A1 | 12/1998 |
| WO | 00/21584 A1 | 4/2000 |
| WO | 00/27445 A1 | 5/2000 |
| WO | 00/27455 A1 | 5/2000 |
| WO | 00/32255 A1 | 6/2000 |
| WO | 00/38754 A1 | 7/2000 |
| WO | 01/87342 A2 | 11/2001 |
| WO | 01/87372 A1 | 11/2001 |
| WO | 01/87373 A1 | 11/2001 |
| WO | 01/87376 A1 | 11/2001 |
| WO | 02/26139 A1 | 4/2002 |
| WO | 02/26271 A1 | 4/2002 |
| WO | 02/26280 A1 | 4/2002 |
| WO | 02/26281 A1 | 4/2002 |
| WO | 03/015664 A1 | 2/2003 |
| WO | 03/057218 A1 | 7/2003 |

OTHER PUBLICATIONS

U.S. Appl. No. 08/424,884, filed Apr. 19, 1995, Helmus et al.

U.S. Appl. No. 08/526,273, filed Sep. 11, 1995, Ding.

U.S. Appl. No. 08/730,542, filed Oct. 11, 1996, Helmus.

U.S. Appl. No. 09/575,480, filed May 19, 2000, Kopia.

U.S. Appl. No. 10/431,059, filed May 7, 2003, Falotico

Abraham, R. T., "Mammalian target of rapamycin: Immunosuppressive drugs offer new insight into cell growth regulation," *Progress in Inflammation Research*, 2000, Switzerland.

Alvarado, R. et al., "Evaluation of Polymer-coated Balloon-expandable Stents in Bile Ducts," *Radiology*, 1989, 170, 975-978.

Bailey et al., "Polymer Coating of Palmaz-Schatz Stent Attenuates Vascular Spasm after Stent Placement," *Circulation*, 82:III-541 (1990).

Berk, B. C. et al., "Pharmacologic Roles of Heparin and Glucocorticoids to Prevent Restenosis After Coronary Angioplasty," *JACC*, May 1991, 17(6), 111B-117B.

Bertram, P. G. et al., "The 14-3-3 proteins positively regulate repamycin-sensitive signaling," *Current Biology*, 1998, 8, 1259-1267.

Biomaterials Science (B.D. Ratner, Ed.), Academic Press, New York, NY, pp. 228-238, 1996.

Campbell, G. R. et al., "Phenotypic Modulation of Smooth Muscle Cells in Primary Culture, Vascular Smooth Muscle Cells in Culture," *CRC Press*, 1987, 39-55.

Chang, M. W. et al., "Adenovirus-mediated Over-expression of the Cyclin/Cyclin-dependent Kinase inhibitor, p21 inhibits Vascular Smooth Muscle Cell Proliferation and Neointima Formation in the Rat Carotid Artery Model of Balloon Angioplasty," *J. Clin. Invest.*, 1995, 96, 2260-2268.

Chung, J. et al., "Rapamycin-FKBP specifically blocks growth-dependent activation of and signaling by the 70 kd S6 protein kinases," *Cell*, Jun. 26, 1992, 69(7), 1227-1236.

Clowes, A. W. et al., "Kinetics of cellular proliferation after arterial injury. IV. Heparin inhibits rat smooth muscle mitogenesis and migration," *Circ. Res.*, 1986, 58(6), 839-845.

Clowes, A. W. et al., Kinetics of Cellular Proliferation after Arterial Injury, *Laboratory Investigation*, 1985, 52(6), 611-616.

Clowes, A. W. et al., "Significance of quiescent smooth muscle migration in the injured rat carotid artery," *Circ Res.* 1985, 56(1), 139-145.

Clowes, A. W., "Suppression by heparin of smooth muscle cell proliferation in injured arteries," *Nature*, 1977, 265(5595), 625-626.

Colburn, M. D. et al., "Dose responsive suppression of myointimal hyperplasia by dexamethasone," *J. Vasc. Surg.*, 1992, 15, 510-518.

Curier, J. W. et al., "Colchicine Inhibits Restenosis After Iliac Angioplasty in the Artherosclerotic Rabbit," *Circ.*, 1989, 80(4), 11-66 (Abstract No. 0263).

Encyclopedia of Polymer Science and Engineering, vol. 7, Fluorocarbon Elastomers, p. 257-267, Mar. 1989.

Farb, A. et al., "Vascular smooth muscle cell cytotoxicity and sustained inhibition of neointimal formation by fibroblast growth factor 2-saporin fusion protein," *Circ. Res.*, 1997, 80, 542-550.

Ferns, G. A. A. et al., "Inhibition of Neointimal Smooth Muscle Accumulation After Angioplasty by an Antibody to PDGF," *Science*, 1991, 253, 1129-1132.

Fischman, D. L. et al., "A Randomized Comparison of Coronary-Stent Placement and Balloon Angioplasty in the Treatment of Coronary Artery Disease," *N. Eng. J. Med.*, Aug. 25, 1994, 331(8), 496-501.

Franklin, S. M. et al., "Pharmacologic prevention of restenosis after coronary angioplasty: review of the randomized clinical trials," *Coronary Artery Disease* Mar. 1993, 4(3), 232-242.

Fukuyama, J. et al., "Tranilast suppresses the vascular intimal hyperplasia after balloon injury in rabbits fed on a high-cholesterol diet," *Eur. J. Pharmacol.*, 1996, 318, 327-332.

Gregory, C. R. et al., "Repamycin Inhibits Arterial Intimal Thickening Caused by Both Alloimmune and Mechanical Injury," *Transplantation*, Jun. 1993, 55(6), 1409-1418.

## US 7,223,286 B2

Page 6

Gregory, C. R. et al., "Treatment with Repamycin and Mycophenolic Acid Reduces Arterial Intimal Thickening Produced by Mechanical Injury and Allows Endothelial Replacement," *Transplantation*, Mar. 15, 1995, 59(5), 655-661.

Guyton, J. R. et al., "Inhibition of rat arterial smooth muscle cell proliferation by heparin. In vivo studies with anticoagulant and nonanticoagulant heparin," *Circ. Res.*, 1980, 46, 625-634.

Hansson, G. K. et al., "Interferon-γ Inhibits Arterial Stenosis After Injury," *Circ.*, 1991, 84, 1266-1272.

Hashemolhosseini, S. et al., "Rapamycin Inhibition of the G1 to S Transition Is Mediated by Effects on Cyclin D1 mRNA and Protein Stability," *J Biol Chem*, Jun. 5, 1998, 273, 14424-14429.

Jonasson, J. et al., "Cyclosporin A inhibits smooth muscle proliferation in the vascular response to injury," *Proc. Natl., Acad. Sci.*, 1988, 85, 2303-2306.

Lange, R. A. MD et al., "Restenosis After Coronary Balloon Angioplasty," *Annu. Rev. Med.*, 1991, 42, 127-132.

Liu, M. W. et al., "Trapidil in Preventing Restenosis After Balloon Angioplasty in the Atherosclerotic Rabbit," *Circ.*, 1990, 81, 1089-1093.

Liu, M. W., MD et al., "Restenosis After Coronary Angioplasty Potential Biologic Determinants and Role of Intimal Hyperplasia," *Circulation*, 1989, 79, 1374-1387.

Lundergan, C. F. et al., "Peptide inhibition of Myointimal Proliferation by Angiopeptin, a Somatostatin Analogue," *JACC*, May 1991, 17(6), 132B-136B.

Majesky, M. W. et al., "Heparin regulates smooth muscle S phase entry in the injured rat carotid artery," *Circ. Res.*, 1987, 61, 296-300.

Marx, S. O. et al., "Rapamycin-FKBP Inhibits Cell Cycle Regulators of Proliferation in Vascular Smooth Muscle Cells," *Circ. Res.*, 1995, 76, 412-417.

Nemecek, G. M. et al.. "Terbinafine Inhibits the Mitogenic Response to Platelet-Derived Growth Factor in Vitro and Neoinimal Proliferation in Vivo," *J. Pharmacol. Exp. Thera.*, 1989, 248, 1167-1174.

Okada, T. et al., "Localized Release of Perivascular Heparin Inhibits Intimal Proliferation after Endothelial Injury without Systemic Anticoagulation," *Neurosurgery*, 1989, 25, 892-898.

Poon, M. et al., "Rapamycin Inhibits Vascular Smooth Muscle Cell Migration," *J. Clin Invest.*, Nov. 1996, 98(10), 2277-2283.

Popma, J. J. et al., "Clinical trials of restenosis after coronary angioplasty," *Circulation*, Sep. 1991, 84(3), 1426-1436.

Powell, J. S. et al., "Inhibitors of Angiotensin-Converting Enzyme Prevent Myoiintimal Proliferation After Vascular Injury," *Science*, 1989, 245, 186-188.

Rensing, B. J. et al., Coronary restenosis elimination with a sirolimus eluting stent, *European Heart Journal*, 2001, 22, 2125-2130.

Rodeck, C. et al., "Methods for the Transcervical Collection of Fetal Cells During the First Trimester of Pregnancy," *Prenatal Diagnosis*, 1995, 15, 933-942.

Ruef, J. MD, et al., "Flavopiridol Inhibits Muscle Cell Proliferation In Vitro and Neointimal Formation In Vivo After Carotid Injury in the Rat," From the Division of Cardiology and Sealy for Molecular Cardiology, University of Texas Medical Branch, Galveston; Accepted Apr. 9, 1999; *Circulation* Aug. 10, 1999, pp. 659-665.

Serruys, P. W. et al., "A comparison of balloon-expandable-stent implantation with balloon angioplasty in patients with coronary artery disease," *N Engl J Med*, Aug. 25, 1994; 331(8), 489-495.

Serruys, P. W. et al., "Evaluation of ketanserin in the prevention of restenosis after percutaneous transluminal coronary angioplasty. A multicenter randomized double-blind placebo-controlled trial," *Circulation*. Oct. 1993; 88(4 Pt 1), 1588-1601.

Serruys, P. W. et al., "Heparin-coated Palmaz-Schatz stents in human coronary arteries. Early outcome of the Benestent-II Pilot Study," *Circulation*, Feb. 1, 1996; 93(3), 412-422.

Siekierka, J. J., "Probing T-Cell Signal Transduction Pathways with the Immunosupressive Drugs, FK-506 and Rapamycin," *Immunologic Research*, 1994, 13, 110-116.

Sigwart, et al., "Intravascular Stents to Prevent Occlusion and Restenosis After Transluminal Angioplasty," *N. Engl. J. Med.*, Mar. 19, 1987, 316, 701-706.

Simons, M. et al., "Antisense *c-myb* oligonucleotides inhibit intimal arterial smooth muscle cell accumulation in vivo," *Nature*, 1992, 359, 67-70.

Snow, A. D. et al., "Heparin modulates the composition of the extracellular matrix domain surrounding arterial smooth muscle cells," *Am. J. Pathol.*, 1990, 137, 313-330.

Sollott, S. J. et al., "Taxol Inhibits Neointimal Smooth Muscle Cell Accumulation after Angioplasty in the Rat," *J. Clin. Invest.*, 1995, 95, 1869-1876.

van Der Giessen, et al., "Self-expandable Mesh Stents: an Experimental Study Comparing Polymer Coated and Uncoated Wallstent Stents in the Coronary Circulation of Pigs," *Circulation* 1990, 82(suppl. III):III-542.

van der Giessen, W. J. et al., "Coronary stenting with polymer-coated and uncoated self-expanding endoprosthesis in pigs," *Coron. Art. Disease* 1992; 3, 631-640.

Vasey, C. G. et al., "Clinical Cardiology: Stress Echo and Coronary Flow", , *Circulation*, Oct. 1989, 80(4) Supplement II, II-66.

Verweire, E. et al., "Evaluation of Fluorinated Polymers As Coronary Stent Coating," *Journal of Materials Science: Materials in Medicine*, Apr. 2000.

Weinberger, J. et al., "Intracoronary irradiation: dose response for the prevention of restenosis in swine," *Int. J. Rad. Onc. Biol. Phys.*, 1996, 36, 767-775.

Preliminary Amendment in U.S. Appl. No. 07/258,189, May 22, 1989.

Trial Transcript from Nov. 6, 2000 at 185-90 and 235-36 (Attorneys' opening remarks regarding '984 patent).

Trial Transcript from Nov. 7, 2000 at 274-301, 307-315, 320-28 and 332 (Cordis expert testimony regarding the Palmaz-Schatz stent); 370-379, 480-496 (J. Palmaz testimony regarding the Palmaz-Schatz stent, the '984 patent and the connected z-stent art).

Trial Transcript from Nov. 8, 2000 at 547-63, 657-63, 674-722, 782-85 (Cordis expert testimony regarding the Palmaz-Schatz stent, the '984 patent and the connected z-stent art).

Trial Transcript from Nov. 9, 2000 at 819-23, 921 (Cordis expert testimony regarding the '984 patent); 926-941. (R. Croce testimony re Palmaz-Schatz stent); 1033-1053. (R. Schatz testimony).

Trial Transcript from Nov. 13, 2000 at 1086-1 134. (R. Schatz testimony); 1275-1305 (Cordis expert testimony regarding the '984 patent).

Trial Transcript from Nov. 14, 2000 at 1390-1404, 1448-1454, 1486-1500 (Cordis expert testimony regarding the '984 patent).

Trial Transcript from Nov. 15, 2000 at 1686-87, 1724-42, 1828-34, 1850-54, 1887-92 (AVE expert testimony regarding the '984 patent).

Trial Transcript from Nov. 16, 2000 at 2077-198 (AVE expert testimony regarding the alleged obviousness of the '984 patent).

Trial Transcript from Nov. 17, 2000 at 2331-34 (jury instructions as to the meaning of the limitations of the claims of the '984 patent).

Trial Transcript from Nov. 20, 2000 at 2441-48, 2499-2500, 2546-50, 2552-56 (Attorneys' closing arguments regarding the '984 patent).

Trial Transcript from Nov. 21, 2000 at 2592-94 (reading of jury verdict).

Trial Transcript from Dec. 18, 2000 at 2750-95 (Cordis expert testimony regarding the Palmaz-Schatz stent during the damages phase).

Trial Transcript from Dec. 20, 2000 at 3421-88 (AVE expert testimony regarding the Palmaz-Schatz stent during the damages phase).

Jury verdict, dated Nov. 21, 2000.

District Court decisions on post-trial motions (194 F. Supp. 2d 323).

Court of Appeal for the Federal Circuit decision (339 F.3d 1352).

Trial Transcript from Mar. 4, 2005 at 133-135, 171-173 and 192-96 (Attorney's opening remarks regarding '984 validity).

Trial Transcript from Mar. 7, 2005 at 275-31 1 (Cordis expert testimony regarding the Palmaz-Schatz stent); 342-46, 353-59, 416-425 (J. Palmaz testimony regarding the Palmaz-Schatz stent, the '984 patent and the connected z-stent art); 430-449, 452-58, 462-492 (R. Croce testimony regarding the Palmaz-Schatz stent); 500-507 (Cordis expert testimony regarding the '984 patent).

Trial Transcript from Mar. 8, 2005 at 609 (Cordis expert testimony regarding the '984 patent); 628-73, 724-740, 773, 801-839 (Cordis expert testimony regarding the '984 patent, the prior art and the Palmaz-Schatz stent).

Trial Transcript from Mar. 9, 2005 at 936-49, 968-69 (Cordis expert testimony regarding the '984 patent, the prior art and the Palmaz-Schatz stent).

Trial Transcript from Mar. 10, 2005 at 1427-74, 178-1509, 1514-23 (AVE expert testimony regarding the alleged obviousness of the '984 patent); 1566-93 (AVE expert testimony regarding Palmaz-Schatz stent); 1634-49 (R. Schatz testimony).

Trial Transcript from Mar. 11, 2005 at 1846-47, 1891-1900, 1919 (Attorneys' closing arguments regarding '984 obviousness).

Trial Transcript from Mar. 14, 2005 at 1964-67 (reading of jury verdict).

Jury verdict dated Mar. 14, 2005.

Medtronic Vascular Inc.'s Opening Brief in Support of Its Motion for Judgement As A Infringement Claim dated Apr. 19, 2005.

Medtronic Vascular Inc.'s Opening Brief in Support of Its Motion for a New Trial dated Apr. 9, 2005.

D.I. 1407, Cordis' Combined Answering Brief In Opposition to AVE's Motion for JMOL on Infringement of the Palmaz '762 and Schatz '984 Patents and Its Motion for a New Trial dated May 6, 2005.

D.I. 1414, Medtronic Vascular Inc.'s Combined Reply Brief In Support of Its Motion for Judgement as a Matter of Law on Cordis Corp.'s Patent Infringement Claims and Its Motion for a New Trial dated May 19, 2005.

Trial Transcript from Feb. 8, 2001 at 372-412, 449-469 (B. Tobor testimony regarding the prosecution of the '417, '984 and '332 patents); 510-13 (J. Milnamow testimony regarding the prosecution of the '332 patent); 558-604 (J. Palmaz testimony regarding the prosecution of the '417, '984 and '332 patents and the prior art).

Trial Transcript from Feb. 9, 2001 at 637-45, 662-672, 682-85 (J. Palmaz testimony regarding the prior art); 699-742 (R. Schatz testimony); 769-770, 790-95 (Cordis expert testimony regarding prior art).

D.I. 1067, Medtronic AVE, Inc.'s Post-Trial Brief Relating to the Unenforceability of the '762 and '984 Patents Due to Inequitable Conduct.

D.I. 1077, Cordis' Combined Answering Brief in Opposition to AVE's BSC's Post-Hearing Briefs on Alleged Inequitable Conduct Concerning the '762, '984 and '332 Patents.

D.I. 1089, Reply Brief In Support of Medtronic AVE, Inc.'s Contention that the '762 and '984 Patents are Unenforceable Due to Inequitable Conduct dated May 7, 2001.

C.A. No. 00-886-SLR, Answer and Counterclaims of Def. Medtronic AVE, Inc. To First Amended Complaint of Plaintiff Cordis Corp.

BSC's Opening Post-Trial Brief in Support of Its Defense That the Patents in Suit Are Unenforceable, dated Mar. 16, 2001.

Reply Brief in Support of BSC's Defense That the Patents in Suit Are Unenforceable, dated May 7, 2001.

Court's Decision on allegations of inequitable conduct (194 F. Supp. 2d 323) Mar. 28, 2002.

Trial Transcript from Nov. 21, 2000 at 155-57 and 180-84 (Attorneys' opening remarks regarding '332 patent).

Trial Transcript from Nov. 27, 2000 at 227-51, 260-300 (Cordis expert testimony regarding the Palmaz-Schatz stent); 343-60, 363-67, 424-33 (J. Palmaz testimony regarding the Palmaz-Schatz stent and the '332 patent).

Trial Transcript from Nov. 28, 2000 at 649-71.

Trial Transcript from Nov. 29, 2000 at 791-816, 859-870, 953-62 (Cordis expert testimony regarding the '332 patent and the Palmaz-Schatz stent).

Trial Transcript from Nov. 30, 2000 at 1018 (Cordis expert testimony regarding the '332 patent); 1062-80, 1 108-1 1 1 1 (R. Croce testimony regarding the Palmaz-Schatz stent); 1 169-70, 1205-17, 1236-45 (Cordis expert testimony regarding the '332 patent).

Trial Transcript from Dec. 1, 2000 at 1352-54 (Cordis expert testimony regarding the '332 patent); 1364-1442 (R. Schatz testimony); 1493-1508, 1552-69 (BSC expert testimony regarding the '332 patent and the Palmaz-Schatz stent).

Trial Transcript from Dec. 4, 2000 at 1602-12, 1638-51, 1713-14, 1730-61, 1811-14, 1823-36 (BSC expert testimony regarding the alleged obviousness of the '332 patent, the prior art and the Palmaz-Schatz stent).

Trial Transcript from Dec. 6, 2000 at 2318-27, 2342-58 (BSC expert testimony regarding the '332 patent).

Trial Transcript from Dec. 7, 2000 at 2549-52 (Cordis expert testimony regarding the '332 patent); 2575-2579, 2591-92, 2630-31, 2649, 2669-71, 2684-85, 2688, 2708-10, 2725-27 (Attorney closing argument regarding '332 patent); 2742-46 Q'ury instructions as to the meaning of the limitations of the claims of the '332 patent).

Trial Transcript from Dec. 11, 2000 at 2817-22 (reading of jury verdict).

Jury verdict, dated Dec. 11, 2000.

D.I. 699, Motion by Defendant BSC and Scimed Life Systems, Inc. For Summary Judgment of Invalidity of U.S. Appl. No. 5,902,332 dated Apr. 4, 2000.

D.I.896, Order Denying Motion for Summary Judgment of Invalidity and Unenforceability of Claims 1, 2, and 5 of the U.S. Appl. No. 5,902,332 Denying {699-1} Motion for Summary Judgment of Invalidity of U.S. Appl. No. 5,902,332 dated Oct. 12, 2000.

Wright et al., Percutaneous Endovascular Stent: An Experimental Study (Abstract), RSNA Meeting (Nov. 28, 1984).

Hearing Transcript from Feb. 10, 1998 at 122-32, 146-80 (Attorneys' opening remarks regarding '417 patent); 180-312 (R. Schatz testimony) [Portions of This Transcript Have Been Removed as Confidential].

Hearing Transcript from Feb. 11, 1998 at 427-575, 577-651 (Cordis expert testimony regarding the '417 patent, the prior art and the Palmaz-Schatz stent).

Hearing Transcript from Feb. 13, 1998 at 1121-1261 (Guidant expert testimony regarding the alleged obviousness of the '417 patent, the prior art and the Palmaz-Schatz stent). [Portions of This Transcript Have Been Removed as Confidential].

Order by J. Robinson denying Cordis' Motion for a Preliminary Injunction Against ACS dated Jul. 17, 1998.

ACS, Inc.'s and Guidant Corp.'s Opening Brief in Support of Their Motion for Summary Judgment of Invalidity of U.S. Appl. No. 5,102, 417 dated Aug. 27, 1998.

Plaintiffs's Answering Brief in Opposition to ACS' and BSC's Motion for Summary Judgment on Obviousness dated Sep. 24, 1998.

Order dated Mar. 31, 2000.

Schatz Deposition Testimony; May 15, 1996: 79-83, 89-92, 105-107 and 153-161.

Schatz Deposition Testimony; May 16, 1996: 555-564, 569-572.

Schatz Deposition Testimony; Jan. 8, 1998: 67-73, 108-110.

Schatz Deposition Testimony; Jul. 14, 1998: 69-77, 108-112, 119-123.

Schatz Deposition Testimony; Jul. 12, 1999: 88-91, 132-135, 144-149, 218-223, 231-242.

Schatz Deposition Testimony; Jul. 13, 1999: 251-334, 339-345, 374-416.

Schatz Deposition Testimony; Jul. 14, 1999: 454-550.

Schatz Deposition Testimony; Jul. 15, 1999: 560-614.

Schatz Deposition Testimony; Dec. 2, 1999: 906-91 1, 928-942, 945-963, 976-978, 1029-1034, 1038-1042.

Palmaz Deposition Testimony, Nov. 5, 1991: 160-172.

Palmaz Deposition Testimony, Feb. 5, 1995: 710-727.

Palmaz Deposition Testimony, Jul. 16, 1998: 55-56; 81-82.

Palmaz Deposition Testimony, Jul. 28, 1999: 560-568, 570-579.

Palmaz Deposition Testimony, Jul. 29, 1999: 778-785.

Palmaz Deposition Testimony, Aug. 31, 1999: 1403-1452.

Palmaz Deposition Testimony, Sep. 2, 1999: 1953-1960.

Palmaz Deposition Testimony, Oct. 14, 1999: 2201-2209; 2275-2342; 2371-2411.

Palmaz Deposition Testimony, Oct. 15, 1999: 2424-2497; 2508-2589.

Palmaz Deposition Testimony, Oct. 16, 1999: 2853-2860.

Tobor Deposition Testimony, Jun. 17, 1999: 837-958.

Tobor Deposition Testimony, Jun. 18, 1999: 1095-1184.

Tobor Deposition Testimony, Dec. 1, 1999: 1217-1371.

## US 7,223,286 B2
Page 8

Tobor Deposition Testimony, Dec. 2, 1999: 1398-1414; 1444-1508; 1532-1548.
Tobor Deposition Testimony, Dec. 3, 1999: 1652-1653; 1662-1672; 1683-1694.
Kula Deposition Testimony, Apr. 20, 1999: 268-169.
Kula Deposition Testimony, Nov. 16, 1999: 660-675; 680-694; 7-8-755; 774-821.
Kula Deposition Testimony, Nov. 18, 1999; 176-223.
Expert Report of Dr. Rodney S. Badger on Behalf of Medtronic AVE, Inc. (Jan. 31, 2000).
Expert Report of Dr. Joseph Bonn on Behalf of Medtronic AVE, Inc. (Jan. 31, 2000).
Deposition of Dr. Joseph Bonn dated Mar. 14, 2000.
Rebuttal Expert Report of Nigel Buller, B.Sc., M.B., F.R.C.P. (Mar. 2000).
Second Supplemental Rebuttal Expert Report of Nigel Buller, B.Sc., M.B., F.R.C.P. (Aug. 17, 2004).
Rebuttal Expert Report of John M. Collins, PH.D. (Feb. 2000).
Expert Report of David C. Cumberland, M.D. (Jan. 24, 2000).
Expert Report of John T. Goolkasian (Feb. 2000).
Deposition of Richard R. Heuser, M.D. (Sep. 7, 2004).
Deposition of Henry R. Piehler (Sep. 10, 2004).
Deposition of Ronald J. Solar (Mar. 22, 2000).
Deposition of Ronald J. Solar (Mar. 23, 2000).
Deposition of Ronald J. Solar (Apr. 12, 2000).
Expert Report of Dr. Arina Van Breda on Behalf of Medtronic AVE, Inc. (Jan. 31, 2000).
Deposition of Anna Van Breda (Mar. 24, 2000).
Deposition of Arina Van Breda (Aug. 21, 2004).
Expert Report of John F. Witherspoon (Jan. 24, 2000).
Supplemental Expert Report of John F. Witherspoon (Oct. 27, 2000).
Deposition of John F. Witherspoon (Mar. 8, 2000).
Palmaz et al., Article: "Normal and Stenotic Renal Arteries: Experimental Balloon Expandable Intraluminal Stentintg", Radiology, Sep. 1987. (AVE 84).
Julio C. Palmaz, Article: "Expandable vascular endoprosthesis." (AVE 132).
Duprat et. al., Article: Flexible Balloon-Expandable Stent for Small Vessels Duprat et. al. Radiology, vol. 162, pp. 276-278, 1987. (AVE 134).
Coons et. al., Article: "Large-Bore, Long Biliary Endoprosthesis (Billiary Stents) for Improved Drainage," Radiology, vol. 148, pp. 89-94, 1983. (AVE 143).
Honickman et. al., Article: "Malpositioned Biliary Endoprosthesis, Technical Developments And Instrumentation," vol. 144, No. 2., 1982. (AVE 144).
Harries-Jones, et al., Article: "Repositioning of Biliary Endoprosthesis with Gruntzig Balloon Catheters," AJR, vol. 138, pp. 771-772, 1982. (AVE 153).
Charnsangavej et al., Article "Stenosis of the Vena Cava: Preliminary Assessment of Treatment with Expandable Metallic Stents," Radiology, vol. 161, No. 2, pp. 295-298, 1986. (AVE 359).
Wallace, M. J. et al., Article "Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications," Radiology, vol. 158, pp. 309-312, 1986. (AVE 364).
T. Yoshioka, et al., AIR Article: "Self-Expanding Endovascular Graft: An Experimental Study in Dogs", vol. 151, pp. 673-676, 1988. (AVE 438).
Palmaz, J. C. et al., Article: "Expandable Intraluminal Vascular Graft: A Feasibility Study," Surgery, vol. 99, pp. 199-205, 1986. (AVE 461).
Lawrence et al., Article: "Percutaneous Endovescular Graft: Experimental Evaluation." Radiology, vol. 163, pp. 357-360, 1987. (AVE 671).
Palmaz et al., Article: Expandable Intraluminal Graft: A Preliminary Study, Nov. 17-22, 1985, Radiology, vol. 156, pp. 73-77, 1985. (AVE 1224).
Fallone et al., "Elastic Characteristics of the Self-Expanding Metallic Stents," Investigative Radiology, vol. 23, pp. 370-376, 1988. (AVE 1953).
Palmaz Paper Entitled "Research Project Expandable Vascular Endoprosthesis" May 18, 1983.

Rousseau , et al., Publication: "Percutaneous Vascular Stent: Experimental Studies & Preliminary Clinical Results in Peripheral Arterial Diseases," in Inter. Angio, vol. 6, 153-161, 1987. (AVE 3301).
Rousseau , et al., Publication: "Self-Expanding Endovascular Prostesis: An Experimental Study," Radiology, vol. 164, pp. 709-714, 1987. (AVE 3303).
Wallace, et al., Article: "Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications," Radiology, vol. 58, pp. 309-312, 1986. (DBX 2938).
Palmaz et al., Article: "Expandable Intraluminal Graft: A Preliminary Study," Radiology, vol. 156, pp. 73-77, Nov. 17-22, 1985 (DBX 4595).
Program for the 12th Annual Course on Diagnostic Angiography and Interventional Radiology Mar. 23-26, 1987 sponsored by The Society of Cardovascular and Interventional Radiology (DBX 6235).
Preliminary Motion for Judgment re: Wolff claims 1, 2-8, 10, 15 and 19 (DBX6759).
Palmaz Declaration (DBX 7069).
Letter from Gaterud to Dr. Palmaz dated Jul. 5, 1988 with attached document entitled: "Segmented, balloon-expandable stents." (DBX 7160).
Duprat et al., Article: "Flexible Balloon-Expandable Stent For Small Vessels," Radiology, vol. 168, pp. 276-278, 1987 (PX 82).
Drawing Sent to Bodic on Mar. 17, 1986 (PX 374).
Letter from Dr. Palmaz to R. Bowman enclosing a model of the flexible coronary graft dated Mar. 17, 1986 (PX 337).
Lab Notebook pages dated Jul. 30, 1987 from Rodney Wolff (COR 185596-597) (PX621A).
Charnsangavej, et al., Article: "Stenosis of The Vena Cava Preliminnary Assessment of Treatment with expandable Metallic Stents," Radiology, vol. 161, No. 2, pp. 295-298 with attached photographs, 1986. (API 72).
J. Palmaz: The Current Status of Vascular Prosthesis, published by SCIR in the Twelfth Annual Course on Diagnostic Angiography And Interventional Radiology Mar. 23-26, 1987. (API 73).
Amendment in Response to Office Action of Oct. 18, 1998 in re: Application of Julio Palmaz U.S. Appl. No. 174,246. (API 152).
Article: Wallace, et al., Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications Work In Progress, Radiology, vol. 158, pp. 309-312. (API 295).
Reply of Senior Party Schatz To Patentee Wolffs Opposition To The Belated Motion For Judgment Of Applicant Schatz With Regard To Wolff Claims 1, 2-8, 10, 1 1, 13-17, And 19 (COR 186450-455) (API 310).
Brief Of Senior Party Schatz At Final Hearing (API 313).
Copy of Letter from Ron Sickles to Ben Tobor dated Feb. 10, 1988 (Exhibit 42).
Copy of Letter from R.O. Sickles to Mike Tatlow dated May 12, 1988 (Exhibit 43).
Copy of Letter from R. 0. Sickles to Richard Schatz dated Jun. 2, 1988 (Exhibit 44).
Copy of Letter from Richard Schatz to Raimund Erbel dated Jun. 3, 1988 (Exhibit 45).
Copy of Letter from Richard Schatz to Mike Schuler dated Aug. 29, 1991 (Exhibit 48).
Minutes of J&J Stent Project Review Meeting datd Jan. 21, 1988 (Exhibit 7).
Preliminary Motion for Judgment with Regard to Wolff Claims 1, 2-8, 10, 11, 13-17, and 19. (Exhibit 67).
Declaration of Richard A Schatz. (Exhibit 75).
Belated Motion for Judgement with Regard to Wolff Claims 1, 2-8, 10, 1 1, 13-17 and 19. (Schatz—Exhibit 77).
Letter from Dr. Schatz to Mr. Tobor, dated Jun. 3, 1988. (Exhibit 122).
Letter from Dr. Schatz to Mr. Romano, dated Nov. 28, 1988. (Exhibit 131).
Letter from Mr. Sickles to Mr. Tobor, dated Feb. 10, 1988 (Exhibit 145).
Richard A. Schatz, Article title: "A View of Vascular Stents" Circulation, vol. 79, No. 2, pp. 445-457, 1989. (Exibit 194).

US 7,223,286 B2
Page 9

Senior Party Schatz's reply to Patentee Wolffs Opposition to the Preliminary Motion Of Application Schatz for judgment with regard to Wolff Claims 1, 2-8, 10, 1 1 , and 13-17. (Exhibit 69).

Wallace, et al., Article: " Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications' Work In Progress," Radiology, vol. 158, pp. 309-312, 1986. (Exhibit 165).

Charnsangavej, et al., Article: "Stenosis of The Vena Cava Preliminmary Assessment of Treatment with expandable Metallic Stents," Radiology, vol. 161, No. 2, pp. 295-298 with attached photographs, 1986! (Exhibit 167).

David D. Lawrence et al., Publication: Percutaneous Endoyascular Graft: Experimental Evaluation[1], Radiology, vol. 163, 357-360, 1987. (Exhibit 173).

Charles E. Putnam, M.D., Cover and article from "Investigative Radiology", vol. 23, No. 5, May 1988. (Exhibit 177).

Robert N. Berk, Cover and article from "American Journal of Roentology", pp. 673-676, 1988. (Exhibit 178).

Declaration of John S. Kula Under 37 CFR § 1 .672. ( Kula—Exhibit 77).

Yoshioka et al., Article: "Self-Expanding Endovascular Graft: An Experimental Study in Dogs" AJR, vol. 151, pp. 673-676, 1988. (PX 100).

Palmaz, et al., Article: Expandable Intraluminal Graft: A Preliminary Study Work in Progress[1], Radiology, vol. 156, No. 1, pp. 73-77, 1985. (PX 101).

Declaration of Richard Schatz Under 37 C.F.R.§ 1.672. (PX 106).

Charnsangavej et al., Article: "Stenosis of the Vena Cave: Preliminary Assessment of Treatment with Expandable Metallic Stents," Radiology, vol. 161, pp. 295-298, 1986. (PX 143).

Wallace, et al., Article: Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications Work in Progress[1], Radiology, vol. 158, pp. 309-312, 1986. (PX 144).

Gina Kolata, News Article: NY Times, "Devices That Opens Clogged Arteries Gets a Falling Grade in a New Study", pp. 16-18, Jan. 3, 1991. (PX 186).

Duprat, et al., Article: "Flexible Balloon-Expanded Stent for Small Vessels Work in Progress[1]", Radiology, vol. 162, pp. 276-278, 1987. (PX 207).

Letter from Palmaz to Bowman dated Mar. 17, 1986. (PX 350).

Memo re: Minutes of Stent Project Review- San Antonia- Mar. 15, 1988. (PX 651).

Kuntz, et al., Article: Clinical Cardiology Frontiers: "Defining Coronary Restenosis, Newer Clinical and Angiographic Paradigms", Circulation, Sep. 1993, vol. 88, No. 3, pp. 1310-1323. (PX 854).

Belated Motion for Judgment with regard to Wolff Claims1, 2-8, 10, 11, 13-17, and 19. (PX 1410).

Drawing of Spiral Stent (sent to Bodie Mar. 17, 1986). (PX2933).

Wright et al., Article: "Percutaneous Endovascular Graft: An Experimental Evaluation," Radiology, vol. 156, pp. 69-72, 1985. (PX 3093).

Charnsangavej et al., Article: "A New Expandable Metallic Stent for Dilation of Stenotic Tubular Structures: Experimental and Clinical Evaluation," Houston Medical Journal, vol. 3, pp. 41-51, Jun. 1987. (PX 3207).

In re Application of Wiktor, U.S. Appl. No. 69,636, Response to Office Action dated Mar. 17, 1988. (PX3236).

Transmittal Letter of Response to First Office Action in '417 patent. (PX 3993).

Letter from B. Tobor to R. Schatz dated Jul. 23, 1991. (PX 3996).

Mullins et al., Article: "Implantation of balloon-expandable intravascular grafts by catherization in pulmonary arteries and systemic veins," Circulation, vol. 77, No. 1, pp. 188-189, 1988. (PX4049).

Schatz et al., Article: "Intravascular Stents for Angioplasty," Cardio, 1997. (PX 4050).

Schatz et al., Article: "New Technology in Angioplasty Balloon-Expandable Intravascular Stents, New Developments in Medicine," vol. 2, No. 2, pp. 59-75, 1987. (PX405I).

Richard A. Schatz, Article: "Introduction to Intravascular Stents," Cardiology Clinics, vol. 6, No. 3, pp. 357-372, 1988. (PX 4052).

Richard A. Schatz, Article: "A View of Vascular Stents," Circulation, vol. 79, No. 2, pp. 445-457, 1989. (PX4053).

Wang et al., Article: "An Update on Coronary Stents," Cardio, pp. 177-186, 1992. (PX 4054).

Richard A. Schatz, Article: "New Technology in Angioplasty: Balloon-Expandable Starts," Medicamundi, vol. 33, No. 3, pp. 1 121-1 16, 1988. (PX 4055).

Letter from Tobor to Schatz dated Sep. 29, 1988. (PX 1395).

Verified Statement of Facts by Innamed Inventor R.A. Schatz document filed in U.S. Patent and Tradement Office on Sep. 8, 1989. (PX 3677).

Declaration of John S. Kula Under 37 CFR § 1.672 (Exhibit 329).

Letter to Mike Schular from R.A. Schatz dated Aug. 29, 1991. (Exhibit 402).

Articulated, Balloon—Expandable Stents, (DBX 7159).

J. Rosch et al., Experimental Intrahepatic Portacaval Anastomosis: Use of Expandable Gianturco Stents, Radiology, vol. 162, pp. 481-485, 1987.

J. Rosch et al., Modified Gianturco Expandable Wire Stents In Experimental and Clinical Use, Ann Radiol, vol. 31, No. 2, pp. 100-103, 1987.

J. Rosch et al., Gianturco Expandable Stents In the Treatment of Superior Vena Cava Syndrome Recurring After Vena Cava Syndrome Recurring After Maximum-Tolerance Radiation, Cancer, vol. 60, pp. 1243-1246, 1987.

I.E. Gordon, Structures or Why Things Don't Fall Down, Penguin Books, pp. 45-59,132-148,210-244,377-383.

Maass et al., Radiological Follow-up of Transluminally Inserted Vascular Endoprostheses: An Experimental Study Using Expanding Spirals, Radiology, vol. 152, pp. 659-663, 1984.

Argument submitted re EP 861 15473 dated Jan. 20, 1995. (AVE 2478).

Verified Statement of Facts by Julio C. Palmaz dated Aug. 4, 1989. (PX 3662).

Papanicolaou et al., Insertion of a Biliary Endoprosthesis Using A Balloon Dilatation Catheter, Gastrointest Radiology, vol. 10, pp. 394-396, 1985.

Palmaz et al., Atheroscierotic Rabbit Aortas: Expandable Intraluminal Grafting, Radiology, vol. 168, pp. 723-726, 1986.

Palmaz, The Current Status of Vascular Prostheses; Rosch et al., Gianturco, Expandable Stents in Experimental and Clinical Use, SCIVR, pp. 1 18-124, 1987.

Rosch et al., Abstract: Modified Gianturco Expandable Wire Stents in Experimental and Clinical Use, CIRSE, Porto Cervo, Sardinia, May 25-29, 1987.

Rosch et al., Gianturco Expandable Wire Stents in the Treatment of Superior Vena Cava Syndrome Recurring After Maximum-Tolerance Radiation, Cancer, vol. 60, pp. 1243-1246, 1987.

Mirich et al., Percutaneously Placed Endovascular Grafts for Aortic Aneurysms: Feasibility Study, Radiology, vol. 170, pp. 1033-1037, 1989.

Dotter, Transluminally-placed Coilspring Endarterial Tube Grafts, Investigative Radiology, vol. 4, Sep.-Oct., pp. 329-332, 1969.

Palmaz et al., Abstract: Expandable Intraluminal Graft: A Preliminary Study, Radiology, vol. 153 (P), Nov. 1983: 70th Scientific Assembly and Annual Meeting.

Cragg et al., Nonsurgical Placement of Arterial Endoprosthesis: A New Technique Using Nitinol Wire, Radiology, vol. 147, pp. 261-263, Apr. 1983.

J. Rosch et al., Gianturco Expandable Stents in Experimental and Clinical Use, Program: "Twelfth Annual Course on Diagnostic Angiography and Interventional Radiology" (Society of Cardiovascular and Interventional Radiology, Pittsburgh, PA), Mar. 23-26, 1987 (the second Monofilament Stent).

Uchida t al., Modifications of Gianturco Expandable Wire Stents, AIR, vol. 150, pp. 1185-1187, 1988.

Palmaz, Balloon-Expandable Intravascular Stent, AJR, vol. 1510, pp. 1263-1269.

Cordis Corporation v. Advanced Cardiovascular Systems, Inc., Guidant Corporation, Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCMED Life Systems, Inc., Plaintiffs Complaint, Oct. 23, 1997 (Case No. 97-550-SLR).

Arterial Vascular Engineering, Inc. v. Cordis Corporation, Johnson & Johnson and Expandable-Grafts Partnership, Plaintiffs First Amended Complaint for Declaratory Relief of Patent Validity,

**US 7,223,286 B2**

Page 10

Unenforceability, Noninfiingement, and for Antitrust Violations, Jan. 27, 1998 (Civil Action No. 97-700).

Arterial Vascular Engineering, Inc. v. Cordis Corporation, Johnson & Johnson and Expandable-Grafts Partnership, Cordis Corporation and Johnson & Johnson's Answer and Counterclaim, Feb. 27, 1998 (Civil Action No. 97-700-SLR).

Arterial Vascular Engineering, Inc. v. Cordis Corporation, Johnson & Johnson and Expandable-Grafts Partnership, Expandable-Graft Partnership's Answer, Feb. 27, 1998 (Civil Action No. 97-700-SLR).

Arterial Vascular Engineering, Inc. v. Cordis Corporation, Johnson & Johnson and Expandable-Grafts Partnership, Reply of Plaintiff Arterial Vascular Engineering, Inc. To Counterclaims of Defendant Cordis Corporation, Mar. 31, 1998 (Civil Action No. 97-700-SLR).

Arterial Vascular Engineering, Inc. v. Cordis Corporation, Johnson & Johnson and Expandable-Grafts Partnership, Reply of Plaintiff Arterial Vascular Engineering, Inc. To Counterclaims of Defendant Expandable Grafts Partnership, Mar. 31, 1998 (Civil Action No. 97-700-SLR).

Cordis Corporation v. Advanced Cardiovascular Systems, Inc. and Guidant Corporation, Cordis Corporation's Motion for a Preliminary Injunction, Oct. 8, 1997 (Civil Action No. 97-550.).

Cordis Corporation v. Advanced Cardiovascular Systems, Inc., Guidant Corporation Arterial Vascular Engineering Inc., Boston Scientific Corporation and SCJJVIED, Inc., Cordis 's Motion for Preliminary Injunction Against Arterial Vascular Engineering Inc., Dec. 29, 1997 (Case No. 97-550-SLR).

Deposition of R. Schatz, M.D. in Cordis Corporation v. Advanced Cardiovascular Systems, Inc., taken on Jan. 8, 1998 (Civil Action No. 97-550 SLR).

Deposition of Lee P. Bendel in Cordis Corporation v. Advanced Cardiovascular Systems, Inc., taken on Jan. 22, 1998 (Civil Action No. 97-550 SLR).

Deposition of Julio Cesar Palmaz in Cordis Corporation v. Advanced Cardiovascular Systems, Inc., taken on Dec. 29, 1997 (Civil Action No. 97-550 SLR).

Deposition of Richard A. Bowman in Cordis Corporation v. Advanced Cardiovascular Systems, Inc., taken on Jan. 9, 1998 (Civil Action No. 97-550 SLR).

Deposition of Gary Schneiderman in Cordis Corporation v. Advanced Cardiovascular Systems, Inc., taken on Jan. 16, 1998 (Civil Action No. 97-550 SLR).

Deposition of David Pearle, M.D. in Cordis Corporation v. Advanced Cardiosvascular Systems, Inc., taken on Jul. 10, 1998 (Civil Action No. 97-550 SLR).

Preliminary Injunction hearing testimony taken on Feb. 9-13, 1998 (Civil Action No. 97-550 SLR).

Cordis Corporation v. Advanced Cardiovascular Systems, Inc., et al., (Civil Action No. 97-550 SLR) and Cordis Corporation v. Advanced Cardiovascular Systems, Inc. Et al. (Civil Action No. 98-65-SLR), Opening Post Hearing Brief of Plaintiff Cordis Corporation in Support of Motion for Preliminary Injunction, Mar. 6, 1998 (Portions relevant to patent claim construction and patent validity issues).

Cordis Corporation and Expandable Grafts Partnership v. Advanced Cardiovascular Systems, Inc. et al., Post-Hearing Reply Brief of Plaintiff Cordis Corporation in Support of Its Motion for Preliminary Injunction, Apr. 10, 1998 (Case No. 97-550 SLR) (Portions relevant to patent validity issues).

Cordis Corporation and Expandable Grafts Partnership v. Advanced Cardiovascular Systems, Inc. et al., Plaintiffs Motion for a Preliminary Injunction Against Boston Scientific Corporation and SCLMED Life Systems, Inc. And Memorandum in Support, Apr. 13, 1998 (Case No. 97-550-SLR).

Cordis Corporation and Expandable Grafts Partnership v. Advanced Cardiovascular Systems, Inc., et al., Judge Robinson's Order Denying Plaintiffs Motion for a Preliminary Injunction, Jul. 17, 1998 (Civil Action No. 97-550 SLR).

Cordis Corporation and Expandable Grafts Partnership v. Advanced Cardiovascular Systems, Inc., et al., Defendant Boston Scientific Corporation and SCTMED Life Systems, Inc.'s Motion for Summary Judgment of Invalidity of U.S. Appl. No. 5,102,417, Aug. 27, 1998 (Civil Action No. 97-550-SLR).

Boston Scientific Limited, et al. v. Expandable Grafts Partnership, Plaintiffs' Statement of Claim, Mar. 13, 1997 (UK Action No. 1493).

Boston Scientific Limited, et al. v. Expandable Grafts Partnership, Defendant's Amended Defense and Counterclaim, Aug. 14, 1997 (UK Action No. 1493).

Boston Scientific Limited, et al. v. Expandable Grafts Partnership, Petition for Revocation, Mar. 13, 1997 (UK Action No. 1497).

Boston Scientific Limited, et al. v. Expandable Grafts Partnership, Particulars of Objections, Mar. 13, 1997 (UK Action No. 1497).

Boston Scientific Limited, et al. v. Expandable Grafts Partnership and Boston Scientific Limited et al., v. Julio C. Palmaz, Boston's Skeleton Argument (UK Action Nos. 1493, 1495, 1496, and 1497).

Boston Scientific Limited, et al. v. Julio C. Palmaz and Expandable Grafts Partnership, Skeleton Argument of Palmaz/EGP, Mar. 19, 1998 (UK Action Nos. 1493, 1495, 1496 and 1497).

Boston Scientific Limited, et al. v. Julio C. Palmaz and Expandable Grafts Partnership, EGP's Final Submissions, Apr. 2, 1998 (UK Action Nos. 1493, 1495, 1496 and 1497).

Boston Scientific Limited, et al. v. Julio C. Palmaz and Expandable Grafts Partnership, Judgment, Jun. 26, 1998 (UK Action Nos. 1493, 1495, 1496 and 1497).

Rosch, Modified Gianturco Expandable Wire Stents in Experimental and Clinical Use, CJJR.SE 1987 Presentation: see Witness Statement of Josef Rosch from U.K. Proceeding.

Statement of Claim by Boston Scientific et al. against Expandable Grafts Partnership et al., in EPG et al., v. Boston Scientific et al. in Netherlands (Mar. 13, 1997).

Motion for Joinder of Actions, Change of Claim and Statement of Claim filed by Expandable Grafts Partnership et al. in EPG et al. v. Boston Scientific et al. In Netherlands (Apr. 22, 1997).

Opinion of K.J. Merman filed in EPG et al. v. Boston Scientific et al. in Netherlands (Aug. 29, 1997).

Expert report of Dr. Nigel Buller in EPG et al. v. Boston Scientific et al. in Netherlands (Aug. 28, 1997).

Expert report of Lee P. Bendel in EPG et al. v. Boston Scientific et al. in Netherlands (Aug. 28, 1997).

Memorandum of Oral Pleading in EPG et al. v. Boston Scientific et al. in Netherlands (Sep. 12, 1997).

Plea Notes of P. A.M. in EPG et al. v. Boston Scientific et al. in Netherlands (Mar. 10, 1998).

Decision of Court of Appeals in EPG et al. v. Boston Scientific et al. in Netherlands (Apr. 23, 1998).

Translation of Nullity Action Against EPO 0 364 787 by Biotronik in Germany.

Translation of Nullity Action Against EPO 0 335 341 by Biotronik in Germany.

Translation of EPG Response to Nullity Action Against EP 0 364 787 by Biotronik in Germany.

Translation of EPG Response to Nullity Action EP 0 335 341 by Biotronik in Germany.

Nullity Suit Against EP-B1-0 335 341 Brought by Boston Scientific in Germany.

Translation of Opposition filed by Terumo Corp. Against Japan Patent No. 2680901.

Translation of Decision on Opposition Against Japan Patent No. 2680901.

Memorandum Order of the Court dated Sep. 7, 2000, concerning disputed claim construction.

Translation of Judgment in Nullity Action Against EP 0 364 787 by Biotronik in Germany.

Translation of Judgment in Nullity Action Against EP 0 335 341 by Biotronik in Germany.

Trial transcript from Mar. 17, 2005 at 171-172, 191-192.

Trial transcript from Mar. 18, 2005 at 282-285, 325-327, 349-351.

Trial transcript from Mar. 21, 2005 at 721-726.

Trial transcript from Mar. 24, 2005 at 1387.

Trial transcript from Jul. 26, 2005.

BSC's Opening Brief in Support of Its Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial, dated Mar. 16, 2001.

Cordis' Answering Brief in Opposition to BSC's Motion for JMOL or a New Trial on the Palmaz '762 Patent and the Schatz '332 Patents, dated Apr. 17, 2001.

BSC's Reply Brief in Support of Its Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial, dated May 11, 2001.

J. Rosch et al., Abstract, Expandable Gianturco-Type Wire Stents in Experimental Intrahepatic Portacaval Shunts, Program: "72nd Scientific Assembly and Annual Meeting of the Radiological Society of North America", Nov. 30-Dec. 5, 1986 Radiology, vol. 161, pp. 40-41, 1986.

Cordis Corporation v. Boston Scientific, Order Dated Mar. 27, 2006 (97-550-SLR).

Cordis Corporation v. Boston Scientific, Judgment in a Civil Case Dated Mar. 27, 2006 (97-550-SLR).

Cordis Corporation v. Boston Scientific, Memorandum Opinion Dated Mar. 27, 2006 (97-550-SLR).

Cordis Corporation and Expandable Grafts Partnership v. Advanced Cardiovascular Systems, Inc., Guidant Corporation, Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCIMED Life Systems, Inc., Answer and Counterclaims of Defendant Advanced Cardiovascular Systems, Inc., Apr. 8, 1998 (Case No. 97-550-SLR).

Boston Scientific Limited et al. v. Expandable Grafts Partnership and Boston Scientific Limited et al. v. Julio C. Palmaz, Boston's Closing Submissions (UK Action Nos. 1493, 1495, 1496 and 1497).

Cordis Corporation v. Advanced Cardiovascular Systems, Inc., Guidant Corporation, Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCIMED Life Systems, Inc., Defendants' Answer, Nov. 12, 1997 (Case No. 97-550-SLR).

Statement of Rejoinder in the Action on the Merits, Also Including an Amendment of Defendant's Final Position in the Principal Action, as Well as the Provisional Statement of Rejoinder in the Action on the Counterclaim in EPG et al. v. Boston Scientific et al. in Netherlands (Feb. 10, 1998).

Statement of Answer in the Ancillary Appeal in EPG et al. v. Boston Scientific et al. in Netherlands (Mar. 10, 1998).

Appeal filed by Expandable Grafts Partnership et al. in EPG et al. v. Boston Scientific et al. in Netherlands (Nov. 12, 1997).

Title filed by Boston Scientific et al. in EPG et al. v. Boston Scientific et al. in Netherlands (Jan. 22, 1998).

Deposition of Richard Schatz, M.D. in Cordis Corporation v. Advanced Cardiovascular Systems, Inc. taken on Jul. 14, 1998 (Civil Action No. 97-550-SLR).

Jury Verdict form from the Cordis Corporation v. Boston Scientific Corporation, et al liability trial, undated.

Trial testimony transcripts from the Cordis Corporation et al. v. Boston Scientific Corporation et al. liability trial dated Nov. 21, Nov. 27-Dec. 1, Dec. 4-8 and Dec. 11, 2000.

Boston Scientic SCIMED, Inc. and Boston Scientific Corporation v. Cordis Corporation and Johnson and Johnson, Inc., Opening Expert Report of Stephen R. Hanson, Ph.D. (Civil Action No. 03-328-SLR).

Boston Scientific SCIMED, Inc. and Boston Scientific Corporation v. Cordis Corporation and Johnson and Johnson, Inc., Opening Expert Report of Robson F. Storey, Ph.D. (Civil Action No. 03-283-SLR).

Boston Scientific SCIMED, Inc. and Boston Scientific Corporation v. Cordis Corporation and Johnson and Johnson, Inc., Rebuttal Expert Report of Kinam Park, Ph.D. (Civil Action No. 03-283-SLR).

Cordis Corporation v. Boston Scientific Corporation and SCIMED Life Systems, Inc. (C.A. No. 03-027-SLR) and Boston Scientific SCIMED, Inc., and Boston Scientific Corporation v. Cordis Corporation and Johnson and Johnson, Inc. (C.A. No. 03-283-SLR) Combined Post-Hearing Brief In Support Of Cordis Corporation's Motion For Preliminary Injunction in C.A. No. 03-027-SLR, And In Opposition to Plaintiffs' Motion For Preliinary Injunction in C.A. No. 03-283-SLR.

Cordis Corporation v. Boston Scientific Corporation and SCIMED Life Systems, Inc. (C.A. No. 03-027-SLR) Boston Scientific SCIMED, Inc., and Boston Scientific Corporation v. Cordis Cor-

poration and Johnson and Johnson, Inc. (C.A. No. 0-283-SLR), Boston Scientific's Opening Post-Hearing Brief.

Cordis Corporation v. Boston Scientific Corporation and SCIMED Life Systems, Inc. (C.A. No. 03-027-SLR) Boston Scientific SCIMED, Inc., and Boston Scientific Corporation v. Cordis Corporation and Johnson and Johnson, Inc. (C.A. No. 03-283-SLR), Combined Post-Hearing Answering Brief In Support of Cordis Corporation's Motion For Preliminary Injunction In C.A. No. 03-027-SLR, And In Opposition To Plaintiffs Motion For Preliminary Injunction in C.A. No. 03-283-SLR.

Wu et al., Silicone-covered self-expanding metallic stents for the palliation of malignant esophageal obstruction and esophagorespiratory fistulas: experience in 32 patients adn a review of the literature, Gastrointestinal Endoscopy, 1994, pp. 22-33, vol. 40, No. 1, Portland Oregon.

Binmoeller, et al., Silicone-Covered Expandable Metallic Stents in the Esophagus: An Experimental Study, Endoscopy, 1992, pp. 416-420, vol. 24, Georg Thieme Verlag Stuttgart New York.

Boston Scientific SCIMED, Inc., and Boston Scientific Corporation v. Cordis Corporation and Johnson and Johnson, Inc., Answering Memorandum in Opposition to Plaintiffs Motion for a Preliminary Injunction and Appendix thereto (Civil Action No. 03-283-SLR).

Boston Scientific SCIMED, Inc., and Boston Scientific Corporation v. Cordis Corporation and Johnson and Johnson, Inc., Answering Memorandum in Opposition to Plaintiffs Motion for a Preliminary Injunction and Appendix thereto (Civil Action No. 03-283-SLR).

Rhine, Polymers for Sustained Macromolecule Release: Procedures to Fabricate Reproducible Delivery Systems and Control Release Kinetics, Journal of Pharmaceutical Sciences, 1 980, pp. 265-270, vol. 69, No. 3.

Langer et al., Controlled Release of Macromolecules From Polymers, Biomedical Polymers Polymeric Materials and Pharmaceuticals for Biomedical Use, 1980, pp. 112-137, Academic Press, Inc., New York, NY.

Langer et al., Applications of Polymeric Delivery Systems for Macromolecules and Factors Controlling Release Kinetics.

Rhine et al., A Method to Achieve Zero-Order Release Kinetics From Polymer Matric Drug Delivery Systems, pp. 67-72.

Langer et al., Polymers for the Sustained Release of Macromolecules: Controlled and Magnetically Modulated Systems, Better Therapy With Existing Drugs: New Uses and Delivery Systems; 1981, pp. 179-216, Merck Sharp & Dohme International, Rahway, NJ.

Hsieh, et al., Zero-Order Controlled-Release Polymer Matrices for Micro-and-Macromolecules, Journal of Pharmaceutical Sciences, 1983 pp. 17-22, vol. 72, No. 1.

Brown et al., In Vivo and In Vitro Release of Macromolecules from Polymeric Drug Delivery Systems, Journal of Pharmaceutical Sciences, 1983, pp. 1181-1185, vol. 72, No. 10.

Langer, Implantable Controlled Release Systems, Pharmac. Ther., 1983, pp. 35-51, vol. 21, printed in Great Britain.

Kost et al., Controlled Release of Bioactive Agents, Trends in Biotechnology, 1984, pp. 47-51, vol. 2, No. 2, Elsevier BV Amsterdam.

Bawa et al., An Explanation for the Controlled Release of Macromolecules from Polymers, Journal of Controlled Release, 1985, pp. 259-267, vol. 1 Elsevier Science BV Amsterdam.

Leong et al., Polymeric controlled drug delivery, 1987, pp. 199-233, vol. 1/3, Elsevier Science Publishers BV Amsterdam.

Langer, Polymeric Delivery Systems, Targeting of Drugs 2 Optimization Strategies, 1989, pp. 165-174, Plenum Press, New York and London.

Langer, Biomaterials in Controlled Drug Delivery: New Perspective from Biotechnological Advances; Pharmaceutical Technology, 1989, pp. 18, 23-24, 26, 28, 30.

Langer, Controlled Release Systems, pp. 115-124.

Laurencin et al., Polymeric Controlled Release Systems: New Methods for Drug Delivery, Clinics in Laboratory Medicine, 1987, pp. 301-323, vol. 7, No. 2, WB Saunders Company, Philadelphia.

Langer, Biopolymers in Controlled Release Systems, Polymeric Biomaterials, pp. 161-169.

**US 7,223,286 B2**

Page 12

Tsong-Pin Hsu et al., Polymers for the Controlled Release of Macromolecules: Effect of Molecular Weight of Ethylene-vinyl Acetate Copolymer, *Journal of Biomedical Materials Research*, 1985, pp. 445-460, vol. 19.

Langer, Polymers and Drug Delivery Systems, *Long-Acting Contraceptive Delivery Systems*, 1983, pp. 23-32, Harper & Row, Philadelphia, PA.

Langer, New Drug Delivery Systems: What the Clinician Can Expect, *Drug Therapy*, 1983, pp. 217-231.

Langer, et al., Chemical and Physical Structure of Polymers as Carriers for Controlled Release of Bioactive Agents: A Review, *Rev. Macromol. Chem. Phys.*, 1983, pp. 61-126.

Langer, Polymeric Delivery Systems for Controlled Drug Release, *Chem. Eng. Commun.* 1980, pp. 1-48-vol. 6, Gordon and Breach Science Publishers, Inc. USA.

Langer, et al., Biocompatibility of Polymer Delivery Systems for Macromolecules, *Journal of Biomedical Materials Research*, 1981, pp. 267-277, vol. 15.

Langer, Controlled Release: A New Approach to Drug Delivery, *Technology Review*, 1981, pp. 26-34.

Langer, et al., Sustained Release of Macromolecules from Polymers, *Polymeric Delivery Systems*, PGS. 175-176, Gordon adn Breach Science Publishers, New York.

Langer, Polymers for the Sustained Release of Proteins and other Macromolecules, *Nature*, 1976, pp. 797, 263, 799-800, vol. 263, No. 5580.

Baker, et al., Controlled Release: Mechanisms and Rates (1974).

Hanson, et al., In Vivo Evaluation of Artificial Surfaces with a Nonhum Primate Model of Arterial Thrombosis,/ *Lab Clin. Med.*, Feb. 1980, pp. 289-304.

Baker, Controlled Release of Biologically Active Agents (1987) pp. 1-275.

*Cordis Corporation* v. *Boston Scientific Corporation* (CA. No. 03-27-SLR) and *Boston Scientific Scimed, Inc.*, v. *Cordis Corporation and Johnson & Johnson, Incorporated* (CA. No. 03-283-SLR) Hearing Transcripts for Jul. 21, 2003, Jul. 22, 2003, Jul. 23, 2003.

*Cordis Corporation* v. *Boston Scientific Corporation et al.* (CA. No. 03-027-SLR), and *Boston Scientific Scimed, Inc. et al.* v. *Cordis Corporation et al.* (CA. No. 03-283-SLR), Boston Scientific's Post-Hearing Reply Brief and Exhibits Thereto, Sep. 12, 2003.

*Cordis Corporation* v. *Boston Scientific Corporation et al.* (CA. No. 03-027-SLR), and *Boston Scientific Scimed, Inc. et al.* v. *Cordis Corporation et al.* (CA. 03-283-SLR), Memorandum Order, Nov. 21, 2003.

*Cordis Corporation* v. *Boston Scientific Corporation et al.* (CA. No. 03-027-SLR), and *Boston Scientific Scimed, Inc. et al.* v. *Cordis Corporation et al* (CA. No. 03-283-SLR), Deposition Transcript of Julio C. Palmaz.

*Arterial Vascular Engineering, Inc.* v. *Cordis Corporation, Johnson & Johnson and Expandable Grafts Partnership*, Cordis Corporation and Johnson & Johnson's Answer and Counterclaim, Feb. 27, 1998 (Civil Action No. 97-700-SLR).

Plea Notes in *EPG et al.* v. *Boston Scientific et al.* in Netherlands (Sep. 12, 1997).

Provisional Judgment *EPG et al.* v. *Boston Scientific et al.* in Netherlands (Oct. 29, 1997).

Trial testimony transcripts from the Cordis Corporation et al. v. Medtronic AVE Inc., et al. liability trial dated Nov. 6-9, 13-17 and 20-21, 2000.

Jury verdict form from the Cordis Corporation et al. v. Medtronic AVE, Inc. et al. liability trial.

Hearing testimony transcript from the consolidated Cordis Corporation et al. v. Medtronic AVE, Inc. et al. and Boston Scientific Corporation et al. inequitable conduct hearing dated Feb. 7-9 and 12, 2001.

Cordis Corporation v. Medtronic Ave., Inc. et al, OPINION, 97-550-SLR, dated Mar. 28, 2002.

*Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc. et al.* (CA. No. 97-550-SLR), *Medtronic Ave, Inc.* v. *Cordis Corporation et al.* (CA. No. 97-700-SLR), *Boston Scientirfic Corporation* v. *Athicon, Inc. etal.* (CA. No. 98-19-SLR), Expert Report of John T. Goolkasian, Esq.

*Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc. et al.* (CA. No. 97-550-SLR), *Medtronic A VE, Inc.* v. *Cordis Corporation et al* (CA. No. 97-700-SLR), *Boston Scientific Corporation* v. *Athicon, Inc. et al* (CA. 98-19-SLR), Expert Report of John F. Witherspoon.

"Microbial Conversion of Rapamycin," Kuhnt et al., Enzyme and Microbial Technology, vol. 21, pp. 405-412, 1997.

"Inhibitory Effects of Rapamycin on Intimal Hyperplasia After PTCA," Badimon et al.., JACC, Mar. 1998.

* cited by examiner



**FIG. 1**



**FIG. 1a**



**FIG. 2a**

**FIG. 2b**



# FIG. 3a



# FIG. 3b



# FIG. 4



US 7,223,286 B2

1

## LOCAL DELIVERY OF RAPAMYCIN FOR TREATMENT OF PROLIFERATIVE SEQUELAE ASSOCIATED WITH PTCA PROCEDURES, INCLUDING DELIVERY USING A MODIFIED STENT

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of Ser. No. 10/408,328, filed Apr. 7, 2003, now issued as U.S. Pat. No. 6,808,536, which in turn is a continuation of application Ser. No. 09/874,117, filed Jun. 4, 2001, now issued as U.S. Pat. No. 6,585,764, which is a continuation of application Ser. No. 09/061,568, filed Apr. 16, 1998, now issued as U.S. Pat. No. 6,273,913, which in turn claims benefit of provisional application Ser. No. 60/044,692, filed Apr. 18, 1997.

### FIELD OF THE INVENTION

Delivery of rapamycin locally, particularly from an intravascular stent, directly from micropores in the stent body or mixed or bound to a polymer coating applied on stent, to inhibit neointimal tissue proliferation and thereby prevent restenosis. This invention also facilitates the performance of the stent in inhibiting restenosis.

### BACKGROUND OF THE INVENTION

Re-narrowing (restenosis) of an artherosclerotic coronary artery after percutaneous transluminal coronary angioplasty (PTCA) occurs in 10–50% of patients undergoing this procedure and subsequently requires either further angioplasty or coronary artery bypass graft. While the exact hormonal and cellular processes promoting restenosis are still being determined, our present understanding is that the process of PTCA, besides opening the artherosclerotically obstructed artery, also injures resident coronary arterial smooth muscle cells (SMC). In response to this injury, adhering platelets, infiltrating macrophages, leukocytes, or the smooth muscle cells (SMC) themselves release cell derived growth factors with subsequent proliferation and migration of medial SMC through the internal elastic lamina to the area of the vessel intima. Further proliferation and hyperplasia of intimal SMC and, most significantly, production of large amounts of extracellular matrix over a period of 3–6 months results in the filling in and narrowing of the vascular space sufficient to significantly obstruct coronary blood flow.

Several recent experimental approaches to preventing SMC proliferation have shown promise although the mechanisms for most agents employed are still unclear. Heparin is the best known and characterized agent causing inhibition of SMC proliferation both in vitro and in animal models of balloon angioplasty-mediated injury. The mechanism of SMC inhibition with heparin is still not known but may be due to any or all of the following: 1) reduced expression of the growth regulatory protooncogenes c-fos and c-myc, 2) reduced cellular production of tissue plasminogen activator; are 3) binding and dequestration of growth regulatory factors such as fibrovalent growth factor (FGF).

Other agents which have demonstrated the ability to reduce myointimal thickening in animal models of balloon vascular injury are angiopeptin (a somatostatin analog), calcium channel blockers, angiotensin converting enzyme inhibitors (captopril, cilazapril), cyclosporin A, trapidil (an antianginal, antiplatelet agent), terbinafine (antifungal),

2

colchicine and taxol (antitubulin antiproliferatives), and c-myc and c-myb antisense oligonucleotides.

Additionally, a goat antibody to the SMC mitogen platelet derived growth factor (PDGF) has been shown to be effective in reducing myointimal thickening in a rat model of balloon angioplasty injury, thereby implicating PDGF directly in the etiology of restenosis. Thus, while no therapy has as yet proven successful clinically in preventing restenosis after angioplasty, the in vivo experimental success of several agents known to inhibit SMC growth suggests that these agents as a class have the capacity to prevent clinical restenosis and deserve careful evaluation in humans.

Coronary heart disease is the major cause of death in men over the age of 40 and in women over the age of fifty in the western world. Most coronary artery-related deaths are due to atherosclerosis. Atherosclerotic lesions which limit or obstruct coronary blood flow are the major cause of ischemic heart disease related mortality and result in 500,000–600,000 deaths in the United States annually. To arrest the disease process and prevent the more advanced disease states in which the cardiac muscle itself is compromised, direct intervention has been employed via percutaneous transiuminal coronary angioplasty (PTCA) or coronary artery bypass graft (CABG)

PTCA is a procedure in which a small balloon-tipped catheter is passed down a narrowed coronary artery and then expanded to re-open the artery. It is currently performed in approximately 250,000–300,000 patients each year. The major advantage of this therapy is that patients in which the procedure is successful need not undergo the more invasive surgical procedure of coronary artery bypass graft. A major difficulty with PTCA is the problem of post-angioplasty closure of the vessel, both immediately after PTCA (acute reocclusion) and in the long term (restenosis).

The mechanism of acute reocclusion appears to involve several factors and may result from vascular recoil with resultant closure of the artery and/or deposition of blood platelets along the damaged length of the newly opened blood vessel followed by formation of a fibrin/red blood cell thrombus. Recently, intravascular stents have been examined as a means of preventing acute reclosure after PTCA.

Restenosis (chronic reclosure) after angioplasty is a more gradual process than acute reocclusion: 30% of patients with subtotal lesions and 50% of patients with chronic total lesions will go on to restenosis after angioplasty. While the exact mechanism for restenosis is still under active investigation, the general aspects of the restenosis process have been identified.

In the normal arterial will, smooth muscle cells (SMC) proliferate at a low rate (<0.1%/day; ref). SMC in vessel wall exists in a 'contractile' phenotype characterized by 80–90% of the cell cytoplasmic volume occupied with the contractile apparatus. Endoplasmic reticulum, golgi bodies, and free ribosomes are few and located in the perinuclear region. Extracellular matrix surrounds SMC and is rich in heparin-like glycosylaminoglycans which are believed to be responsible for maintaining SMC in the contractile phenotypic state.

Upon pressure expansion of an intracoronary balloon catheter during angioplasty, smooth muscle cells within the arterial wall become injured. Cell derived growth factors such as platelet derived growth factor (PDGF), basic fibroblast growth factor (bFGF), epidermal growth factor (EGF), etc. released from platelets (i.e., PDGF) adhering to the damaged arterial luminal surface, invading macrophages and/or leukocytes, or directly from SMC (i.e., BFGF) provoke a proliferation and migratory response in medial SMC.

3

These cells undergo a phenotypic change from the contractile phenotype to a 'synthetic' phenotype characterized by only few contractile filament bundles but extensive rough endoplasmic reticulum, golgi and free ribosomes. Proliferation/migration usually begins within 1–2 days post-injury and peaks at 2 days in the media, rapidly declining thereafter (Campbell et al., In: *Vascular Smooth Muscle Cells in Culture,* Campbell, J. H. and Campbell, G. R., Eds, CRC Press, Boca Ration, 1987, pp. 39–55); Clowes, A. W. and Schwartz, S. M., Circ. Res. 56:139–145, 1985).

Finally, daughter synthetic cells migrate to the intimal layer of arterial smooth muscle and continue to proliferate. Proliferation and migration continues until the damaged luminal endothelial layer regenerates at which time proliferation ceases within the intima, usually within 7–14 days postinjury. The remaining increase in intimal thickening which occurs over the next 3–6 months is due to an increase in extracellular matrix rather than cell number. Thus, SMC migration and proliferation is an acute response to vessel injury while intimal hyperplasia is a more chronic response. (Liu et al., Circulation, 79:1374–1387, 1989).

Patients with symptomatic reocclusion require either repeat PTCA or CABG. Because 30–50% of patients undergoing PTCA will experience restenosis, restenosis has clearly limited the success of PTCA as a therapeutic approach to coronary artery disease. Because SMC proliferation and migration are intimately involved with the pathophysiological response to arterial injury, prevention of SMC proliferation and migration represents a target for pharmacological intervention in the prevention of restenosis.

SUMMARY OF THE INVENTION

Novel Features and Applications to Stent Technology

Currently, attempts to improve the clinical performance of stents have involved some variation of either applying a coating to the metal, attaching a covering or membrane, or embedding material on the surface via ion bombardment. A stent designed to include reservoirs is a new approach which offers several important advantages over existing technologies.

Local Drug Delivery from a Stent to Inhibit Restenosis

In this application, it is desired to deliver a therapeutic agent to the site of arterial injury. The conventional approach has been to incorporate the therapeutic agent into a polymer material which is then coated on the stent. The ideal coating material must be able to adhere tenaciously to the metal stent both before and after expansion, be capable of retaining the drug at a sufficient load level to obtain the required dose, be able to release the drug in a controlled way over a period of several weeks, and be as thin as possible so as to minimize the increase in profile. In addition, the coating material should not contribute to any adverse response by the body (i.e., should be non-thrombogenic, non-inflammatory, etc.). To date, the ideal coating material has not been developed for this application.

An alternative would be to design the stent to contain reservoirs which could be loaded with the drug. A coating or membrane of biocompatable material could be applied over the reservoirs which would control the diffusion of the drug from the reservoirs to the artery wall.

One advantage of this system is that the properties of the coating can be optimized for achieving superior biocompatibility and adhesion properties, without the addition requirement of being able to load and release the drug. The size,

4

shape, position, and number of reservoirs can be used to control the amount of drug, and therefore the dose delivered.

DESCRIPTION OF THE DRAWINGS

The invention will be better understood in connection with the following figures in which FIGS. 1 and 1A are top views and section views of a stent containing reservoirs as described in the present invention;

FIGS. 2a and 2b are similar views of an alternate embodiment of the stent with open ends;

FIGS. 3a and 3b are further alternate figures of a device containing a grooved reservoir; and

FIG. 4 is a layout view of a device containing a reservoir as in FIG. 3.

DETAILED DESCRIPTION OF THE INVENTION

Pharmacological attempts to prevent restenosis by pharmacologic means have thus far been unsuccessful and all involve systemic administration of the trial agents. Neither aspirin-dipyridamole, ticlopidine, acute heparin administration, chronic warfarin (6 months) nor methylprednisolone have been effective in preventing restenosis although platelet inhibitors have been effective in preventing acute reocclusion after angioplasty. The calcium antagonists have also been unsuccessful in preventing restenosis, although they are still under study. Other agents currently under study include thromboxane inhibitors, prostacyclin mimetics, platelet membrane receptor blockers, thrombin inhibitors and angiotensin converting enzyme inhibitors. These agents must be given systemically, however, and attainment of a therapeutically effective dose may not be possible; antiproliferative (or anti-restenosis) concentrations may exceed the known toxic concentrations of these agents so that levels sufficient to produce smooth muscle inhibition may not be reached (Lang et al., 42 Ann. Rev. Med., 127–132 (1991); Popma et al., 84 *Circulation,* 1426–1436 (1991)).

Additional clinical trials in which the effectiveness for preventing restenosis of dietary fish oil supplements, thromboxane receptor antagonists, cholesterol lowering agents, and serotonin antagonists has been examined have shown either conflicting or negative results so that no pharmacological agents are as yet clinically available to prevent post-angioplasty restenosis (Franklin, S. M. and Faxon, D. P., 4 Coronary Artery Disease, 232–242 (1993); Serruys, P. W. et al., 88 *Circulation,* (part 1) 1588–1601, (1993).

Conversely, stents have proven useful in preventing reducing the proliferation of restenosis. Stents, such as the stent 10 seen in layout in FIG. 4, balloon-expandable slotted metal tubes (usually but not limited to stainless steel), which when expanded within the lumen of an angioplastied coronary artery, provide structural support to the arterial wall. This support is helpful in maintaining an open path for blood flow. In two randomized clinical trials, stents were shown to increase angiographic success after PTCA, increase the stenosed blood vessel lumen and to reduce the lesion recurrence at 6 months (Serruys et al., 331 New Eng Jour. Med, 495, (1994); Fischman et al., 331 New Eng Jour. Med, 496–501 (1994). Additionally, in a preliminary trial, heparin coated stents appear to possess the same benefit of reduction in stenosis diameter at follow-up as was observed with non-heparin coated stents. Additionally, heparin coating appears to have the added benefit of producing a reduction in sub-acute thrombosis after stent implantation (Serruys et al., 93 Circulation, 412–422, (1996). Thus, 1) sustained

US 7,223,286 B2

5

mechanical expansion of a stenosed coronary artery has been shown to provide some measure of restenosis prevention, and 2) coating of stents with heparin has demonstrated both the feasibility and the clinical usefulness of delivering drugs to local, injured tissue off the surface of the stent.

Numerous agents are being actively studied as antiproliferative agents for use in restenosis and have shown some activity in experimental animal models. These include: heparin and heparin fragments (Clowes and Karnovsky, 265 *Nature,* 25–626, (1977); Guyton, J. R. et al. 46 Circ. Res., 625–634, (1980); Clowes, A. W. and Clowes, M. M., 52 Lab. Invest., 611–616, (1985); Clowes, A. W. and Clowes, M. M., 58 Circ. Res., 839–845 (1986);. Majesky et al., 61 Circ Res., 296–300, (1987); Snow et al., 137 Am. J. Pathol., 313–330 (1990); Okada, T. et al., 25 *Neurosurgery,* 892–898, (1989) colchicine (Currier, J. W. et al., 80 *Circulation,* 11–66, (1989), taxol (ref), agiotensin converting enzyme (ACE) inhibitors (Powell, J. S. et al., 245 Science, 186–188 (1989), angiopeptin (Lundergan, C. F. et al., 17 Am. J. Cardiol. (Suppi. B); 132B–136B (1991), Cyclosporin A (Jonasson, L. et. al., 85 Proc. Natl. Acad. Sci., 2303 (1988), goat-anti-rabbit PDGF antibody (Ferns, G. A. A., et al., 253 *Science,* 1129–1132 (1991), terbinafine (Nemecek, G. M. et al., 248 J. Pharmacol. Exp. Thera., 1167–11747 (1989), trapidil (Liu, M. W. et al., 81 *Circulation,* 1089–1093 (1990), interferon-gamma (Hansson, G. K. and Holm, 84 *J. Circulation,* 1266–1272 (1991), steroids (Colburn, M. D. et al., 15 J. Vasc. Surg., 510–518 (1992), see also Berk, B. C. et al., 17 J. Am. Coll. Cardiol., 111B–117B (1991), ionizing radiation (ref), fusion toxins (ref) antisense oligonucleotides (ref), gene vectors (ref), and rapamycin (see below).

Of particular interest in rapamycin. Rapamycin is a macrolide antibiotic which blocks IL-2-mediated T-cell proliferation and possesses antiinflammatory activity. While the precise mechanism of rapamycin is still under active investigation, rapamycin has been shown to prevent the $G_1$ to S phase progression of T-cells through the cell cycle by inhibiting specific cell cyclins and cyclin-dependent protein kinases (Siekierka, Immunol. Res. 13: 110–116, 1994). The antiproliferative action of rapamycin is not limited to T-cells; Marx et al. (Circ Res 76:412–417, 1995) have demonstrated that rapamycin prevents proliferation of both rat and human SMC in vitro while Poon et al. have shown the rat, porcine, and human SMC migratin can also be inhibited by rapamycin (J Clin Invest 98: 2277–2283, 1996). Thus, rapamycin is capable of inhibiting both the inflammatory response known to occur after arterial injury and stent implantation, as well as the SMC hyperproliferative response. In fact, the combined effects of rapamycin have been demonstrated to result in a diminished SMC hyperproliferative response in a rat femoral artery graft model and in both rat and porcine arterial balloon injury models (Gregory et al., Transplantation 55:1409–1418, 1993; Gallo et al., in press, (1997)). These observations clearly support the potential use of rapamycin in the clinical setting of post-angioplasty restenosis.

Although the ideal agent for restenosis has not yet been identified, some desired properties are clear: inhibition of local thrombosis without the risk systemic bleeding complications and continuous and prevention of the dequale of arterial injury, including local inflammation and sustained prevention smooth muscle proliferation at the site of angioplasty without serious systemic complications. Inasmuch as stents prevent at least a portion of the restenosis process, an agent which prevents inflammation and the proliferation of SMC combined with a stent may provide the most efficacious treatment for post-angioplasty restenosis.

6

Experiments

Agents: Rapamycin (sirolimus) structural analogs (macrocyclic lactones) and inhibitors of cell-cycle progression.

Delivery Methods:

These can vary:

Local delivery of such agents (rapamycin) from the struts of a stent, from a stent graft, grafts, stent cover or sheath.

Involving comixture with polymers (both degradable and nondegrading) to hold the drug to the stent or graft.

or entrapping the drug into the metal of the stent or graft body which has been modified to contain micropores or channels, as will be explained further herein.

or including covalent binding of the drug to the stent via solution chemistry techniques (such as via the Carmeda process) or dry chemistry techniques (e.g. vapour deposition methods such as rf-plasma polymerization) and combinations thereof.

Catheter delivery intravascularly from a tandem balloon or a porous balloon for intramural uptake

Extravascular delivery by the pericardial route

Extravascular delivery by the advential application of sustained release formulations.

Uses: for inhibition of cell proliferation to prevent neointimal proliferation and restenosis.

prevention of tumor expansion from stents

prevent ingrowth of tissue into catheters and shunts inducing their failure.

1. Experimental Stent Delivery Method—Delivery from Polymer Matrix:

Solution of Rapamycin, prepared in a solvent miscible with polymer carrier solution, is mixed with solution of polymer at final concentration range 0.001 weight % to 30 weight % of drug. Polymers are biocompatible (i.e., not elicit any negative tissue reaction or promote mural thrombus formation) and degradable, such as lactone-based polyesters or copolyesters, e.g., polylactide, polycaprolactonglycolide, polyorthoesters, polyanhydrides; poly-amino acids; polysaccharides; polyphosphazenes; poly(ether-ester) copolymers, e.g., PEO-PLLA, or blends thereof. Nonabsorbable biocompatible polymers are also suitable candidates. Polymers such as polydimethylsiolxane; poly(ethylene-vingylacetate); acrylate based polymers or copolymers, e.g., poly(hydroxyethyl methylmethacrylate, polyvinyl pyrrolidinone; fluorinated polymers such as polytetrafluoroethylene; cellulose esters.

Polymer/drug mixture is applied to the surfaces of the stent by either dip-coating, or spray coating, or brush coating or dip/spin coating or combinations thereof, and the solvent allowed to evaporate to leave a film with entrapped rapamycin.

2. Experimental Stent Delivery Method—Delivery from Microporous Depots in Stent Through a Polymer Membrane Coating:

Stent, whose body has been modified to contain micropores or channels is dipped into a solution of Rapamycin, range 0.001 wt % to saturated, in organic solvent such as acetone or methylene chloride, for sufficient time to allow solution to permeate into the pores. (The dipping solution can also be compressed to improve the loading efficiency.) After solvent has been allowed to evaporate, the stent is dipped briefly in fresh solvent to remove excess surface bound drug. A solution of polymer, chosen from any identified in the first experimental method, is applied to the stent as detailed above. This outer layer of polymer will act as diffusion-controller for release of drug.

US 7,223,286 B2

7

8

3. Experimental Stent Delivery Method—Delivery via Lysis of a Covalent Drug Tether

Rapamycin is modified to contain a hydrolytically or enzymatically labile covalent bond for attaching to the surface of the stent which itself has been chemically derivatized to allow covalent immobilization. Covalent bonds such as ester, amides or anhydrides may be suitable for this.

4. Experimental Method—Pericardial Delivery

A: Polymeric Sheet Rapamycin is combined at concentration range previously highlighted, with a degradable polymer such as poly(caprolactone-gylcolide) or non-degradable polymer, e.g., polydimethylsiloxane and mixture cast as a thin sheet, thickness range 10μ to 1000μ. The resulting sheet can be wrapped perivascularly on the target vessel. Preference would be for the absorbable polymer.

B: Conformal Coating: Rapamycin is combined with a polymer that has a melting temperature just above 37° C., range 40°–45° C. Mixture is applied in a molten state to the external side of the target vessel. Upon cooling to body temperature the mixture solidifies conformally to the vessel wall. Both non-degradable and absorbable biocompatible polymers are suitable.

As seen in the figures it is also possible to modify currently manufactured stents in order to adequately provide the drug dosages such as rapamycin. As seen in FIGS. 1a, 2a and 3a, any stent strut 10, 20, 30 can be modified to have a certain reservoir or channel 11, 21, 31. Each of these reservoirs can be open or closed as desired. These reservoirs can hold the drug to be delivered. FIG. 4 shows a stent 40 with a reservoir 45 created at the apex of a flexible strut. Of course, this reservoir 45 is intended to be useful to deliver rapamycin or any other drug at a specific point of flexibility of the stent. Accordingly, this concept can be useful for "second generation" type stents.

In any of the foregoing devices, however, it is useful to have the drug dosage applied with enough specificity and enough concentration to provide an effective dosage in the lesion area. In this regard, the reservoir size in the stent struts must be kept at a size of about 0.0005" to about 0.003". Then, it should be possible to adequately apply the drug dosage at the desired location and in the desired amount.

These and other concepts will are disclosed herein. It would be apparent to the reader that modifications are possible to the stent or the drug dosage applied. In any event, however, the any obvious modifications should be perceived to fall within the scope of the invention which is to be realized from the attached claims and their equivalents.

What is claimed is:

1. A stent having a coating applied thereto, wherein said coating comprises a biocompatible polymer/drug mixture and said drug is rapamycin or a macrocyclic lactone analog thereof.

2. A stent according to claim 1 comprising a generally thin walled cylinder containing a plurality of generally solid struts to which said coating is applied.

3. A stent according to claim 2 further comprising a channel formed in at least one of said struts.

4. A stent according to claim 3, wherein said channel has a closed perimeter on all sides, an open top and a generally rectangular perimeter, and said channel is smaller in all dimensions than said strut.

5. A stent according to claim 1 wherein the coating is dip-coated onto the stent.

6. A stent according to claim 1 wherein the coating is spray-coated onto the stent.

7. A stent according to claim 1 wherein said rapamycin or macrocyclic lactone analog thereof is contained in the coating at a weight percentage of about 30%.

8. A stent according to claim 1 wherein the coating comprises a degradable polymer.

9. A stent according to claim 1 wherein the coating comprises a nonabsorbable polymer.

10. A stent according to claim 1 wherein the coating comprises a lactone-based polyester; a lactone-based copolyester; a polyanhydride; a polyaminoacid; a polysaccharide; a polyphosphazene; a poly(ether-ester) copolymer; a polydimethylsiloxane; a poly(ethylene)vinylacetate; a poly (hydroxy)ethylmethylmethacrylate; an acrylate based polymer; an acrylate based copolymer; a polyvinyl pyrrolidone; a cellulose ester; a fluorinated polymer; or a blend thereof.

11. A stent according to claim 10 wherein the coating comprises a lactone-based polyester.

12. A stent according to claim 10 wherein the coating comprises a lactone-based copolyester.

13. A stent according to claim 10 wherein the coating comprises a polyanhydride.

14. A stent according to claim 10 wherein the coating comprises a polyaminoacid.

15. A stent according to claim 10 wherein the coating comprises a polysaccharide.

16. A stent according to claim 10 wherein the coating comprises a polyphosphazene.

17. A stent according to claim 10 wherein the coating comprises a poly(ether-ester) copolymer.

18. A stent according to claim 10 wherein the coating comprises a polydimethylsiloxane.

19. A stent according to claim 10 wherein the coating comprises a poly(ethylene)vinylacetate.

20. A stent according to claim 10 wherein the coating comprises a poly(hydroxy)ethylmethylmethacrylate.

21. A stent according to claim 10 wherein the coating comprises an acrylate based polymer.

22. A stent according to claim 10 wherein the coating comprises an acrylate based copolymer.

23. A stent according to claim 10 wherein the coating comprises a polyvinyl pyrrolidone.

24. A stent according to claim 10 wherein the coating comprises a cellulose ester.

25. A stent according to claim 10 wherein the coating comprises a fluorinated polymer.

26. A stent according to claim 10 wherein the fluorinated polymer is polytetrafluoroethylene.

27. A stent according to any one of claims 1 to 26 wherein said drug is a macrocyclic lactone analog of rapamycin.

28. A stent according to any one of claims 1 to 26 that provides a controlled release of said rapamycin or macrocyclic lactone analog thereof over a period of several weeks.

29. A stent according to claim 28 wherein said drug is a macrocyclic lactone analog of rapamycin.

30. A stent according to any one of claims 1 to 26 that releases said rapamycin or macrocyclic lactone analog thereof over a period of at least 14 days.

31. A stent according to claim 30 wherein said drug is a macrocyclic lactone analog of rapamycin.

32. A stent according to any one of claims 1 to 26 wherein said rapamycin or macrocyclic lactone analog thereof is present in a therapeutically beneficial amount to inhibit neointimal proliferation.

33. A stent according to claim 32 wherein said drug is a macrocyclic lactone analog of rapamycin.

US 7,223,286 B2

9
10

**34.** A stent according to claim **33** that releases said macrocyclic lactone analog of rapamycin over a period of at least 14 days.

**35.** A stent according to claim **34** wherein the coating comprises a fluorinated polymer.

**36.** A stent according to claim **35** wherein the coating further comprises an acrylate based polymer or copolymer.

**37.** A stent according to claim **33** that provides a controlled release of said rapamycin or macrocyclic lactone analog thereof over a period of several weeks.

**38.** A stent according to claim **37** wherein the coating comprises a fluorinated polymer.

**39.** A stent according to claim **38** wherein the coating further comprises an acrylate based polymer or copolymer.

**40.** A device comprising a metallic stent, a biocompatible polymeric carrier and a drug, wherein said drug is rapamycin or a macrocyclic lactone analog thereof and is present in an amount effective to inhibit neointimal proliferation.

**41.** A device according to claim **40** wherein said polymeric carrier and drug are mixed together.

**42.** A device according to claim **40** wherein said polymeric carrier is bound to the drug.

**43.** A device according to claim **40** wherein the drug is entrapped on the surface of the stent by said polymeric carrier.

**44.** A device according to claim **40** wherein said stent comprises a generally thin walled cylinder containing a plurality of generally solid struts to which said polymeric carrier and drug are applied.

**45.** A device according to claim **44** further comprising a channel formed in at least one of said struts.

**46.** A device according to claim **45**, wherein said channel has a closed perimeter on all sides, an open top and a generally rectangular perimeter, and said channel is smaller in all dimensions than said strut.

**47.** A device according to claim **40** wherein the polymeric carrier and drug are dip-coated onto the stent.

**48.** A device according to claim **40** wherein the polymeric carrier and drug are spray-coated onto the stent.

**49.** A device according to claim **40** wherein the weight ratio of drug to polymeric carrier is about 3:7.

**50.** A device according to claim **40** wherein the polymeric carrier comprises a degradable polymer.

**51.** A device according to claim **40** wherein the polymeric carrier comprises a nonabsorbable polymer.

**52.** A device according to claim **40** wherein the polymeric carrier comprises a lactone-based polyester; a lactone-based copolyester; a polyanhydride; a polyaminoacid; a polysaccharide; a polyphosphazene; a poly(ether-ester) copolymer; a polydimethylsiloxane; a poly(ethylene)vinylacetate; a poly (hydroxy)ethylmethylmethacrylate; an acrylate based polymer; an acrylate based copolymer; a polyvinyl pyrrolidone; a cellulose ester; a fluorinated polymer; or a blend thereof.

**53.** A device according to claim **52** wherein the polymeric carrier comprises a lactone-based polyester.

**54.** A device according to claim **52** wherein the polymeric carrier comprises a lactone-based copolyester.

**55.** A device according to claim **52** wherein the polymeric carrier comprises a polyanhydride.

**56.** A device according to claim **52** wherein the polymeric carrier comprises a polyaminoacid.

**57.** A device according to claim **52** wherein the polymeric carrier comprises a polysaccharide.

**58.** A device according to claim **52** wherein the polymeric carrier comprises a polyphosphazene.

**59.** A device according to claim **52** wherein the polymeric carrier comprises a poly(ether-ester) copolymer.

**60.** A device according to claim **52** wherein the polymeric carrier comprises a polydimethylsiloxane.

**61.** A device according to claim **52** wherein the polymeric carrier comprises a poly(ethylene)vinylacetate.

**62.** A device according to claim **52** wherein the polymeric carrier comprises a poly(hydroxy)ethylmethylmethacrylate.

**63.** A device according to claim **52** wherein the polymeric carrier comprises an acrylate based polymer.

**64.** A device according to claim **52** wherein the polymeric carrier comprises an acrylate based copolymer.

**65.** A device according to claim **52** wherein the polymeric carrier comprises a polyvinyl pyrrolidone.

**66.** A device according to claim **52** wherein the polymeric carrier comprises a cellulose ester.

**67.** A device according to claim **52** wherein the polymeric carrier comprises a fluorinated polymer.

**68.** A device according to claim **67** wherein the fluorinated polymer is polytetrafluoroethylene.

**69.** A device according to any one of claims **40** to **68** wherein said drug is a macrocyclic lactone analog of rapamycin.

**70.** A device according to any one of claims **40** to **68** that provides a controlled release of said rapamycin or macrocyclic lactone analog thereof over a period of several weeks.

**71.** A device according to claim **70** wherein said drug is a macrocyclic lactone analog of rapamycin.

**72.** A device according to claim **71** wherein the polymeric carrier comprises a fluorinated polymer.

**73.** A device according to claim **72** wherein the polymeric carrier further comprises an acrylate based polymer or copolymer.

**74.** A device according to any one of claims **40** to **68** that releases said drug over a period of at least 14 days.

**75.** A device according to claim **74** wherein said drug is a macrocyclic lactone analog of rapamycin.

**76.** A device according to claim **75** wherein the polymeric carrier comprises a fluorinated polymer.

**77.** A device according to claim **76** wherein the polymeric carrier further comprises an acrylate based polymer or copolymer.

*   *   *   *   *

# EXHIBIT B

Donald A. Robinson
John B. Livelli
Keith J. Miller
ROBINSON & LIVELLI
2 Penn Plaza East, 11th Floor
Newark, NJ 07105
(973) 690-5400

David T. Pritikin
William H. Baumgartner, Jr.
Paul E. Veith
Russell E. Cass
SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL 60603
(312) 853-7000

Attorneys for Plaintiff
Cordis Corporation

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CORDIS CORPORATION | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | |
| vs. | ) | **COMPLAINT AND DEMAND** |
| | ) | **FOR JURY TRIAL** |
| | ) | |
| ABBOTT LABORATORIES., | ) | *Document Filed Electronically* |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Cordis Corporation, by its attorneys, alleges as follows:

## THE PARTIES

1.      Plaintiff Cordis Corporation ("Cordis"), 33 Technology Drive, Warren,

New Jersey, is a Florida corporation with a principal place of business in Warren, New Jersey.

Cordis also has facilities in Clark, New Jersey.  Cordis is a pioneer in developing invasive

treatments for vascular disease, including the CYPHER® drug-eluting stent, a drug/device combination for the treatment of coronary artery disease.

2.        Upon information and belief, Defendant Abbott Laboratories ("Abbott"), 100 Abbott Park Road, North Chicago, IL 60064, is an Illinois corporation with a principal place of business in Illinois.

## JURISDICTION AND VENUE

3.        This Court has subject matter jurisdiction over Cordis's patent infringement claims under 28 U.S.C. § 1331 and 1338(a).

4.        This Court has personal jurisdiction over Abbott.  On information and belief, Abbott has systematic and continuous contacts in this judicial District, regularly transacts business within this judicial District, and regularly avails itself of the benefits of this judicial District.  For example, Abbott is registered to do business in New Jersey, and has facilities located in this District, including in East Windsor, Cranbury, South Brunswick, Edison, Whippany, and Parsippany, New Jersey.  On information and belief, Abbott also has numerous employees in this District, derives substantial revenues from its business operations and sales in this district, and pays taxes in New Jersey based on revenue generated in this District.  On information and belief, Abbott also sells and distributes medical devices in this District, including vascular devices.

5.        Venue is proper in this District under 28 U.S.C. §§ 1391(b) and (c) and 1400(b).

## FACTUAL ALLEGATIONS

6.        Abbott is the manufacturer of a drug-eluting stent named XIENCE V Everolimus Eluting Coronary Stent System ("XIENCE V stent").  Abbott has manufactured

2

thousands of XIENCE V products in the United States for sale in Europe and Asia. Abbott launched the XIENCE V stent in Europe and the Asia Pacific regions in 2006.

      7.      On May 29, 2007, the United States Patent and Trademark Office ("USPTO") duly and legally issued United States Patent No. 7,223,286, entitled "Local Delivery of Rapamycin For Treatment of Proliferative Sequelae Associated With PTCA Procedures, Including Delivery Using a Modified Stent" (the "'286 patent"). The '286 patent issued to Wright et al., and is assigned to Cordis. Cordis holds all right, title and interest in and to the '286 patent.

      8.      Abbott has been and is performing acts covered by the claims of the '286 patent, including making and/or using the XIENCE V stent in the United States for sale in Europe and Asia.

      9.      At present, there are only two companies marketing in the United States drug eluting stents – Cordis and Boston Scientific Corporation. Abbott has publicly announced that it plans to seek approval from the United States Food and Drug Administration in the second quarter of 2007 to sell the XIENCE V stent in the United States. Abbott has also publicly announced that, assuming it receives regulatory approval, it plans to launch the XIENCE V stent in the United States in the first half of 2008. Upon its launch in the United States, the XIENCE V stent will compete directly with Cordis's CYPHER stent, reducing Cordis's market share and causing irreparable harm to Cordis.

      10.      This action is related to Case No. 3:07-cv-02265-JAP-TJB, which was filed on May 15, 2007 in this judicial District by Cordis against Abbott. In the 02265 action, Cordis alleged that Abbott was liable for infringement of U.S. Patent No. 7,217,286, which is

related to the '286 patent at issue in this action, by making and/or using the XIENCE V stent in the United States.

### COUNT I:  INFRINGEMENT OF THE '286 PATENT

11.    Cordis realleges paragraphs 1-10 above as if fully set forth herein.

12.    Abbott is infringing the '286 patent in violation of 35 U.S.C. § 271, including by making and/or using the XIENCE V stent in the United States.

13.    Abbott had and has actual notice of the '286 patent, and is infringing the '286 patent with knowledge of Cordis's patent rights.  Abbott's actions are willful and deliberate.

### PRAYER FOR RELIEF

WHEREFORE, Cordis prays for the following relief against Abbott:

1.    For judgment in favor of Cordis that Abbott is infringing Cordis's patent;

2.    For a preliminary and permanent injunction pursuant to 35 U.S.C. § 283 prohibiting Abbott from making, using, selling, or offering for sale the infringing products in the United States;

3.    For an award of damages for Abbott's infringement of Cordis's patent, together with interest (both pre-and post-judgment), costs, and disbursements as fixed by this Court under 35 U.S.C. § 284;

4.    For a determination that Abbott's infringement is willful, and an award of treble the amount of damages and losses sustained by Cordis as a result of Abbott's infringement, under 35 U.S.C. § 284;

5.    For a determination that this is an exceptional case within the meaning of 35 U.S.C. § 285, and an award to Cordis of its reasonable attorneys' fees; and

6.       For such other and further relief in law or in equity to which Cordis may

be justly entitled.

5

## DEMAND FOR JURY TRIAL

Cordis demands a trial by jury of any and all issues triable of right before a jury.

Dated:  May 29, 2007.

By:

    *s/Donald A. Robinson*       

Donald A. Robinson
John B. Livelli
Keith J. Miller
ROBINSON & LIVELLI
2 Penn Plaza East, 11th Floor
Newark, NJ 07105
(973) 690-5400
     -and-

David T. Pritikin
William H. Baumgartner, Jr.
Paul E. Veith
Russell E. Cass
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000

ATTORNEYS FOR PLAINTIFF CORDIS
CORPORATION

CH1 3876671v.1

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBOTT LABORATORIES and ABBOTT CARDIOVASCULAR SYSTEMS, INC., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. |
| v. | ) ) ) | JURY TRIAL DEMANDED |
| JOHNSON AND JOHNSON, INC. and CORDIS CORPORATION, | ) ) ) | |
| Defendants. | ) ) | |

COMPLAINT FOR DECLARATORY JUDGMENT
OF PATENT INVALIDITY AND NONINFRINGEMENT

Plaintiffs Abbott Laboratories and Abbott Cardiovascular Systems, Inc. (collectively "Abbott") bring this Complaint against Defendants Johnson and Johnson, Inc. and Cordis Corporation (collectively "J&J"). This is an action for declaratory judgment and injunctive relief that United States Patent No. 7,217,286 entitled "Load Delivery of Rapamycin for Treatment of Proliferative Sequelae Associated with PTCA Procedures, Including Delivery Using a Modified Stent" ("the Falotico '286 patent") is invalid and not infringed by Abbott. The Issue Notification for the Falotico '286 patent is attached as Exhibit A. The Falotico '286 patent is attached as Exhibit B. Abbott alleges as follows:

### THE PARTIES

1.    Abbott Laboratories is a corporation organized under the laws of the State of Illinois and has a principal place of business at 100 Abbott Park Road, North Chicago, Illinois.

2.    Abbott Cardiovascular Systems, Inc. ("ACS"), formerly Advanced Cardiovascular Systems, Inc., is a corporation organized under the laws of the State of California

and has a principal place of business at 3200 Lakeside Drive, Santa Clara, California. ACS is a subsidiary of Abbott Laboratories.

3.     On information and belief, Johnson and Johnson, Inc. is a corporation organized under the laws of the State of New Jersey and has a principal place of business at One Johnson and Johnson Plaza, New Brunswick, New Jersey.

4.     On information and belief, Cordis Corporation ("Cordis") is a corporation organized under the laws of the State of Florida and has a principal place of business in Miami Lakes, Florida. Cordis is a subsidiary of Johnson and Johnson, Inc.

## JURISDICTION AND VENUE

5.     This action arises under the Patent Laws of the United States (35 U.S.C. § 1 *et seq.*).

6.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

7.     This Court has personal jurisdiction, general and specific, over J&J.

8.     On information and belief, J&J has systematic and continuous contacts in this judicial district.

9.     On information and belief, J&J regularly avails itself of the benefits of this judicial district, including the jurisdiction of the courts.

10.     On information and belief, J&J regularly transacts business within this judicial district.

11.     On information and belief, J&J regularly sells products in this judicial district. J&J derives substantial revenues from sales in this district.

12.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c).

2

## BACKGROUND

13.    J&J, and in particular Cordis, directly competes with Abbott in the field of intravascular stents used to treat coronary artery disease.

14.    The coronary stent industry is highly litigious. J&J, and in particular Cordis, has a well-known history of suing competitors in this field for patent infringement.

15.    On three occasions within the last ten years, Cordis sued ACS in this district, alleging patent infringement involving angioplasty catheters or stents for treating coronary artery disease. (*Cordis Corporation, et al. v. Advanced Cardiovascular Systems, Inc, et al.*, C.A. No. 97-550-SLR; *Cordis Corporation, et al. v. Advanced Cardiovascular Systems, Inc., et al.*, C.A. No. 97-635-SLR; and *Cordis Corporation, et al. v. Advanced Cardiovascular Systems, Inc., et al.*, C.A. No. 98-065-SLR).

16.    On three additional occasions within the last ten years, Cordis initiated patent infringement actions in this judicial district involving angioplasty catheters or stents for treating coronary artery disease. (*Cordis Corp. v. Boston Scientific Corp.*, C.A. No. 98-197-SLR; *Cordis Corp. v. Medtronic AVE, Inc.*, C.A. No. 00-886-SLR; and *Cordis Corp. v. Boston Scientific Corp.*, C.A. No. 03-027-SLR).

17.    In early 2006, J&J and Boston Scientific Corporation ("BSC") each were bidding to acquire assets of Guidant Corporation ("Guidant"), which at the time was the parent corporation of ACS. In conjunction with BSC's bid, ACS would be acquired by Abbott Laboratories, which was the ultimate result.

18.    One of the key assets of ACS was the XIENCE V drug eluting stent system ("XIENCE V"), which elutes a proprietary drug known as everolimus. ACS holds an exclusive

3

patent license to use everolimus for drug eluting stents. In clinical trials, everolimus has proven superior to other drugs.

19.    On information and belief, J&J believed in early 2006 that the XIENCE V would be launched within a few months.

The Patent-in-Suit

20.    United States Application No. 11/467,035 entitled "Load Delivery of Rapamycin for Treatment of Proliferative Sequelae Associated with PTCA Procedures, Including Delivery Using a Modified Stent" (the "Falotico '035 application") was filed on August 24, 2006.

21.    The Falotico '035 application is related to and claims priority to United States Patent Nos. 6,808,536 ("the Wright '536 patent") and 6,585,764 ("the Wright '764 patent).

22.    On information and belief, the subject matter claimed in the Falotico '035 application is not patentably distinct from subject matter claimed in at least the Wright '764 patent and the Wright '536 patent.

23.    On information and belief, the Falotico '035 patent issued on May 15, 2007 as United States Patent No. 7,217,286.

J&J's Public Threats To Sue For Patent Infringement By XIENCE V

24.    On information and belief, J&J undertook a public campaign to cast a cloud over the launch of the XIENCE V.

25.    On information and belief, as a main thrust of this public campaign, J&J alleged that the XIENCE V would infringe patents allegedly owned by J&J and that J&J would sue Abbott for infringement by the XIENCE V following its launch. On information and belief, J&J's allegations related to at least the Wright '764 patent, the Wright '536 patent, and United States Patent No. 6,776,796 ("the Falotico '796 patent").

4

26.    On information and belief, J&J broadcasted threatening statements to industry analysts regarding alleged infringement by the XIENCE V, for publication in furtherance of J&J's public campaign.

27.    For example, the Prudential Equity Group, LLC published a report on January 20, 2006, titled "JNJ: Takes Off The Gloves In Its Fight With Boston Scientific For Guidant," attached as Exhibit G ("the Prudential report"). In the Prudential report, parties are identified by their stock symbols: ABT for Abbott, GDT for Guidant, JNJ for J&J, and BSX for BSC.

28.    On information and belief, the Prudential report relied on information provided in pertinent part by J&J.

29.    Among other things, the Prudential report stated:

JNJ claims that 2 of its patents may be infringed if a company tries to launch a drug-eluting stent coated with a rapamycin derivative such as . . . GDT's everolimus. The potential for JNJ to prevent ABT and BSX from marketing the Xience-V DES, could give the GDT board pause for approving a BSX-GDT merger.

\* \* \*

If BSX acquires GDT, BSX would sell GDT's vascular intervention (VI) business, including shared rights to GDT's promising everolimus-coated stent, Xience-V, to ABT. Although JNJ's patents have never been litigated, JNJ believes it has a strong intellectual property (IP) position with regard to the use of rapamycin derivatives on a stent. JNJ could pursue a preliminary injunction if ABT and BSX try to launch an everolimus-coated . . . stent. . . . According to JNJ, the key patents are the Falotico (6,776,796) and Wright (6,585,764) patents.

30.    On information and belief, J&J anticipated and intended that Abbott and others would become aware of threatening statements made by J&J to Prudential analysts.

31.    On January 23, 2006, A.G. Edwards & Sons, Inc. published a report titled "Healthcare Industry Note: The Game May Be Far From Over," attached as Exhibit D ("the AG Edwards report").

32.    On information and belief, the AG Edwards report relied on information provided in pertinent part by J&J.

33.    Among other things, the AG Edwards report stated:

We have had conversations with Johnson & Johnson (JNJ) and Boston Scientific (BSX) and others recently that lead us to believe that the Guidant (GDT) game is far from over.

\* \* \*

We were also reminded by JNJ that it had three patents related to '-limus' compounds that it thought precluded any other company from using such a compound on a stent. We were only given two patent numbers (6776796 [the Falotico '796 patent] and 6585764 [the Wright '764 patent]) . . . .

34.    On information and belief, the third patent referenced in J&J's threatening statements was the Wright '536 patent.

35.    On information and belief, J&J anticipated and intended that Abbott and others would become aware of threatening statements made by J&J to AG Edwards analysts.

36.    On January 13, 2006, Citigroup published a report titled "An INTERESTing New Offer," attached as Exhibit E ("the January 13 Citigroup report").

37.   On information and belief, the January 13, 2006 Citigroup report relied on information provided in pertinent part by J&J.

38.   Among other things, the January 13, 2006 Citigroup report stated:

The [Wright and Falotico] patents have never been challenged or enforced because no other company has launched a limus-based drug-eluting stent in the US, but are likely to eventually lead to litigation.

39.   Citigroup published an additional report on March 23, 2006 titled "Deconstructing Xience," attached as Exhibit F ("the March 23, 2006 Citigroup report"). In the March 23, 2006 Citigroup report, J&J is identified by its stock symbol JNJ.

40.   On information and belief, the March 23, 2006 Citigroup report relied on information provided in pertinent part by J&J.

41.   Among other things, the March 23, 2006 Citigroup report stated:

Everolimus will likely face two IP challenges from JNJ as both its Falotico and Wright patents claim the use of a limus analogue on a stent.

42.   On information and belief, J&J anticipated and intended that Abbott and others would become aware of threatening statements made by J&J to Citigroup analysts.

43.   On January 30, 2006, Lehman Brothers published a report titled "The Risks – Part I," attached as Exhibit G ("the Lehman Brothers report"). In the Lehman Brothers report, parties are identified by their stock symbols: ABT for Abbott; GDT for Guidant; and JNJ for J&J.

44.   On information and belief, the Lehman Brothers report relied on information provided in pertinent part by J&J.

45.   Among other things, the Lehman Brothers report stated:

7

There are even hypothetical litigations to contend with as JNJ has strongly suggested that they feel GDT and ABT may violate JN/Wyeth DES patents covering the "limus" family of drugs.

46.    On information and belief, J&J anticipated and intended that Abbott and others would become aware of threatening statements made by J&J to Lehman Brothers analysts.

47.    On March 14, 2006, Merril Lynch published a report titled "More legal wrangling for J&J possible," attached as Exhibit H ("the Merril Lynch report"). In the Merril Lynch report, J&J is identified by its stock symbol JNJ.

48.    On information and belief, the Merril Lynch report relied on information provided in pertinent part by J&J.

49.    Among other things, the Merril Lynch report stated:

JNJ has two patents (Wright and Falotico) which appear to relate to the elution of characteristics of "olimus" compounds; JNJ's Cypher DES uses sirolimus, a member of the olimus family of drugs; other olimus drugs include Guidant's everolimus and Abbott/Medtronic's zotarolimus (ABT-578). The European launch of Guidant's Xience DES, which the company has targeted for Q2:06, could trigger possible legal activity since we understand U.S. patent law prohibits domestic manufacture of a product for sale outside the U.S. if there's been infringement of intellectual property.

50.    On information and belief, J&J anticipated and intended that Abbott and others would become aware of threatening statements made by J&J to Merril Lynch analysts.

51.    On information and belief, J&J broadcast threatening statements to other news outlets regarding alleged infringement by the XIENCE V, for publication in furtherance of J&J's public campaign.

52.    On January 23, 2006, the International Herald Tribune published an article headlined "J&J works to discredit rival offer for Guidant," attached as Exhibit I ("the International Herald article").

53.    On information and belief, the International Herald article relied on information provided in pertinent part by J&J.

54.    Among other things, the International Herald article stated:

"J&J is communicating to the Street that Boston Scientific's $80-a-share offer for Guidant is fraught with uncertainty," Lawrence Biegelsen, an analyst with Prudential in New York, said in a note to clients sent on Friday.

* * *

Johnson & Johnson's campaign consists of telling analysts and shareholders that Boston Scientific is in over its head and is tempting patent litigation that may undercut Boston Scientific's plans.

"They're trying to tell all of us that there are patents out there that they have that they feel can stop Boston Scientific," said Jan David Wald, an analyst with A.G. Edwards.  Wald said he had been called by a Johnson & Johnson employee, whom he declined to name.

Johnson & Johnson told analysts it was considering filing patent infringement lawsuits over stent drug coatings to keep Boston Scientific and its bidding partner, Abbott Laboratories, from profiting from the new Guidant devices, according to Biegelsen of Prudential.

* * *

9

Boston Scientific and J&J have been fighting in court for years over patent-infringement cases related to stent design. At the moment, the two companies are alone in the U.S. stent market, with Boston Scientific holding a 55 percent share.

* * *

The potential for Johnson & Johnson to prevent Abbott and Boston Scientific from marketing Guidant's next-generation heart stent "could give the Guidant board pause for approving a Boston Scientific-Guidant merger," Biegelsen said. "J&J claims that two of its patents may be infringed if a company tries to launch a drug-eluting stent coated with" . . . Guidant's everolimus, he wrote.

55.    On January 20, 2006, the Boston Globe published an article headlined "Suitors take Guidant fight to The Street," attached as Exhibit J ("the Boston Globe article").

56.    On information and belief, the Boston Globe article relied on information provided in pertinent part by J&J.

57.    Among other things, the Boston Globe article stated:

[J&J] has also raised prospects that it could use patents and existing ties to Guidant to derail or complicate Boston Scientific's offer, said Matthew Dodds, an analyst for Citigroup who is skeptical about Guidant's value to both companies.

58.    Also on January 20, 2006, Crain's Chicago Business published an article headlined "Abbott stock falls on concerns over success of Guidant bid," attached as Exhibit K ("the Crain's article").

59.    On information and belief, the Crain's article relied on information provided in pertinent part by J&J.

60.    Among other things, the Crain's article stated:

The analyst, Prudential Equity Group, LLC's Larry Biegelsen, reported that Guidant's board could balk at Boston Scientific and Abbott's joint bid because Johnson & Johnson, a competing bidder for Guidant, claims its patents would be violated if Abbott markets its own drug-eluting stent or those made by Guidant.

61.     On January 21, 2006, Reuters published an article headlined "Abbott, Boston shares off J&J patent threat," attached as Exhibit L ("the Reuters article").

62.     On information and belief, the Reuters article relied on information provided in pertinent part by J&J.

63.     Among other things, the Reuters article stated:

One analyst, who asked not to be named, said J&J management was making rounds on Wall Street trying to fan fears about the Boston Scientific bid. The analyst said J&J was arguing that Boston Scientific's bid was breaking its bank, that its assumptions on Guidant's cardiac rhythm management were too aggressive and that there was intellectual property infringement that would limit potential of important products.

64.     On January 24, 2006, Medical Device Daily published an article headlined "J&J offer rumors persist as Guidant has more ICD issues," attached as Exhibit M ("the Medical Device Daily article").

65.     On information and belief, the Medical Device Daily article relied on information provided in pertinent part by J&J.

66.     Among other things, the Medical Device Daily article stated:

Fueling this speculation were rumors, some of which apparently were planted by J&J personnel as part of an organized campaign to undermine the Boston Scientific offer in

11

the minds of analysts, that two of its patents may be infringed if an unnamed company tries to launch a drug-eluting stent coated with a derivative of rapamycin.

67.    On January 26, 2006, The Wall Street Journal published an article headline "Boston Scientific Faces Pivotal Test After Victory in Fight for Guidant," attached as Exhibit N ("the Wall Street Journal article").

68.    On information and belief, the Wall Street Journal article relied on information provided in pertinent part by J&J.

69.    Among other things, the Wall Street Journal article stated that:

Another potential wrinkle arises in the intellectual-property rights surrounding stents – an area that's been the subject of extensive litigation in the industry. Citigroup analyst Matthew Dodds says J&J holds patents on methods of using "limus-type drugs on stents - - including the everolimus on Guidant's stent, as well as a drug on an Abbott stent.

70.    On information and belief, J&J anticipated and intended that Abbott and others would become aware of threatening statements made by J&J to analysts and others.

71.    On information and belief, J&J made additional threatening statements to industry analysts, asserting that J&J could prevent Abbott from making or selling the XIENCE V by suing for infringement of patents in the Wright and/or Falotico families. On information and belief, J&J anticipated and intended that Abbott and others would become aware of these threatening statements.

72.    Abbott and others did become aware of J&J's threatening statements.

73.    For example, on January 20, 2006, Avram Goldstein of Bloomberg contacted Abbott regarding the Wright and Falotico patents in relation to the XIENCE V.

74.    On January 13, 2006, Bruce Nudell of Sanford C. Bernstein contacted Guidant regarding the Wright and Falotico patents in relation to the XIENCE V.

75.    Also on January 13, 2006, The Shaw Group contacted Guidant regarding the Wright and Falotico patents in relation to the XIENCE V.

76.    On January 20, 2006, Avram Goldstein of Bloomberg contacted Guidant regarding the Wright and Falotico patents in relation to the XIENCE V.

77.    Again on January 20, 2006, Barnaby Feder of the New York Times contacted Guidant regarding the Wright and Falotico patents in relation to the XIENCE V.

78.    On January 31, 2006, Steve Silva of Joele Frank contacted Guidant regarding the Wright and Falotico patents in relation to the XIENCE V.

79.    On March 23, 2006, Jennifer B. Pearlman of Burgundy Asset Management contacted Guidant regarding the Wright and Falotico patents in relation to the XIENCE V.

80.    On information and belief, J&J intended to create a substantial controversy between J&J and Abbott regarding alleged infringement of patents in the Wright and/or Falotico families by the XIENCE V.

81.    On information and belief, J&J intended to create the apprehension in Abbott and others that J&J would sue Abbott, asserting that the XIENCE V allegedly infringes patents in the Wright and/or Falotico families.

82.    In March 2006, Guidant publicly announced that the XIENCE V launch would be delayed due to an issue related to manufacturing.

83.    The XIENCE V was subsequently launched in Europe.  On information and belief, J&J is aware that the XIENCE V has launched and is preparing to sue Abbott for infringement by the XIENCE V of patents in the Wright and/or Falotico families.

13

84.    On information and belief, J&J has never withdrawn or retracted any of its threatening statements that, following the launch of the XIENCE V, J&J would sue Abbott for infringement of the patents in the Wright and/or Falotico families.

85.    On information and belief, in furtherance of its campaign to cast a cloud over the launch of the XIENCE V, J&J made threatening statements to Guidant.

86.    On January 12, 2006, J&J contacted Guidant and informed Guidant that if Boston Scientific acquired Guidant, Abbott and Boston Scientific would have problems with the Wright and Falotico patent families.

87.    On January 13, 2006, J&J again contacted Guidant. J&J sent Guidant a document asserting that J&J's intellectual property portfolio included patents directed to Everolimus when used on a stent, Abbott would not receive access to these patent in the event that Boston Scientific were to acquire Guidant, and any drug eluting stent using Everolimus, including the XIENCE V, may infringe these patents.

88.    On information and belief, by these statements J&J intended to create a substantial controversy between J&J and Abbott regarding alleged infringement of patents in the Wright and/or Falotico families by the XIENCE V.

89.    On information and belief, by these statements J&J intended to create the apprehension in Abbott and others that J&J would sue Abbott, following the launch of the XIENCE V, asserting that the XIENCE V allegedly infringes patents in the Wright and/or Falotico families.

**J&J's Assertions In The Patent Office Of Infringement By XIENCE V**

90.    On August 24, 2006, J&J filed a "Petition to Make Special Because of Actual Infringement ("the Petition") with the United States Patent and Trademark Office in the matter of

United States Application Serial No. 11/467,035 ("the Falotico '035 application").    On information and belief, on May 15, 2007, the Falotico '035 application issued as United States Patent No. 7,217,286.  A copy of the Petition is attached as Exhibit O.

91.    In the Petition, J&J asserted that it could sue Abbott for infringement by the XIENCE V immediately upon issuance of the Falotico '035 application as a patent.  Among other things, counsel for J&J asserted:

Guidant's vascular business has recently been acquired by Abbott Laboratories (Exhibit 3).  Abbott has announced that it intends to launch the XIENCE™ V in Europe in the third quarter of 2006 (Exhibit 4).

* * *

I have made a rigid comparison of the XIENCE™ V product, as described in Guidant press releases, with the claims of the instant application.  In my opinion, the XIENCE™ V product is unquestionably within the scope of at least claims 1 to 5 on file in this application.

* * *

It is therefore my opinion that Guidant is making a product in the United States to support the European launch that is unquestionably within the scope of at least claims 1 to 5 of the instant application, and that a patent containing these claims could immediately be asserted upon issue.

92.    On information and belief, J&J intended to create a substantial controversy between J&J and Abbott regarding the XIENCE V's alleged infringement of the Falotico '286 patent.

15

93.    On information and belief, J&J intended to create the apprehension in Abbot and others that J&J would sue Abbott asserting that the XIENCE V allegedly infringes the Falotico '286 patent.

94.    On information and belief, J&J is preparing to sue Abbott for infringement by the XIENCE V of the Falotico '286 patent.

## J&J Has Recently Sued Abbott In An Attempt To Interfere With The XIENCE V Launch

95.    On September 25, 2006, J&J filed a complaint in the District Court for the Southern District of New York.    Among other things, J&J alleges that Abbott Laboratories tortiously interfered with J&J's intended acquisition of Guidant.    The complaint seeks no less than $5.5 billion in damages.    A copy of the complaint is attached as Exhibit P.

96.    Although the events cited in the complaint occurred over eight months ago, J&J timed the lawsuit, on information and belief, in anticipation of the then imminent launch of the XIENCE V.    Both the timing of the lawsuit and the amount of the damages claimed manifest J&J's intent to cast a cloud over Abbott and interfere with the then imminent launch of the XIENCE V.

## The XIENCE V Launch

97.    Abbott has manufactured and continues to manufacture, at its facilities in the United States, thousands of the XIENCE V.

98.    On information and belief, J&J created a substantial controversy between J&J and Abbott regarding the alleged infringement of the Falotico '286 patent by the XIENCE V.

99.    Abbott has a reasonable apprehension that J&J intends to sue Abbott for infringement of the Falotico '286 patent by the XIENCE V.

CLAIM I

INVALIDITY AND NONINFRINGEMENT OF U.S. PATENT NO.7,217,286

100.    Abbott realleges and incorporates by reference the allegations set forth in paragraphs 1-99.

101.    J&J's actions have created a substantial controversy between J&J and Abbott regarding alleged infringement of the Falotico '286 patent by the XIENCE V.

102.    J&J has asserted rights under the Falotico '286 patent against the XIENCE V.

103.    J&J's actions have placed Abbott in reasonable apprehension that it will be sued for alleged infringement of the Falotico '286 patent by the XIENCE V.

104.    On information and belief, the claims of the Falotico '286 patent are invalid for failure to meet the requirements for patentability, including the requirements of 35 U.S.C. §§ 102, 103, and 112.

105.    The XIENCE V does not infringe any valid claim of the Falotico '286 patent.

106.    An actual and justiciable controversy exists between Abbott and J&J regarding invalidity and noninfringement of the Falotico '286 patent.

PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request entry of judgment in their favor that:

(a)    each and every claim of U.S. Patent No. 7,217,286 is invalid;

(b)    Plaintiffs are not liable for any infringement, for any contributory infringement, or for inducing the infringement of U.S. Patent No. 7,217,286;

(c)    Defendants and their officers, agents, employees, representatives, counsel and all persons in active concert or participation with any of them, directly or indirectly, be enjoined from threatening or charging infringement of, or instituting any action for infringement of U.S.

Patent No. 7,217,286 against Plaintiffs, their suppliers, customers, distributors or users of their products;

(d)    Defendants pay to Plaintiffs the costs and reasonable attorneys fees incurred by Plaintiffs in this action; and

(e)    Plaintiffs be granted such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury on all issues so triable.

OF COUNSEL:
Edward A. Mas II
Leland G. Hansen
Sandra A. Frantzen
Christopher J. Buchko
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, Illinois 60661
(312) 775-8000

Frederick L. Cottrell III (#2555)
cottrell@RLF.com
Anne Shea Gaza (#4093)
gaza@RLF.com
RICHARDS, LAYTON & FINGER
One Rodney Square
920 N. King Street
Wilmington, Delaware 19899
(302) 651-7700

ATTORNEYS FOR PLAINTIFFS ABBOTT
LABORATORIES and ABBOTT
CARDIOVASCULAR SYSTEMS, INC.

Date: May 15, 2007

# Exhibit D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC SCIMED, INC., | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| JOHNSON & JOHNSON, INC. and CORDIS CORPORATION, | ) ) ) |
| Defendants. | ) ) ) ) |

0 7 - 3 3 3

Civil Action No. 07-

**JURY TRIAL DEMANDED**

## COMPLAINT FOR DECLARATORY JUDGMENT
## OF PATENT INVALIDITY AND NONINFRINGEMENT

Plaintiffs Boston Scientific Corporation and Boston Scientific Scimed, Inc. (collectively "BSC"), through its attorneys, bring this complaint against Defendants Johnson & Johnson, Inc. and Cordis Corporation (collectively "J&J") and requests a jury trial on all issues so triable. BSC alleges as follows, upon knowledge with respect to itself and its own acts, and upon information and belief as to the circumstances and facts of others:

### NATURE OF THE ACTION

1.      This is an action for a declaratory judgment that United States Patent No. 7,217,286 entitled "Local Delivery of Rapamycin for Treatment of Proliferative Sequelae Associated With PTCA Procedures, Including Delivery Using a Modified Stent" ("the Falotico '286 patent") is invalid and not infringed by BSC. The Falotico '286 patent is attached as Exhibit A.

2007 MAY 25  PM 2:40

NY01 1358331 v1

## THE PARTIES

2.    Plaintiff Boston Scientific Corporation is a corporation organized under the laws of the State of Delaware, having its principal place of business at One Boston Scientific Plaza, Natick, Massachusetts 01760.

3.    Plaintiff Boston Scientific Scimed, Inc. is a corporation organized under the laws of the State of Minneapolis, having its principle place of business at One Scimed Place, Maple Grove, MN 55311-1566.

4.    Upon information and belief, Defendant Johnson & Johnson, Inc. is a corporation organized under the laws of the State of New Jersey and has a principal place of business at 1 Johnson and Johnson Plaza, New Brunswick, New Jersey.

5.    Upon information and belief, Defendant Cordis Corporation ("Cordis") is a corporation organized under the laws of the State of Florida and has a principal place of business in Miami Lakes, Florida.  Cordis is a subsidiary of Johnson & Johnson, Inc.

## JURISDICTION AND VENUE

6.    This action arises under the Patent Laws of the United States (35 U.S.C. § 1, *et seq.*).

7.    This Court has jurisdiction over the subject matter of all causes of action herein pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201 and 2202.

8.    On information and belief, J&J has systematic and continuous contacts in this judicial district.

9.    On information and belief, J&J regularly avails itself of the benefits of this judicial district, including the jurisdiction of the courts.

10.     On information and belief, J&J regularly transacts business within this judicial district.

11.     On information and belief, J&J regularly sells products in this judicial district. J&J derives substantial revenues from sales in this district.

12.     This Court has personal jurisdiction, general and specific, over J&J.

13.     Venue in this judicial district is proper pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(b).

## BACKGROUND

14.     BSC is a world renowned leader in the development of intravascular stents used to treat coronary artery disease.

15.     J&J and, in particular, Cordis, directly compete with BSC in the field of intravascular stents used to treat coronary artery disease.

16.     J&J has a well-known history of suing competitors, including BSC, in the field of intravascular stents for patent infringement. Within the past several years, J&J and/or Cordis have sued BSC in this Court, alleging patent infringement in cases involving intravascular stents used to treat coronary artery disease. BSC has also brought suits for patent infringement against J&J within this judicial district.

17.     Pursuant to an agreement between BSC and Abbott Laboratories ("Abbott"), BSC is presently selling the PROMUS Stent System ("PROMUS") in Europe. The PROMUS stent is a private-labeled XienceV Everolimus-Eluting Coronary Stent System ("XIENCE V") which is manufactured for BSC by Abbott in the United States. The PROMUS stent is an intravascular stent used to treat coronary artery disease. It advantageously releases a drug designed to

diminish reblocking (restenosis) of the patient's blood vessel into which the stent has been inserted.

18.    The PROMUS stent received CE Mark approval in October 2006, which allows BSC to distribute PROMUS in 27 countries of the European Economic Area. Since that time, BSC has been taking title to the PROMUS stent from Abbott in the United States and then exporting those stents to the European market. BSC intends to begin selling its PROMUS stent in the United States in 2008; FDA approval is pending.

19.    In 2006, BSC purchased Guidant Corporation ("Guidant"). As part of the agreement governing the Guidant acquisition, Guidant separately sold the rights to its everolimus-eluting stent product to Abbott. BSC separately entered into an agreement with Abbott that permits BSC to sell (under the designation "PROMUS") the everolimus-eluting stents manufactured by Abbott (which Abbott sells on its own as its "XIENCE V" stent).

20.    Abbott currently manufactures and sells its own everolimus-eluting stent, the XIENCE V stent, which is the same product as BSC's PROMUS stent.

21.    On May 15, 2007, Cordis Corporation filed a patent infringement suit against Abbott in the United States District Court for the District of New Jersey. *See* Exhibit B, the Complaint in Civil Action No. 07-2265-JAP-TJB. Cordis alleges in its May 15 Complaint that Abbott's manufacture and/or use of the XIENCE V stent in the Unites States infringes the Falotico '286 patent. *Id.*, pp. 3-4. Among other remedies, Cordis seeks a preliminary and permanent injunction prohibiting Abbott from making, using, selling, or offering for sale the XIENCE V stent in the United States. *Id.*, p. 4.

22.    Cordis' patent infringement suit, as referenced in paragraph 21, has created a present substantial controversy between J&J and BSC concerning the PROMUS stent. J&J,

through Cordis, has asserted rights under the Falotico '286 patent against the same product as the PROMUS stent, and the alleged infringement of that patent has created apprehension that, if Cordis is successful in its suit, BSC's investment in the PROMUS stent will be harmed.

## RELATED CASES PENDING IN THE DISTRICT OF DELAWARE

23.    On May 15, 2007, prior to the filing of Cordis' patent infringement case against Abbott in the District of New Jersey, Abbott filed a declaratory judgment action against Cordis in the United States District Court for the District of Delaware. *See* Exhibit C, the complaint in Civil Action No. 07-259-SLR. Abbott alleges in its May 15 Complaint that the Falotico '286 patent is invalid and not infringed by Abbott's manufacture and/or use of the XIENCE V stent in the Unites States. *Id.*, p. 17.

24.    Abbott's declaratory judgment action against the Falotico '286 patent is currently pending in this judicial district is the first filed action concerning the '286 patent. The instant action by BSC against J&J is related to Abbott's May 15 action in terms of the '286 patent at issue, the prior art to that patent, and the nature of the products of the declaratory judgment defendants, XIENCE V (Abbott) and PROMUS (BSC).

25.    Abbott has also filed, on September 29, 2006, in this Court, a declaratory judgment action against J&J, alleging that other Cordis-owned patents – U.S. Patent Nos. 6,585,764, 6,776,796, and 6,808,536 – are invalid and not infringed by Abbott's manufacture and/or use of the XIENCE V stent in the Unites States. *See* Exhibit D, the complaint in Civil Action No. 06-613-SLR. The '764 and '536 patents are directly related to the Falotico '286 patent. Abbott has also recently filed a motion to amend its Complaint in that action to include the Falotico '286 patent, or in the alternative, consolidate its two filed actions.

## COUNT I

## INVALIDITY AND NONINFRINGEMENT OF U.S. PATENT NO. 7,217,286

26.     BSC repeats and realleges each and every allegation contained in paragraphs 1-25 of this Complaint as though fully set forth herein.

27.     Each of the claims in the Falotico '286 patent is invalid for failure to comply with one or more of the requirements of Title 35, United States Code, including, but not limited to, 35 U.S.C. §§ 102, 103 and 112.

28.     The PROMUS stent does not infringe any valid claim of the Falotico '286 patent.

## PRAYER FOR RELIEF

WHEREFORE, BSC prays that this Court enter judgment as follows, ordering that:

(a)     Each and every claim of U.S. Patent No. 7,217,286 is invalid;

(b)     Plaintiffs are not liable for directly, contributorily or inducing infringement of any claim of U.S. Patent No. 7,217,286;

(c)     Defendants and their officers, agents, employees, representatives, counsel and all persons in active concert or participation with any of them, directly or indirectly, be enjoined from threatening or charging infringement of, or instituting any action for infringement of U.S. Patent No. 7,217,286 against Plaintiffs, its suppliers, customers, distributors or users of its products;

(d)     Defendants pay to Plaintiffs the costs and reasonable attorney's fees incurred by Plaintiffs in this action; and

(e)    Plaintiffs be granted such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

Josy W. Ingersoll (#1088)
Karen E. Keller (#4489)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE  19801
jingersoll@ycst.com
kkeller@ycst.com
(302) 571-6554

*Attorneys for Plaintiffs*
*Boston Scientific Corporation and*
*Boston Scientific Scimed, Inc.*

*Of Counsel:*

Richard L. Delucia
Paul M. Richter
Michael K. Levy
Jerry Canada
KENYON & KENYON LLP
One Broadway
New York, NY 10004
(212) 425-7200

Dated: May 25, 2007

# EXHIBIT-E

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ABBOTT LABORATORIES and ADVANCED CARDIOVASCULAR SYSTEMS, INC., | ) ) ) |  |
|  | ) | Civil Action No. |
| Plaintiffs, | ) ) |  |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| JOHNSON AND JOHNSON, INC. and CORDIS CORPORATION, | ) ) ) |  |
| Defendants. | ) |  |

### COMPLAINT FOR DECLARATORY JUDGMENT
### OF PATENT INVALIDITY AND NONINFRINGEMENT

Plaintiffs Abbott Laboratories and Advanced Cardiovascular Systems, Inc. (collectively "Abbott") bring this Complaint against Defendants Johnson and Johnson, Inc. and Cordis Corporation (collectively "J&J"). This is an action for a declaratory judgment and injunctive relief that United States Patent No. 6,585,764 entitled "Stent With Therapeutically Active Dosage Of Rapamycin Coated Thereon" (the "Wright '764 patent"), United States Patent No. 6,808,536 entitled "Stent Containing Rapamycin Or Its Analogs Using A Modified Stent" (the "Wright '536 patent"), and United States Patent No. 6,776,796 entitled "Antiinflammatory Drug Delivery Device" (the "Falotico '796 patent") are invalid and not infringed by Abbott. The Wright '764 patent, the Wright '536 patent, and the Falotico '796 patent are attached as Exhibits A – C, respectively. Abbott alleges as follows:

### THE PARTIES

1.    Abbott Laboratories is a corporation organized under the laws of the State of Illinois and has a principal place of business at 100 Abbott Park Road, North Chicago, Illinois.

2.     Advanced Cardiovascular Systems, Inc. ("ACS") is a corporation organized under the laws of the State of California and has a principal place of business at 3200 Lakeside Drive, Santa Clara, California. ACS is a subsidiary of Abbott Laboratories.

3.     On information and belief, Johnson and Johnson, Inc. is a corporation organized under the laws of the State of New Jersey and has a principal place of business at One Johnson and Johnson Plaza, New Brunswick, New Jersey.

4.     On information and belief, Cordis Corporation ("Cordis") is a corporation organized under the laws of the State of Florida and has a principal place of business in Miami Lakes, Florida. Cordis is a subsidiary of Johnson and Johnson, Inc.

## JURISDICTION AND VENUE

5.     This action arises under the Patent Laws of the United States (35 U.S.C. § 1 *et seq.*).

6.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

7.     This Court has personal jurisdiction, general and specific, over J&J.

8.     On information and belief, J&J has systematic and continuous contacts in this judicial district.

9.     On information and belief, J&J regularly avails itself of the benefits of this judicial district, including the jurisdiction of the courts.

10.    On information and belief, J&J regularly transacts business within this judicial district.

11.    On information and belief, J&J regularly sells products in this judicial district. J&J derives substantial revenues from sales in this district.

2

12.    Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c)

## BACKGROUND

13.    J&J, and in particular Cordis, directly competes with Abbott in the field of intravascular stents used to treat coronary artery disease.

14.    The coronary stent industry is highly litigious. J&J, and in particular Cordis, has a well-known history of suing competitors in this field for patent infringement.

15.    On three occasions within the last ten years, Cordis sued ACS in this district, alleging patent infringement. (*Cordis Corporation, et al v Advanced Cardiovascular Systems, Inc, et al.*, C.A. No. 97-550-SLR; *Cordis Corporation, et al v Advanced Cardiovascular Systems, Inc, et al*, C.A. No. 97-635-SLR; and *Cordis Corporation, et al. v Advanced Cardiovascular Systems, Inc., et al*, C.A. No. 98-065-SLR).

16.    In early 2006, J&J and Boston Scientific Corporation ("BSC") each were bidding to acquire assets of Guidant Corporation ("Guidant"), which at the time was the parent corporation of ACS. In conjunction with BSC's bid, ACS would be acquired by Abbott Laboratories, which was the ultimate result.

17.    One of the key assets of ACS was the XIENCE V drug eluting stent system ("XIENCE V"), which elutes a proprietary drug known as everolimus. ACS holds an exclusive patent license to use everolimus for drug eluting stents. In clinical trials, everolimus has proven superior to other drugs.

18.    On information and belief, J&J believed in early 2006 that the XIENCE V would be launched within a few months.

3

**J&J's Public Threats To Sue For Patent Infringement By XIENCE V**

19.    On information and belief, J&J undertook a public campaign to cast a cloud over the launch of the XIENCE V.

20.    On information and belief, as a main thrust of this public campaign, J&J alleged that the XIENCE V would infringe patents allegedly owned by J&J and that J&J would sue Abbott for infringement by the XIENCE V following its launch.  On information and belief, J&J's allegations related to at least the Wright '764 patent, the Wright '536 patent, and the Falotico '796 patent.

21    On information and belief, J&J broadcasted threatening statements to industry analysts regarding alleged infringement by XIENCE V, for publication in furtherance of J&J's public campaign.

22.    For example, the Prudential Equity Group, LLC published a report on January 20, 2006, titled "JNJ: Takes Off The Gloves In Its Fight With Boston Scientific For Guidant," attached as Exhibit D ("the Prudential report").  In the Prudential report, parties are identified by their stock symbols:  ABT for Abbott, GDT for Guidant, JNJ for J&J, and BSX for BSC.

23.    On information and belief, the Prudential report relied on information provided in pertinent part by J&J.

24.    Among other things, the Prudential report stated:

JNJ claims that 2 of its patents may be infringed if a company tries to launch a drug-eluting stent coated with a rapamycin derivative such as . . . GDT's everolimus.  The potential for JNJ to prevent ABT and BSX from marketing the Xience-V DES, could give the GDT board pause for approving a BSX-GDT merger.

\* \* \*

If BSX acquires GDT, BSX would sell GDT's vascular intervention (VI)
business, including shared rights to GDT's promising everolimus-coated stent,
Xience-V, to ABT. Although JNJ's patents have never been litigated, JNJ
believes it has a strong intellectual property (IP) position with regard to the use of
rapamycin derivatives on a stent. JNJ could pursue a preliminary injunction if
ABT and BSX try to launch an everolimus-coated . . . stent. . . . According to
JNJ, the key patents are the Falotico (6,776,796) and Wright (6,585,764) patents.

25.    On information and belief, J&J anticipated and intended that Abbott and others
would become aware of threatening statements made by J&J to Prudential analysts.

26.    On January 23, 2006, A.G Edwards & Sons, Inc. published a report titled
"Healthcare Industry Note: The Game May Be Far From Over," attached as Exhibit E ("the AG
Edwards report").

27.    On information and belief, the AG Edwards report relied on information provided
in pertinent part by J&J.

28.    Among other things, the AG Edwards report stated:

We have had conversations with Johnson & Johnson (JNJ) and Boston Scientific
(BSX) and others recently that lead us to believe that the Guidant (GDT) game is
far from over.

\* \* \*

We were also reminded by JNJ that it had three patents related to '-limus'
compounds that it thought precluded any other company from using such a

5

compound on a stent. We were only given two patent numbers (6776796 [the

Falotico '796 patent] and 6585764 [the Wright '764 patent]) . . .

29    On information and belief, the third patent referenced in J&J's threatening

statements was the Wright '536 patent.

30.    On information and belief, J&J anticipated and intended that Abbott and others

would become aware of threatening statements made by J&J to AG Edwards analysts.

31.    On January 23, 2006, the International Herald Tribune published an article

headlined "J&J works to discredit rival offer for Guidant," attached as Exhibit F ("the

International Herald article").

32    On information and belief, the International Herald article relied on information

provided in pertinent part by J&J.

33.    Among other things, the International Herald article stated:

"J&J is communicating to the Street that Boston Scientific's $80-a-share offer for

Guidant is fraught with uncertainty," Lawrence Biegelsen, an analyst with

Prudential in New York, said in a note to clients sent on Friday.

* * *

Johnson & Johnson's campaign consists of telling analysts and shareholders that

Boston Scientific is in over its head and is tempting patent litigation that may

undercut Boston Scientific's plans

"They're trying to tell all of us that there are patents out there that they have that

they feel can stop Boston Scientific," said Jan David Wald, an analyst with A.G.

Edwards. Wald said he had been called by a Johnson & Johnson employee,

whom he declined to name.

6

Johnson & Johnson told analysts it was considering filing patent infringement lawsuits over stent drug coatings to keep Boston Scientific and its bidding partner, Abbott Laboratories, from profiting from the new Guidant devices, according to Biegelsen of Prudential

* * *

Boston Scientific and J&J have been fighting in court for years over patent-infringement cases related to stent design. At the moment, the two companies are alone in the U.S. stent market, with Boston Scientific holding a 55 percent share.

* * *

The potential for Johnson & Johnson to prevent Abbott and Boston Scientific from marketing Guidant's next-generation heart stent "could give the Guidant board pause for approving a Boston Scientific-Guidant merger," Biegelsen said. "J&J claims that two of its patents may be infringed if a company tries to launch a drug-eluting stent coated with" . . . Guidant's everolimus, he wrote.

34.    On information and belief, J&J anticipated and intended that Abbott and others would become aware of threatening statements made by J&J to analysts and others.

35.    On information and belief, J&J made additional threatening statements to industry analysts, asserting that J&J could prevent Abbott from making or selling the XIENCE V by suing for infringement of the Wright '764 patent, the Wright '536 patent, and the Falotico '796 patent. On information and belief, J&J anticipated and intended that Abbott and others would become aware of these threatening statements.

36.    On information and belief, J&J intended to create the apprehension in Abbott and others that J&J would sue Abbott, following the launch of the XIENCE V, asserting that the

7

XIENCE V allegedly infringes the Wright '764 patent, the Wright '536 patent, and the Falotico '796 patent.

37.    In March 2006, Guidant publicly announced that the XIENCE V launch would be delayed due to an issue related to manufacturing.

38.    As of the date of this Complaint, the XIENCE V launch is imminent.   On information and belief, J&J is aware that the XIENCE V launch is imminent and is preparing to sue Abbott for infringement by the XIENCE V of the Wright '764 patent, the Wright '536 patent, and the Falotico '796 patent

39.    On information and belief, J&J has never withdrawn or retracted any of its threatening statements that, following the launch of the XIENCE V, J&J would sue Abbott for infringement of the Wright '764 patent, the Wright '536 patent, and the Falotico '796 patent.

**J&J's Assertions In The Patent Office Of Infringement By XIENCE V**

40.    On August 7, 2006, J&J filed a "Petition to Make Special Because of Actual Infringement" ("Wright Petition") with the United States Patent and Trademark Office in the matter of United States Application Serial No. 10/951,385 ("Wright '385 application").   The Wright '385 application is related to the Wright '764 patent and the Wright '536 patent   A copy of the Wright Petition is attached as Exhibit G.

41.    In the Wright Petition, J&J asserted that it could sue Abbott for infringement by the XIENCE V immediately upon issuance of the Wright '385 application as a patent.   Among other things, counsel for J&J asserted:

Guidant's vascular business has recently been acquired by Abbott Laboratories (Exhibit 3).   Abbott has announced that it intends to launch the XIENCE™ V in Europe in the third quarter of 2006 (Exhibit 4).

RLF1-3065255-1

\* \* \*

I have made a rigid comparison of the XIENCE™ V product, as described in Guidant press releases, with the claims of the instant application. In my opinion, the XIENCE™ V product is unquestionably within the scope of at least claims 103 and 130 on file in this application.

\* \* \*

It is therefore my opinion that Guidant is making a product in the United States to support the European launch that is unquestionably within the scope of at least claims 103 and 130 of the instant application, and that a patent containing these claims could immediately be asserted upon issue.

42.    The subject matter of at least claim 103 of the Wright '385 application overlaps with subject matter claimed in the Wright '764 patent and the Wright '536 patent.

43.    On information and belief, J&J is preparing to assert one or more patents in the Wright family, including at least the Wright '764 patent and the Wright '536 patent, against the XIENCE V following its imminent launch.

44.    On August 7, 2006, J&J filed a "Petition to Make Special Because of Actual Infringement" ("Falotico Petition") with the United States Patent and Trademark Office in the matter of United States Application Serial No. 10/829,074 ("Falotico '074 application"). The Falotico '074 application is related to the Falotico '796 patent. A copy of the Falotico Petition is attached as Exhibit H.

45.    In the Falotico Petition, J&J asserted that it could sue Abbott for infringement by the XIENCE V immediately upon issuance of the Falotico '074 application as a patent. Among other things, counsel for J&J asserted:

Guidant's vascular business has recently been acquired by Abbott Laboratories (Exhibit 3). Abbott has announced that it intends to launch the XIENCE™ V in Europe in the third quarter of 2006 (Exhibit 4).

* * *

I have made a rigid comparison of the XIENCE™ V product, as described in Guidant press releases and other publicly available documents, with the claims of the instant application.    In my opinion, the XIENCE™ V product is unquestionably within the scope of claims 15 to 30 on file in this application.

* * *

It is therefore my opinion that Guidant is making a product in the United States to support the European launch that is unquestionably within the scope of claims 15 to 30 of the instant application, and that a patent containing these claims could immediately be asserted upon issue.

46.    The subject matter of at least claim 15 of the Falotico '074 application overlaps with subject matter claimed in the Falotico '796 patent.

47.    On information and belief, J&J is preparing to assert one or more patents in the Falotico family, including at least the Falotico '796 patent, against the XIENCE V following its imminent launch.

## J&J Has Recently Sued Abbott In An Attempt To Interfere With The XIENCE V Launch

48.    On September 25, 2006, J&J filed a complaint in the District Court for the Southern District of New York.    Among other things, J&J alleges that Abbott Laboratories tortiously interfered with J&J's intended acquisition of Guidant.    The complaint seeks no less than $5.5 billion in damages. A copy of the complaint is attached as Exhibit 1.

10

49.    Although the events cited in the complaint occurred over eight months ago, J&J timed the lawsuit, on information and belief, in anticipation of the imminent launch of XIENCE V. Both the timing of the lawsuit and the amount of the damages claimed manifest J&J's intent to cast a cloud over Abbott and interfere with the imminent launch of the XIENCE V.

**The XIENCE V Launch Is Imminent**

50.    As of the date of this Complaint, Abbott will have manufactured, at its facilities in the United States, thousands of XIENCE V products to support its imminent launch.

51.    Abbott will continue to manufacture XIENCE V at its facilities in the United States following the launch.

52.    Abbott has a reasonable apprehension that J&J intends to sue Abbott for infringement of the Wright '764 patent, the Wright '536 patent, and Falotico '796 patent by XIENCE V following its imminent launch.

CLAIM I

**INVALIDITY AND NONINFRINGEMENT OF U.S. PATENT NO. 6,585,764**

53.    Abbott realleges and incorporates by reference the allegations set forth in paragraphs 1-52.

54.    J&J's actions have placed Abbott in reasonable apprehension that it will be sued for infringement of the Wright '764 patent by XIENCE V.

55.    On information and belief, the claims of the Wright '764 patent are invalid for failure to meet the requirements for patentability, including the requirements of 35 U.S.C. §§ 102, 103, and 112.

56    The XIENCE V does not infringe any valid claim of the Wright '764 patent

57.    An actual and justiciable controversy exists between Abbott and J&J regarding invalidity and noninfringement of the Wright '764 patent.

## CLAIM II

### INVALIDITY AND NONINFRINGEMENT OF U.S. PATENT NO. 6,808,536

58.    Abbott realleges and incorporates by reference the allegations set forth in paragraphs 1-57.

59.    J&J's actions have placed Abbott in reasonable apprehension that it will be sued for infringement of the Wright '536 patent by XIENCE V.

60.    On information and belief, the claims of the Wright '536 patent are invalid for failure to meet the requirements for patentability, including the requirements of 35 U.S.C. §§ 102, 103, and 112.

61.    The XIENCE V does not infringe any valid claim of the Wright '536 patent.

62.    An actual and justiciable controversy exists between Abbott and J&J regarding invalidity and noninfringement of the Wright '536 patent.

## CLAIM III

### INVALIDITY AND NONINFRINGEMENT OF U.S. PATENT NO. 6,776,796

63.    Abbott realleges and incorporates by reference the allegations set forth in paragraphs 1-62.

64.    J&J's actions have placed Abbott in reasonable apprehension that it will be sued for infringement of the Falotico '796 patent by XIENCE V.

65.    On information and belief, the claims of the Falotico '796 patent are invalid for failure to meet the requirements for patentability, including the requirements of 35 U.S.C. §§ 102, 103, and 112.

66.    The XIENCE V does not infringe any valid claim of the Falotico '796 patent.

67.    An actual and justiciable controversy exists between Abbott and J&J regarding invalidity and noninfringement of the Falotico '796 patent.

RLF1-3065255-1

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request entry of judgment in their favor that:

(a)    each and every claim of U.S. Patent No. 6,585,764 is invalid;

(b)    each and every claim of U.S. Patent No. 6,808,536 is invalid;

(c)    each and every claim of U.S. Patent No. 6,776,796 is invalid;

(d)    Plaintiffs are not liable for any infringement, for any contributory infringement, or for inducing the infringement of U.S. Patent No 6,585,764;

(e)    Plaintiffs are not liable for any infringement, for any contributory infringement, or for inducing the infringement of U.S. Patent No. 6,808,536;

(f)    Plaintiffs are not liable for any infringement, for any contributory infringement, or for inducing the infringement of U.S. Patent No. 6,776,796;

(g)    Defendants and their officers, agents, employees, representatives, counsel and all persons in active concert or participation with any of them, directly or indirectly, be enjoined from threatening or charging infringement of, or instituting any action for infringement of any of U.S. Patent Nos. 6,585,764, 6,808,536, and 6,776,796 against Plaintiffs, their suppliers, customers, distributors or users of their products;

(h)    Defendants pay to Plaintiffs the costs and reasonable attorneys fees incurred by Plaintiffs in this action; and

(i)    Plaintiffs be granted such other and further relief as this Court deems just and proper.

13

<u>JURY TRIAL DEMANDED</u>

Plaintiffs demand a trial by jury on all issues so triable.

OF COUNSEL:
Edward A. Mas II
Leland G. Hansen
Donald J. Pochopien
Sandra A. Frantzen
Christopher J. Buchko
MCANDREWS, HELD & MALLOY, LTD.
500 West Madison Street, 34th Floor
Chicago, Illinois 60661
(312) 775-8000

Frederick L. Cottrell III (#2555)
cottrell@RLF.com
Anne Shea Gaza (#4093)
gaza@RLF.com
RICHARDS, LAYTON & FINGER
One Rodney Square
920 N. King Street
Wilmington, Delaware 19899
(302) 651-7700

ATTORNEYS FOR PLAINTIFFS ABBOTT
LABORATORIES and ADVANCED
CARDIOVASCULAR SYSTEMS, INC.

Date: September 29, 2006

14

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBOTT LABORATORIES and ABBOTT CARDIOVASCULAR SYSTEMS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C. A. No. 07-259-SLR |
| JOHNSON AND JOHNSON, INC. and CORDIS CORPORATION, | ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' MOTION FOR LEAVE TO FILE
A SUPPLEMENTAL COMPLAINT**

Pursuant to Federal Rules of Civil Procedure 15, Plaintiffs Abbott Laboratories, Inc. and Abbott Cardiovascular Systems, Inc. (collectively "Abbott") respectfully move for leave to file a supplemental complaint adding a claim for declaratory judgment of invalidity and noninfringement of United States Patent No. 7,223,286 ("the Wright 3286 patent"). The Wright 3286 patent issued from the Patent Office today and is directly related to, and has the same specification as, the present patent-in-suit, U.S. Patent No. 7,217,286 ("the Wright 7286 patent"). The proposed complaint and a proposed order are attached as Exhibit 1 and Exhibit A, respectively. A redline showing changes made against the original complaint is attached as Exhibit 2.

**DISCUSSION**

**I.    INTRODUCTION**

This is a civil action for declaratory judgment that the Wright 7286 patent-in-suit is invalid and not infringed by Abbott's XIENCE V drug-eluting stent system. This case

1

is related to Civil Action No. 06-613-SLR, which <u>also</u> involves a declaratory judgment that certain directly-related Wright patents are invalid and not infringed by Abbott's XIENCE V drug-eluting stent system.[1]

On May 15, 2007, Abbott filed its Complaint for declaratory judgment concerning the Wright 7286 patent-in-suit. Defendants have not yet answered Abbott's Complaint.[2] Since the filing of Abbott's May 15 Complaint, the Patent Office <u>today</u> issued the Wright 3286 patent, which is related to and has the same disclosure as the Wright 7286 patent-in-suit. Given the stage of the case, the lack of any prejudice to Defendants, and Abbott's promptness in moving to supplement, the Court should grant Abbott's motion for leave to file a supplemental and amended complaint (attached as Exhibit 1) relating to the newly-issued Wright 3286 patent.[3]

---

[1] In that related case (Civ. No. 06-613-SLR), Abbott has filed two motions seeking leave to file a supplemental complaint to add the Wright 7286 patent-in-suit and the Wright 3286 patent, given that the case involves directly-related Wright patents and the same accused product. (*See* Civ. No. 06-613-SLR, D.I. 43 and D.I. on May 29, 2007 (filed concurrently herewith).) In the alternative, Abbott requested that the Court consolidate that case (Civ. No. 06-613-SLR) with this case (Civ. No. 07-259-SLR). (D.I. 43.)

[2] Defendant Cordis has filed a Civil Action relating to the Wright 7286 patent in the District of New Jersey. In this Court, Abbott has moved to enjoin Cordis from prosecuting that later-filed parallel litigation. (*See* Civ. No. 06-613-SLR, D.I. 47; Civ. No. 07-259-SLR, D.I. 7.)

[3] In addition to supplementing the Complaint to add a claim concerning the newly-issued Wright 3286 patent, Abbott is also amending the complaint to clarify certain aspects and correct typographical errors. For example, the patent-in-suit is now referenced as the "Wright 7286 patent" (instead of the "Falotico 286 patent") to clarify family lineage and distinguish it from the Wright 3286 patent. (*See* Civ. No. 06-613, Supp. Motion to Supplement at n.1 (filed concurrently herewith).) Since Defendants have not yet filed a responsive pleading, Abbott may amend its complaint as a matter of course without leave. Fed. R. Civ. 15(a). This motion only addresses the issues that are being added via supplementation, i.e., the portion of the complaint relating to events that happened after the original complaint was filed.

2

## II.    LEAVE TO SUPPLEMENT THE COMPLAINT TO ADD A NEWLY ISSUED PATENT IS JUST AND SHOULD BE GRANTED

Pursuant to Federal Rule of Civil Procedure 15(d), "[u]pon motion of a party the court may, upon reasonable notice and upon such terms as are just, permit the party to serve a supplemental pleading setting forth transactions or occurrences or events which have happened since the date of the pleading sought to be supplemented." Leave to supplement a complaint under Rule 15(d) is "within the sound discretion of the court" and "should be granted if it will promote the just disposition of the case, will not cause undue prejudice or delay and will not prejudice the rights of any parties." *Medeva Pharma Ltd. v. Am. Home Prods. Corp.*, 201 F.R.D. 103, 104 (D. Del. 2001); *see also Intel Corp. v. Amberwave Sys. Corp.*, 233 F.R.D. 416, 417-18 (D. Del. 2005); *Procter & Gamble Co. v. McNeil-PPC, Inc.*, No. 98-361-GMS, 1998 U.S. Dist. LEXIS 23305, at *3-4 (D. Del. Dec. 7, 1998). As a result, "unless the court finds undue delay, bad faith or dilatory motive on the part of the movant or undue prejudice to the opposing party an appropriate exercise of the court's discretion should result in affording a plaintiff the opportunity to test its claim on the merits." *Medeva*, 201 F.R.D. at 104 (internal citations omitted); *Procter*, 1998 U.S. Dist. LEXIS 23305, at *4. Here, Defendants have no basis for arguing undue delay, bad faith, dilatory motive or undue prejudice.

As a matter of judicial economy and efficiency, the invalidity and noninfringement of the related Wright patents should all be tried as part of the same case.[4] The Wright 7286 and 3286 patents are directly related and claim similar subject matter. More specifically, the Wright 7286 patent-in-suit is a continuation of the newly-

---

[4] Indeed, it would best promote judicial economy if all the Wright patents, including those at issue in Civ. Action No. 06-613-SLR, were part of the same case. (*See* Civ. No. 06-613-SLR, D.I. 43.)

3

issued Wright 3286 patent.[5] (*See* Ex. 1 at Ex. D, Wright 7286 patent at cover.) Thus, in construing the claims of any <u>one</u> of these patents, the Court must not only consider the same disclosure and specification, but also must consider the file histories of <u>both patents</u> – in addition to the file histories of the related Wright patents that are at issue in Civil Action 06-613-SLR. In addition, the claims of the newly-issued Wright 3286 patent are very similar to claims of the Wright 7286 patent-in-suit. (*Compare* Ex. 1 at Ex. A, claims of Wright 7286 patent *with* Ex. 3, issued claims of Wright 3286 patent.) Moreover, there is only one accused product – Abbott's XIENCE V drug-eluting stent system.

Further, supplementation will promote the just disposition of this case. <u>First</u>, Abbott has moved for leave to supplement the complaint on the same day (May 29, 2007) that the Wright 3286 patent issued from the Patent Office. Therefore, Defendants cannot allege delay in bringing the motion to supplement. *Procter*, 1998 U.S. Dist. LEXIS 23305, at *5. <u>Second</u>, adding the Wright 3286 patent to this litigation causes no prejudice, particularly at this stage of the case. Defendants have not yet answered Abbott's May 15 complaint. The Court has not yet set a discovery schedule, engaged in claim construction, or set other pretrial and trial deadlines. *See, e g , id.* at *5-7. <u>Third</u>, Defendants have no basis to argue bad faith or dilatory motive. Indeed, courts routinely find that supplementing a complaint with newly issued and related patents serves judicial economy. *See Intel*, 233 F.R.D. at 416 (granting motion to supplement where related

---

[5] Abbott notes that on May 23, 2007, the Patent Office mailed an Issue Notification for U.S. Application No. 11/466,983. (Ex. 4, Issue Notification.) This Wright patent is scheduled to issue on June 12, 2007. Like the Wright 7286 and the Wright 3286 patents, this application also claims priority to the Wright patents at issue in Civil Action No. 06-613-SLR. (*Id*, Priority Claim) More specifically, it is a direct continuation of the Wright 3286 patent. (*Id*) When this patent application issues into a patent, Abbott will promptly move to supplement its Complaint to add declaratory judgment claims of invalidity and noninfringement as to the patent issuing from that application.

patents were newly issued); *Procter & Gamble*, 1998 U.S. Dist. LEXIS 23305, at *4-7

(D. Del. Dec. 7, 1998) (granting leave to file a supplemental complaint on newly issued

patents as all the patents were directed to the same technology).

In short, Defendants have no basis to argue that supplementing the complaint will

cause undue prejudice or that Abbott has made its motion in bad faith or for a dilatory

purpose. To the contrary, litigating the related Wright patents together will promote the

interests of justice and conserve judicial resources. Accordingly, Abbott should be

granted leave to supplement its Complaint to add a declaratory judgment claim regarding

the Wright 3286 patent. Further, Abbott requests that the supplemental complaint be

deemed filed *nunc pro tunc* as of the filing of Abbott's motion to supplement.


OF COUNSEL:
Edward A. Mas II
Leland G. Hansen
Sandra A. Frantzen
Christopher J. Buchko
McAndrews, Held & Malloy, Ltd.
500 West Madison Street, 34th Floor
Chicago, Illinois 60661
(312) 775-8000

Frederick L. Cottrell III (#2555)
cottrell@RLF.com
Anne Shea Gaza (#4093)
gaza@RLF.com
Richards, Layton & Finger
One Rodney Square
920 N. King Street
Wilmington, Delaware 19899
(302) 651-7700


Attorneys for Plaintiffs Abbott
Laboratories and Abbott Cardiovascular
Systems, Inc.

Date: May 29, 2007

5

## CERTIFICATE OF SERVICE

I hereby certify that on May 29, 2007 caused to be served by hand delivery the foregoing document and electronically filed the same with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following:

>Steven J. Balick, Esquire
>John G. Day, Esquire
>Lauren E. Maguire, Esquire
>Ashby & Geddes
>222 Delaware Avenue, 17th Floor
>P.O. Box 1150
>Wilmington, DE 19899

I hereby certify that on May 29, 2007, I caused to be sent by Federal Express the foregoing document to the following non-registered participant:

>David T. Pritikin, Esquire
>William H. Baumgartner, Jr., Esquire
>Russell E. Cass, Esquire
>Laura L. Kolb, Esquire
>Sidley Austin LLP
>One South Dearborn
>Chicago, IL 60603
>
>Cordis Corporation
>14201 NW 60th Avenue
>Miami Lakes, FL 33014
>
>Johnson and Johnson, Inc.
>1 Johnson & Johnson Plaza
>New Brunswick, NJ 08933

Anne Shea Gaza (#4093)
Gaza@rlf.com

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBOTT LABORATORIES and ABBOTT CARDIOVASCULAR SYSTEMS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C. A. No. 07-259-SLR |
| JOHNSON AND JOHNSON, INC. and CORDIS CORPORATION, | ) ) ) | |
| Defendants. | ) | |

## [PROPOSED] ORDER GRANTING PLAINTIFFS' MOTION FOR LEAVE TO FILE A SUPPLEMENTAL COMPLAINT

At Wilmington this _____ day of _____, 2007, having considered Plaintiffs' Motion For Leave To File A Supplemental Complaint ("Plaintiffs' Motion"),

IT IS HEREBY ORDERED that Plaintiffs' Motion is GRANTED. Within 10 days of entry of this Order, Plaintiffs may file an Amended and Supplemental Complaint substantially in the form as Exhibit 1 filed in support of Plaintiffs' Motion. The Amended and Supplemental Complaint is deemed filed as of the filing of Plaintiffs' Motion.

_____
Chief Judge

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ABBOTT LABORATORIES and ABBOTT CARDIOVASCULAR SYSTEMS, INC., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 07-259-SLR |
| v. | ) ) ) | |
| JOHNSON AND JOHNSON, INC. and CORDIS CORPORATION, | ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) | |

## SUPPLEMENTAL AND AMENDED COMPLAINT FOR DECLARATORY JUDGMENT OF PATENT INVALIDITY AND NONINFRINGEMENT

Plaintiffs Abbott Laboratories and Abbott Cardiovascular Systems, Inc. (collectively "Abbott") bring this Supplemental and Amended Complaint against Defendants Johnson and Johnson, Inc. and Cordis Corporation (collectively "J&J"). This is an action for declaratory judgment and injunctive relief that United States Patent No. 7,217,286 entitled "Local Delivery of Rapamycin for Treatment of Proliferative Sequelae Associated with PTCA Procedures, Including Delivery Using a Modified Stent" ("the Wright '7286 patent"), and United States Patent No. 7,223,286 entitled "Local Delivery of Rapamycin for Treatment of Proliferative Sequelae Associated with PTCA Procedures, Including Delivery Using a Modified Stent" ("the Wright '3286 patent") are invalid and not infringed by Abbott. The Wright '7286 patent is attached as Exhibit A. The Issue Notification for the Wright '3286 patent and the Wright '3286 patent are attached as Exhibit B. Abbott alleges as follows:

### THE PARTIES

1.     Abbott Laboratories is a corporation organized under the laws of the State of

Illinois and has a principal place of business at 100 Abbott Park Road, North Chicago, Illinois.

2.    Abbott    Cardiovascular    Systems,    Inc.    ("ACS"),    formerly    Advanced Cardiovascular Systems, Inc., is a corporation organized under the laws of the State of California and has a principal place of business at 3200 Lakeside Drive, Santa Clara, California. ACS is a subsidiary of Abbott Laboratories.

3.    On information and belief, Johnson and Johnson, Inc. is a corporation organized under the laws of the State of New Jersey and has a principal place of business at One Johnson and Johnson Plaza, New Brunswick, New Jersey.

4.    On information and belief, Cordis Corporation ("Cordis") is a corporation organized under the laws of the State of Florida and has a principal place of business in Miami Lakes, Florida. Cordis is a subsidiary of Johnson and Johnson, Inc.

### JURISDICTION AND VENUE

5.    This action arises under the Patent Laws of the United States (35 U.S.C. § 1 *et seq.*).

6.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202.

7.    This Court has personal jurisdiction, general and specific, over J&J.

8.    On information and belief, J&J has systematic and continuous contacts in this judicial district.

9.    On information and belief, J&J regularly avails itself of the benefits of this judicial district, including the jurisdiction of the courts.

10.    On information and belief, J&J regularly transacts business within this judicial district.

2

11.    On information and belief, J&J regularly sells products in this judicial district. J&J derives substantial revenues from sales in this district.

12.    Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c).

## BACKGROUND

13.    J&J, and in particular Cordis, directly competes with Abbott in the field of intravascular stents used to treat coronary artery disease.

14.    The coronary stent industry is highly litigious. J&J, and in particular Cordis, has a well-known history of suing competitors in this field for patent infringement.

15.    On three occasions within the last ten years, Cordis sued ACS in this district, alleging patent infringement involving angioplasty catheters or stents for treating coronary artery disease. (*Cordis Corporation, et al v. Advanced Cardiovascular Systems, Inc, et al*, C.A. No. 97-550-SLR; *Cordis Corporation, et al v Advanced Cardiovascular Systems, Inc., et al.*, C.A. No. 97-635-SLR; and *Cordis Corporation, et al. v Advanced Cardiovascular Systems, Inc., et al*, C.A. No. 98-065-SLR).

16.    On three additional occasions within the last ten years, Cordis initiated patent infringement actions in this judicial district involving angioplasty catheters or stents for treating coronary artery disease. (*Cordis Corp. v. Boston Scientific Corp*, C.A. No. 98-197-SLR; *Cordis Corp v Medtronic AVE, Inc*, C.A. No. 00-886-SLR; and *Cordis Corp. v. Boston Scientific Corp.*, C.A. No. 03-027-SLR).

17.    In early 2006, J&J and Boston Scientific Corporation ("BSC") each were bidding to acquire assets of Guidant Corporation ("Guidant"), which at the time was the parent corporation of ACS. In conjunction with BSC's bid, ACS would be acquired by Abbott Laboratories, which was the ultimate result.

18.    One of the key assets of ACS was the XIENCE V drug eluting stent system ("XIENCE V"), which elutes a proprietary drug known as everolimus. ACS holds an exclusive patent license to use everolimus for drug eluting stents. In clinical trials, everolimus has proven superior to other drugs.

19.    On information and belief, J&J believed in early 2006 that the XIENCE V would be launched within a few months.

**The Patents-in-Suit**

20.    United States Application No. 10/951,385 entitled "Local Delivery of Rapamycin for Treatment of Proliferative Sequelae Associated with PTCA Procedures, Including Delivery Using a Modified Stent" ("the Wright '385 application") was filed on September 28, 2004.

21.    The Wright '385 application is related to and claims priority to United States Patent Nos. 6,808,536 ("the Wright '536 patent") and 6,585,764 ("the Wright '764 patent").

22.    On information and belief, the subject matter claimed in the Wright '385 application is not patentably distinct from the subject matter claimed in at least the Wright '536 patent, the Wright '764 patent, and the Wright '7286 patent.

23.    On information and belief, the Wright '385 application issued on May 29, 2007 as United States Patent No. 7,223,286.

24.    United States Application No. 11/467,035 entitled "Local Delivery of Rapamycin for Treatment of Proliferative Sequelae Associated with PTCA Procedures, Including Delivery Using a Modified Stent" ("the Wright '035 application") was filed on August 24, 2006.

25.    The Wright '035 application is related to and claims priority to the Wright '536 patent, the Wright '764 patent, and the Wright '3286 patent.

4

26.    On information and belief, the subject matter claimed in the Wright '035 application is not patentably distinct from subject matter claimed in at least the Wright '764 patent, the Wright '536 patent, and the Wright '3286 patent.

27.    The Wright '035 application issued on May 15, 2007 as United States Patent No. 7,217,286.

**J&J's Public Threats To Sue For Patent Infringement By XIENCE V**

28.    On information and belief, J&J undertook a public campaign to cast a cloud over the launch of the XIENCE V.

29.    On information and belief, as a main thrust of this public campaign, J&J alleged that the XIENCE V would infringe patents allegedly owned by J&J and that J&J would sue Abbott for infringement by the XIENCE V following its launch.  On information and belief, J&J's allegations related to at least the Wright '764 patent, the Wright '536 patent, and United States Patent No. 6,776,796 ("the Falotico '796 patent").

30.    On information and belief, J&J broadcasted threatening statements to industry analysts regarding alleged infringement by the XIENCE V, for publication in furtherance of J&J's public campaign.

31.    For example, the Prudential Equity Group, LLC published a report on January 20, 2006, titled "JNJ: Takes Off The Gloves In Its Fight With Boston Scientific For Guidant," attached as Exhibit C ("the Prudential report").  In the Prudential report, parties are identified by their stock symbols: ABT for Abbott, GDT for Guidant, JNJ for J&J, and BSX for BSC.

32.    On information and belief, the Prudential report relied on information provided in pertinent part by J&J.

33.    Among other things, the Prudential report stated:

JNJ claims that 2 of its patents may be infringed if a company tries to launch a drug-eluting stent coated with a rapamycin derivative such as . . . GDT's everolimus. The potential for JNJ to prevent ABT and BSX from marketing the Xience-V DES, could give the GDT board pause for approving a BSX-GDT merger.

\* \* \*

If BSX acquires GDT, BSX would sell GDT's vascular intervention (VI) business, including shared rights to GDT's promising everolimus-coated stent, Xience-V, to ABT. Although JNJ's patents have never been litigated, JNJ believes it has a strong intellectual property (IP) position with regard to the use of rapamycin derivatives on a stent. JNJ could pursue a preliminary injunction if ABT and BSX try to launch an everolimus-coated . . . stent. . . . According to JNJ, the key patents are the Falotico (6,776,796) and Wright (6,585,764) patents.

34.    On information and belief, J&J anticipated and intended that Abbott and others would become aware of threatening statements made by J&J to Prudential analysts.

35.    On January 23, 2006, A.G. Edwards & Sons, Inc. published a report titled "Healthcare Industry Note: The Game May Be Far From Over," attached as Exhibit D ("the AG Edwards report").

36.    On information and belief, the AG Edwards report relied on information provided in pertinent part by J&J.

37.    Among other things, the AG Edwards report stated:

6

We have had conversations with Johnson & Johnson (JNJ) and Boston Scientific (BSX) and others recently that lead us to believe that the Guidant (GDT) game is far from over.

* * *

We were also reminded by JNJ that it had three patents related to '-limus' compounds that it thought precluded any other company from using such a compound on a stent. We were only given two patent numbers (6776796 [the Falotico '796 patent] and 6585764 [the Wright '764 patent]) . . . .

38.     On information and belief, the third patent referenced in J&J's threatening statements was the Wright '536 patent.

39.     On information and belief, J&J anticipated and intended that Abbott and others would become aware of threatening statements made by J&J to AG Edwards analysts.

40.     On January 13, 2006, Citigroup published a report titled "An INTERESTing New Offer," attached as Exhibit E ("the January 13, 2006 Citigroup report").

41.     On information and belief, the January 13, 2006 Citigroup report relied on information provided in pertinent part by J&J.

42.     Among other things, the January 13, 2006 Citigroup report stated:

The [Wright and Falotico] patents have never been challenged or enforced because no other company has launched a limus-based drug-eluting stent in the US, but are likely to eventually lead to litigation.

43.     Citigroup published an additional report on March 23, 2006 titled "Deconstructing Xience," attached as Exhibit F ("the March 23, 2006 Citigroup report"). In the March 23, 2006 Citigroup report, J&J is identified by its stock symbol JNJ.

7

44.    On information and belief, the March 23, 2006 Citigroup report relied on information provided in pertinent part by J&J.

45.    Among other things, the March 23, 2006 Citigroup report stated:

Everolimus will likely face two IP challenges from JNJ as both its Falotico and Wright patents claim the use of a limus analogue on a stent.

46.    On information and belief, J&J anticipated and intended that Abbott and others would become aware of threatening statements made by J&J to Citigroup analysts.

47.    On January 30, 2006, Lehman Brothers published a report titled "BSX: The Risks – Part I," attached as Exhibit G ("the Lehman Brothers report"). In the Lehman Brothers report, parties are identified by their stock symbols: ABT for Abbott; GDT for Guidant; and JNJ for J&J.

48.    On information and belief, the Lehman Brothers report relied on information provided in pertinent part by J&J.

49.    Among other things, the Lehman Brothers report stated:

There are even hypothetical litigations to contend with as JNJ has strongly suggested that they feel GDT and ABT may violate JNJ/Wyeth DES patents covering the "limus" family of drugs.

50.    On information and belief, J&J anticipated and intended that Abbott and others would become aware of threatening statements made by J&J to Lehman Brothers analysts.

51.    On March 14, 2006, Merrill Lynch published a report titled "More legal wrangling for J&J possible," attached as Exhibit H ("the Merrill Lynch report"). In the Merrill Lynch report, J&J is identified by its stock symbol JNJ.

8

52.    On information and belief, the Merrill Lynch report relied on information provided in pertinent part by J&J.

53.    Among other things, the Merrill Lynch report stated:

JNJ has two patents (Wright and Falotico) which appear to relate to the elution of characteristics of "olimus" compounds; JNJ's Cypher DES uses sirolimus, a member of the olimus family of drugs; other olimus drugs include Guidant's everolimus and Abbott/Medtronic's zotarolimus (ABT-578). The European launch of Guidant's Xience DES, which the company has targeted for Q2:06, could trigger possible legal activity since we understand U.S. patent law prohibits domestic manufacture of a product for sale outside the U.S. if there's been infringement of intellectual property.

54.    On information and belief, J&J anticipated and intended that Abbott and others would become aware of threatening statements made by J&J to Merrill Lynch analysts.

55.    On information and belief, J&J broadcast threatening statements to other news outlets regarding alleged infringement by the XIENCE V, for publication in furtherance of J&J's public campaign.

56.    On January 23, 2006, the International Herald Tribune published an article headlined "J&J works to discredit rival offer for Guidant," attached as Exhibit I ("the International Herald article").

57.    On information and belief, the International Herald article relied on information provided in pertinent part by J&J.

58.    Among other things, the International Herald article stated:

9

"J&J is communicating to the Street that Boston Scientific's $80-a-share offer for Guidant is fraught with uncertainty," Lawrence Biegelsen, an analyst with Prudential in New York, said in a note to clients sent on Friday.

* * *

Johnson & Johnson's campaign consists of telling analysts and shareholders that Boston Scientific is in over its head and is tempting patent litigation that may undercut Boston Scientific's plans.

"They're trying to tell all of us that there are patents out there that they have that they feel can stop Boston Scientific," said Jan David Wald, an analyst with A.G. Edwards.   Wald said he had been called by a Johnson & Johnson employee, whom he declined to name.

Johnson & Johnson told analysts it was considering filing patent infringement lawsuits over stent drug coatings to keep Boston Scientific and its bidding partner, Abbott Laboratories, from profiting from the new Guidant devices, according to Biegelsen of Prudential.

* * *

Boston Scientific and J&J have been fighting in court for years over patent-infringement cases related to stent design.  At the moment, the two companies are alone in the U.S. stent market, with Boston Scientific holding a 55 percent share.

* * *

The potential for Johnson & Johnson to prevent Abbott and Boston Scientific from marketing Guidant's next-generation heart stent "could give the Guidant board pause for approving a Boston Scientific-Guidant merger," Biegelsen said.

10

"J&J claims that two of its patents may be infringed if a company tries to launch a drug-eluting stent coated with" . . . Guidant's everolimus, he wrote.

59.     On January 20, 2006, the Boston Globe published an article headlined "Suitors take Guidant fight to The Street," attached as Exhibit J ("the Boston Globe article").

60.     On information and belief, the Boston Globe article relied on information provided in pertinent part by J&J.

61.     Among other things, the Boston Globe article stated:

[J&J] has also raised the prospect that it could use patents and existing ties to Guidant to derail or complicate Boston Scientific's offer, said Matthew Dodds, an analyst for Citigroup who is skeptical about Guidant's value to both companies.

62.     Also on January 20, 2006, Crain's Chicago Business published an article headlined "Abbott stock falls on concerns over success of Guidant bid," attached as Exhibit K ("the Crain's article").

63.     On information and belief, the Crain's article relied on information provided in pertinent part by J&J.

64.     Among other things, the Crain's article stated:

The analyst, Prudential Equity Group, LLC's Larry Biegelsen, reported that Guidant's board could balk at Boston Scientific and Abbott's joint bid because Johnson & Johnson, a competing bidder for Guidant, claims its patents would be violated if Abbott markets its own drug-eluting stents or those made by Guidant.

65.     On January 21, 2006, Reuters published an article headlined "Abbott, Boston shares off on J&J patent threat," attached as Exhibit L ("the Reuters article").

66.     On information and belief, the Reuters article relied on information provided in pertinent part by J&J.

67.     Among other things, the Reuters article stated:

One analyst, who asked not to be named, said J&J management was making rounds on Wall Street trying to fan fears about the Boston Scientific bid.

The analyst said J&J was arguing that Boston Scientific's bid was breaking its bank, that its assumptions on Guidant's cardiac rhythm management were too aggressive and that there was intellectual property infringement that would limit potential of important products.

68.     On January 24, 2006, Medical Device Daily published an article headlined "J&J offer rumors persist as Guidant has more ICD issues," attached as Exhibit M ("the Medical Device Daily article").

69.     On information and belief, the Medical Device Daily article relied on information provided in pertinent part by J&J.

70.     Among other things, the Medical Device Daily article stated:

Fueling this speculation were rumors, some of which apparently were planted by J&J personnel as part of an organized campaign to undermine the Boston Scientific offer in the minds of analysts, that two of its patents may be infringed if an unnamed company tries to launch a drug-eluting stent coated with a derivative of rapamycin.

71.     On January 26, 2006, The Wall Street Journal published an article headlined "Boston Scientific Faces Pivotal Test After Victory in Fight for Guidant," attached as Exhibit N ("the Wall Street Journal article").

12

72.    On information and belief, the Wall Street Journal article relied on information provided in pertinent part by J&J.

73.    Among other things, the Wall Street Journal article stated that:

Another potential wrinkle arises in the intellectual-property rights surrounding stents - - an area that's been the subject of extensive litigation in the industry.  Citigroup analyst Matthew Dodds says J&J holds patents on methods of using "limus-type drugs on stents - - including the everolimus on Guidant's stent, as well as a drug on an Abbott stent.

74.    On information and belief, J&J anticipated and intended that Abbott and others would become aware of threatening statements made by J&J to analysts and others.

75.    On information and belief, J&J made additional threatening statements to industry analysts, asserting that J&J could prevent Abbott from making or selling the XIENCE V by suing for infringement of patents in the Wright and/or Falotico families. On information and belief, J&J anticipated and intended that Abbott and others would become aware of these threatening statements.

76.    Abbott and others did become aware of J&J's threatening statements.

77.    For example, on January 20, 2006, Avram Goldstein of Bloomberg contacted Abbott regarding the Wright and Falotico patents in relation to the XIENCE V.

78.    On January 13, 2006, Bruce Nudell of Sanford C. Bernstein contacted Guidant regarding the Wright and Falotico patents in relation to the XIENCE V.

79.    Also on January 13, 2006, The Shaw Group contacted Guidant regarding the Wright and Falotico patents in relation to the XIENCE V.

80.    On January 20, 2006, Avram Goldstein of Bloomberg contacted Guidant regarding the Wright and Falotico patents in relation to the XIENCE V.

13

81.    Again on January 20, 2006, Barnaby Feder of the New York Times contacted Guidant regarding the Wright and Falotico patents in relation to the XIENCE V.

82.    On January 31, 2006, Steve Silva of Joele Frank contacted Guidant regarding the Wright and Falotico patents in relation to the XIENCE V.

83.    On March 23, 2006, Jennifer B. Pearlman of Burgundy Asset Management contacted Guidant regarding the Wright and Falotico patents in relation to the XIENCE V.

84.    On information and belief, in furtherance of its campaign to cast a cloud over the launch of the XIENCE V, J&J made threatening statements to Guidant.

85.    On January 12, 2006, J&J contacted Guidant and informed Guidant that if Boston Scientific acquired Guidant, Abbott and Boston Scientific would have problems with the Wright and Falotico patent families.

86.    On January 13, 2006, J&J again contacted Guidant. J&J sent Guidant a document asserting that J&J's intellectual property portfolio included patents directed to everolimus when used on a stent, Abbott would not receive access to these patents in the event that Boston Scientific were to acquire Guidant, and any drug eluting stent using everolimus, including the XIENCE V, may infringe these patents.

87.    On information and belief, J&J intended to create a substantial controversy between J&J and Abbott regarding alleged infringement of patents in the Wright and/or Falotico families by the XIENCE V.

88.    On information and belief, J&J intended to create the apprehension in Abbott and others that J&J would sue Abbott, asserting that the XIENCE V allegedly infringes patents in the Wright and/or Falotico families.

89.    In March 2006, Guidant publicly announced that the XIENCE V launch would be delayed due to an issue related to manufacturing.

90.    The XIENCE V was subsequently launched in Europe.  On information and belief, J&J is aware that the XIENCE V has launched and is preparing to sue Abbott for infringement by the XIENCE V of patents in the Wright and/or Falotico families.

91.    On information and belief, J&J has never withdrawn or retracted any of its threatening statements that, following the launch of the XIENCE V, J&J would sue Abbott for infringement of the patents in the Wright and/or Falotico families.

92.    On information and belief, by these statements J&J intended to create a substantial controversy between J&J and Abbott regarding alleged infringement of patents in the Wright and/or Falotico families by the XIENCE V.

93.    On information and belief, by these statements J&J intended to create the apprehension in Abbott and others that J&J would sue Abbott, following the launch of the XIENCE V, asserting that the XIENCE V allegedly infringes patents in the Wright and/or Falotico families.

**J&J's Assertions In The Patent Office Of Infringement By XIENCE V**

94.    On August 7, 2006, J&J filed a "Petition to Make Special Because of Actual Infringement" ("the First Petition") with the United States Patent and Trademark Office in the matter of the Wright '385 application.  On information and belief, on May 29, 2007 the Wright '385 application issued as the Wright '3286 patent.  A copy of the First Petition is attached as Exhibit O.

15

95.    In the First Petition, J&J asserted that it could sue Abbott for infringement by the XIENCE V immediately upon issuance of the Wright '385 application as a patent. Among other things, counsel for J&J asserted:

Guidant's vascular business has recently been acquired by Abbott Laboratories (Exhibit 3). Abbott has announced that it intends to launch XIENCE™ V in Europe in the third quarter of 2006 (Exhibit 4).

* * *

I have made a rigid comparison of the XIENCE™ V product, as described in Guidant press releases, with the claims of the instant application. In my opinion, the XIENCE™ V product is unquestionably within the scope of at least claims 103 and 130 on file in this application.

* * *

It is therefore my opinion that Guidant is making a product in the United States to support the European launch that is unquestionably within the scope of at least claims 103 and 130 of the instant application, and that a patent containing these claims could immediately be asserted upon issue.

96.    On information and belief, J&J intended to create a substantial controversy between J&J and Abbott regarding the XIENCE V's alleged infringement of the Wright '3286 patent.

97.    On information and belief, J&J intended to create the apprehension in Abbott and others that J&J would sue Abbott asserting that the XIENCE V allegedly infringes the Wright '3286 patent.

16

98.    On information and belief, J&J is preparing to sue Abbott for infringement by the XIENCE V of the Wright '3286 patent.

99.    On August 24, 2006, J&J filed a "Petition to Make Special Because of Actual Infringement" ("the Second Petition") with the United States Patent and Trademark Office in the matter of the Wright '035 application. On May 15, 2007, the Wright '035 application issued as the Wright '7286 patent. A copy of the Petition is attached as Exhibit P.

100.    In the Second Petition, J&J asserted that it could sue Abbott for infringement by the XIENCE V immediately upon issuance of the Wright '035 application as a patent. Among other things, counsel for J&J asserted:

> Guidant's vascular business has recently been acquired by Abbott Laboratories (Exhibit 3). Abbott has announced that it intends to launch XIENCE™ V in Europe in the third quarter of 2006 (Exhibit 4).
>
> * * *
>
> I have made a rigid comparison of the XIENCE™ V product, as described in Guidant press releases, with the claims of the instant application. In my opinion, the XIENCE™ V product is unquestionably within the scope of claims 1 to 5 on file in this application.
>
> * * *
>
> It is therefore my opinion that Guidant is making a product in the United States to support the European launch that is unquestionably within the scope of claims 1 to 5 of the instant application, and that a patent containing these claims could immediately be asserted upon issue.

17

101.   On information and belief, J&J intended to create a substantial controversy between J&J and Abbott regarding the XIENCE V's alleged infringement of the Wright '7286 patent.

102.   On information and belief, J&J intended to create the apprehension in Abbott and others that J&J would sue Abbott asserting that the XIENCE V allegedly infringes the Wright '7286 patent.

103.   On information and belief, J&J is preparing to sue Abbott for infringement by the XIENCE V of the Wright '7286 patent.

### J&J Has Recently Sued Abbott In An Attempt To Interfere With The XIENCE V Launch

104.   On September 25, 2006, J&J filed a complaint in the District Court for the Southern District of New York.  Among other things, J&J alleges that Abbott Laboratories tortiously interfered with J&J's intended acquisition of Guidant.  The complaint seeks no less than $5.5 billion in damages.  A copy of the complaint is attached as Exhibit Q.

105.   Although the events cited in the complaint occurred over eight months ago, J&J timed the lawsuit, on information and belief, in anticipation of the then imminent launch of the XIENCE V.  Both the timing of the lawsuit and the amount of the damages claimed manifest J&J's intent to cast a cloud over Abbott and interfere with the then imminent launch of the XIENCE V.

### The XIENCE V Launch

106.   Abbott has manufactured and continues to manufacture, at its facilities in the United States, thousands of the XIENCE V.

107.   J&J created a substantial controversy between J&J and Abbott regarding the alleged infringement of the Wright '7286 patent and the Wright '3286 patent by the XIENCE V.

108.    Abbott has a reasonable apprehension that J&J intends to sue Abbott for infringement of the Wright '7286 patent and the Wright '3286 patent by the XIENCE V.

## CLAIM I

### INVALIDITY AND NONINFRINGEMENT OF U.S. PATENT NO. 7,217,286

109.    Abbott realleges and incorporates by reference the allegations set forth in paragraphs 1-108.

110.    The Wright '7286 patent issued on May 15, 2007.

111.    J&J's actions have created a substantial controversy between J&J and Abbott regarding alleged infringement of the Wright '7286 patent by the XIENCE V.

112.    J&J has asserted rights under the Wright '7286 patent against the XIENCE V.

113.    J&J's actions have placed Abbott in reasonable apprehension that it will be sued for alleged infringement of the Wright '7286 patent by the XIENCE V.

114.    On information and belief, the claims of the Wright '7286 patent are invalid for failure to meet the requirements for patentability, including the requirements of 35 U.S.C. §§ 102, 103, and 112.

115.    The XIENCE V does not infringe any valid claim of the Wright '7286 patent.

116.    An actual and justiciable controversy exists between Abbott and J&J regarding invalidity and noninfringement of the Wright '7286 patent.

## CLAIM II

### INVALIDITY AND NONINFRINGEMENT OF U.S. PATENT NO. 7,223,286

117.    Abbott realleges and incorporates by reference the allegations set forth in paragraphs 1-116.

118    On information and belief, the Wright '3286 patent issued on May 29, 2007.

19

119.    J&J's actions have created a substantial controversy between J&J and Abbott regarding alleged infringement of the Wright '3286 patent by the XIENCE V.

120.    J&J has asserted rights under the Wright '3286 patent against the XIENCE V.

121.    J&J's actions have placed Abbott in reasonable apprehension that it will be sued for alleged infringement of the Wright '3286 patent by the XIENCE V.

122.    On information and belief, the claims of the Wright '3286 patent are invalid for failure to meet the requirements for patentability, including the requirements of 35 U.S.C. §§ 102, 103 and 112.

123.    The XIENCE V does not infringe any valid claim of the Wright '3286 patent.

124.    An actual and justiciable controversy exists between Abbott and J&J regarding invalidity and noninfringement of the Wright '3286 patent.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request entry of judgment in their favor that:

(a)    each and every claim of U.S. Patent No. 7,217,286 is invalid;

(b)    each and every claim of U.S. Patent No. 7,223,286 is invalid;

(c)    Plaintiffs are not liable for any infringement, for any contributory infringement, or for inducing the infringement of U.S. Patent No. 7,217,286;

(d)    Plaintiffs are not liable for any infringement, for any contributory infringement, or for inducing the infringement of U.S. Patent No. 7,223,286;

(e)    Defendants and their officers, agents, employees, representatives, counsel and all persons in active concert or participation with any of them, directly or indirectly, be enjoined from threatening or charging infringement of, or instituting any action for infringement of U.S.

Patent Nos. 7,217,286 and 7,223,286 against Plaintiffs, their suppliers, customers, distributors or

users of their products;

      (f)     Defendants pay to Plaintiffs the costs and reasonable attorneys fees incurred by

Plaintiffs in this action; and

      (g)     Plaintiffs be granted such other and further relief as this Court deems just and

proper.

## JURY TRIAL DEMANDED

      Plaintiffs demand a trial by jury on all issues so triable.


OF COUNSEL:                    Frederick L. Cottrell III (#2555)
Edward A. Mas II               cottrell@RLF.com
Leland G. Hansen              Anne Shea Gaza (#4093)
Sandra A. Frantzen             gaza@RLF.com
Christopher J. Buchko          RICHARDS, LAYTON & FINGER
MCANDREWS, HELD & MALLOY, LTD.    One Rodney Square
500 West Madison Street, 34th Floor     920 N. King Street
Chicago, Illinois 60661         Wilmington, Delaware 19899
(312) 775-8000                (302) 651-7700


                        ATTORNEYS FOR PLAINTIFFS ABBOTT
                        LABORATORIES and ABBOTT
                        CARDIOVASCULAR SYSTEMS, INC.


Date: May 29, 2007

21

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

BOSTON SCIENTIFIC CORPORATION
and BOSTON SCIENTIFIC SCIMED, INC.

**DEFENDANTS**

JOHNSON & JOHNSON, INC. and
CORDIS CORPORATION,

(b)  County Of Residence Of First Listed Plaintiff:  New Castle
(Except In U.S. Plaintiff Cases)

County Of Residence Of First Listed Defendant:
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

(c)  Attorneys (Firm Name, Address, And Telephone Number)

John W. Shaw, Esquire
Karen E. Keller, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

Attorneys (If Known)

## II. BASIS OF JURISDICTION    (PLACE AN X IN ONE BOX ONLY)

☐ 1 U.S. Government
    Plaintiff

☒ 3 Federal Question
    (U.S. Government Not a Party)

☐ 2 U.S. Government
    Defendant

☐ 4 Diversity
    (Indicate Citizenship of
    Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place An X In One Box For Plaintiff And
(For Diversity Cases Only)    One Box For Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in This State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## V. NATURE OF SUIT    (Place An X In One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 151 Medicare Act<br>☐ 152 Recovery of Defaulted (Excl. Veterans)<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholders' Suits<br>☐ 190 Other Contract<br>☐ 195 Contract Product Liability | **PERSONAL INJURY**<br>☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury | **PERSONAL INJURY**<br>☐ 362 Personal Injury - Med Malpractice<br>☐ 365 Personal Injury - Product Liability<br>☐ 368 Asbestos Personal Injury Product Liability<br>**PERSONAL PROPERTY**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | ☐ 610 Agriculture<br>☐ 620 Other Food & Drug<br>☐ 625 Drug Related Seizure of Property 21 U.S.C. 881<br>☐ 630 Liquor Laws<br>☐ 640 R.R. & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other | ☐ 422 Appeal 28 U.S.C. 158<br>☐ 423 Withdrawal 28 U.S.C. 157<br>**PROPERTY RIGHTS**<br>☐ 820 Copyrights<br>☒ 830 Patent<br>☐ 840 Trademark | ☐ 400 State Reapportionment<br>☐ 410 Antitrust<br>☐ 430 Banks and Banking<br>☐ 450 Commerce/ICC Rates,<br>☐ 460 Deportation<br>☐ 470 Racketeer Influenced and Corrupt Organizations<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 U.S.C. 3410<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 895 Freedom of Information Act<br>☐ 900 Appeal of Fee Determination Under Equal Access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions |
| **REAL PROPERTY**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☐ 290 All Other Real Property | **CIVIL RIGHTS**<br>☐ 441 Voting<br>☐ 442 Employment<br>☐ 443 Housing/ Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights | **PRISONER PETITIONS**<br>☐ 510 Motions to Vacate Sentence<br>**Habeas Corpus:**<br>☐ 530 General<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition | **LABOR**<br>☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Railway Labor Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl Ret Inc Security Act | **SOCIAL SECURITY**<br>☐ 861 HIA (1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g))<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g))<br>**FEDERAL TAX SUITS**<br>☐ 870 Taxes (U.S. Plaintiff or Defendant)<br>☐ 871 IRS - Third Party 26 U.S.C. 7609 | |

## IV. ORIGIN    (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original Proceeding  ☐ 2 Removed from Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify)  ☐ 6 Multidistrict Litigation  ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)
35 U.S.C. § 1 et seq.

Brief description of cause:
Declaratory judgment action for patent non-infringement

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23    ☐ YES ☒ NO

DEMAND $

Check YES only if demanded in complaint
JURY DEMAND: ☒ YES ☐ NO

## VIII. RELATED CASE(S) IF ANY (See instructions)

JUDGE: Chief Judge Sue L. Robinson

DOCKET NUMBER: 07-259-SLR, 06-613-SLR, 07-333-SLR

DATE  6/1/07

SIGNATURE OF ATTORNEY OF RECORD

## FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

**INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-44**

Authority For Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I.      (a)      **Plaintiffs - Defendants**. Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

        (b)      **County of Residence**. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved).

        (c)      **Attorneys**. Enter firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

II.     **Jurisdiction**. The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction is based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

III.    **Residence (citizenship) of Principal Parties**. This section of the JS-44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV.     **Cause of Action**. Report the civil statute directly related to the cause of action and give a brief description of the cause.

V.      **Nature of Suit**. Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section IV above, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

VI.     **Origin**. Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C. Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate's decision.

VII.    **Requested in Complaint**. Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII.   **Related Cases**. This section of the JS-44 is used to reference relating pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature**. Date and sign the civil cover sheet.

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. ___0 7 - 3 4 8___

# ACKNOWLEDGMENT
# OF RECEIPT FOR AO FORM 85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF ___2___ COPIES OF AO FORM 85.

___JUN 0 1 2007___
(Date forms issued)

_____
(Signature of Party or their Representative)

Sean Casey (Parcels)
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action